# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

|  |  |
|---|---|
| GROCERY MANUFACTURERS ASSOCIATION, SNACK FOOD ASSOCIATION, INTERNATIONAL DAIRY FOODS ASSOCIATION, and NATIONAL ASSOCIATION OF MANUFACTURERS, <br><br> *Plaintiffs-Appellants*, <br><br> v. <br><br> WILLIAM H. SORRELL, in his official capacity as the Attorney General of Vermont; PETER SHUMLIN, in his official capacity as Governor of Vermont; JAMES B. REARDON, in his official capacity as Commissioner of the Vermont Department of Finance and Management; and HARRY L. CHEN, in his official capacity as the Commissioner of the Vermont Department of Health, <br><br> *Defendants-Appellees*. | No. 15-1504 <br><br> Addendum A to Civil Appeal Pre-Argument Statement (Form C) |

## NATURE OF THE ACTION

In May 2014, the State of Vermont enacted Act 120, a first-of-its-kind law that both compels and restricts food manufacturers' speech in the advertising and labeling of what the State calls "genetically engineered foods" (GE foods). Act 120 requires manufacturers of certain foods to disclose if their products are "entirely or partially produced with genetic engineering" on food labels. The law

also prohibits manufacturers from labeling or advertising GE foods as "natural,"
"naturally made," "naturally grown," "all natural," or using "any words of similar
import that would have a tendency to mislead a consumer."

The plaintiff-appellant industry groups filed a federal lawsuit challenging
Act 120 in June 2014. They alleged that Act 120 compelled speech (by requiring
labels) *and* restricted speech (by prohibiting the word "natural" and similar terms)
without adequate justification, in violation of the First Amendment. Plaintiffs also
contended that multiple federal statutes preempted Vermont's attempt to require
labeling of products, and that the Commerce Clause similarly prohibited Vermont
from imposing its unique requirements on products that are nationally
manufactured, advertised, marketed, and sold. Plaintiffs sought injunctive and
declaratory relief.

After negotiations over a stay of the Act's effective date failed, Plaintiffs in
September 2014 moved for a preliminary injunction on certain of their claims. As
they explained, in addition to the irreparable harm that attends a First Amendment
violation, Act 120's July 2016 effective date will force (indeed, is already forcing)
the Plaintiffs' members to engage in massive structural changes to their labeling
and distribution processes, necessitating early relief in the form of staying the
Act's effective date pending completion of the litigation.

Defendants moved to dismiss Plaintiffs' claims and filed an opposition to

Plaintiffs' motion for a preliminary injunction.

## DECISION BELOW

Following a hearing on the motions in January 2015, the District Court on

April 27, 2015 issued its Opinion and Order granting Defendants' motion to

dismiss in part and denying Plaintiffs' motion for a preliminary injunction.  The

court dismissed Plaintiffs' claims that Act 120's compelled GE labeling

requirement was subject to (and failed) strict scrutiny, that Act 120 was preempted

by the Federal Food, Drug, and Cosmetic Act and the Nutrition Labeling and

Education Act, and that Act 120 facially discriminates or substantially burdens

interstate commerce in violation of the Dormant Commerce Clause.

The District Court declined to dismiss Plaintiffs' remaining claims.  Indeed,

the court concluded that Plaintiffs were substantially likely to succeed on the

merits of their First Amendment challenge to Act 120's prohibition on "natural," as

well as their claims that the prohibition was void for vagueness and that Act 120

was preempted by the FMIA and the PPIA.  The court nevertheless denied

Plaintiffs' preliminary-injunction motion, concluding that Plaintiffs had not shown

sufficient irreparable harm if Act 120 went forward.

## EXHIBITS

Included with this addendum are copies of: (i) the Appellant's Notice of Appeal (Exhibit A); (ii) the District Court docket sheet (Exhibit B); and (iii) the District Court's April 27, 2015 Opinion and Order Granting in Part and Denying in Part Defendants' Motion to Dismiss and Denying Plaintiffs' Motion for a Preliminary Injunction (Exhibit C).

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| GROCERY MANUFACTURERS ASSOCIATION, SNACK FOOD ASSOCIATION, INTERNATIONAL DAIRY FOODS ASSOCIATION, and NATIONAL ASSOCIATION OF MANUFACTURERS,<br><br>               Plaintiffs,<br><br>      v.<br><br>WILLIAM H. SORRELL, in his official capacity as the Attorney General of Vermont; PETER SHUMLIN, in his official capacity as Governor of Vermont; TRACY DOLAN, in her official capacity as Interim Commissioner of the Vermont Department of Health; and JAMES B. REARDON, in his official capacity as Commissioner of the Vermont Department of Finance and Management,<br><br>               Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>    Case No. 5:14-cv-117-cr |

## NOTICE OF APPEAL

Notice is hereby given that Plaintiffs Grocery Manufacturers Association,

Snack Food Association, International Dairy Foods Association, and National

Association of Manufacturers, by their attorneys, hereby appeal to the United

States Court of Appeals for the Second Circuit from an Order denying Plaintiffs'

motion for a preliminary injunction entered in this action on April 27, 2015.   The

Order is attached to this Notice as Exhibit A.

Date:   May 6, 2015                          Respectfully submitted,

                                             __/s/ Catherine E. Stetson_____
Matthew B. Byrne                             Catherine E. Stetson (*pro hac vice*)
GRAVEL & SHEA, P.C.                           Mary Helen Wimberly (*pro hac vice*)
76 St. Paul Street                           HOGAN LOVELLS US LLP
Post Office Box 369                          555 Thirteenth Street NW
Burlington, VT 05401                         Washington, DC 20004
802-658-0220                                 202-637-5600
mbyrne@gravelshea.com                        cate.stetson@hoganlovells.com

                                             *Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Catherine E. Stetson, counsel for Plaintiffs, hereby certify that on May 6, 2015, I caused the foregoing Document to be electronically filed through this Court's CM/ECF system, which will send notification of such filing to all registered participants.

   /s/ Catherine E. Stetson      
Catherine E. Stetson

# Exhibit B

APPEAL

# U.S. District Court
## District of Vermont (Rutland)
## CIVIL DOCKET FOR CASE #: 5:14–cv–00117–cr

Grocery Manufacturers Association et al v. Sorrell et al
Assigned to: Chief Judge Christina Reiss
Cause: 28:2201 Constitutionality of State Statute(s)

Date Filed: 06/12/2014
Jury Demand: None
Nature of Suit: 950 Constitutional – State Statute
Jurisdiction: Federal Question

**Plaintiff**

| | | |
|---|---|---|
| **Grocery Manufacturers Association** | represented by | **Catherine E. Stetson , Esq.** |

Hogan Lovells US LLP
555 Thirteenth Street, N.W.
Washington, DC 20004
(202) 637–5600
Fax: (202) 637–5910
Email: cate.stetson@hoganlovells.com
*ATTORNEY TO BE NOTICED*

**E. Desmond Hogan , Esq.**
Hogan Lovells US LLP
555 Thirteenth Street, N.W.
Washington, DC 20004
(202) 637–5600
Fax: (202) 637–5910
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Judith E. Coleman , Esq.**
Hogan Lovells US LLP
555 Thirteenth Street, N.W.
Washington, DC 20004
(202) 637–5600
Fax: (202) 637–5910
Email: judith.coleman@hoganlovells.com
*TERMINATED: 11/13/2014*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mary H. Wimberly , Esq.**
Hogan Lovells US LLP
555 Thirteenth Street, N.W.
Washington, DC 20004
(202) 637–5600
Fax: (202) 637–5910
Email: maryhelen.wimberly@hoganlovells.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew B. Byrne**
Gravel &Shea PC
76 St. Paul Street, 7th Floor
P.O. Box 369
Burlington, VT 05402–0369
(802) 658–0220
Email: mbyrne@gravelshea.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **Snack Food Association** | represented by | **Catherine E. Stetson , Esq.** |
| | | (See above for address) |

*ATTORNEY TO BE NOTICED*

**E. Desmond Hogan , Esq.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Judith E. Coleman , Esq.**
(See above for address)
*TERMINATED: 11/13/2014*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mary H. Wimberly , Esq.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew B. Byrne**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **International Dairy Foods Association (IDFA)** | represented by | **Catherine E. Stetson , Esq.**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**E. Desmond Hogan , Esq.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Judith E. Coleman , Esq.**
(See above for address)
*TERMINATED: 11/13/2014*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mary H. Wimberly , Esq.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew B. Byrne**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **National Association of Manufacturers** | represented by | **Catherine E. Stetson , Esq.**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**E. Desmond Hogan , Esq.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Judith E. Coleman , Esq.**
(See above for address)
*TERMINATED: 11/13/2014*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mary H. Wimberly , Esq.**

(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew B. Byrne**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**William H. Sorrell**                              represented by   **Alan D. Strasser , Esq.**
*in his official capacity as the Attorney*                            Robbins, Russell, Englert, Orseck,
*General of Vermont*                                                  Untereiner &Sauber LLP
                                                                     1801 K Street N.W., Suite 411 L
                                                                     Washington, DC 20006
                                                                     (202) 775–4500
                                                                     Fax: (202) 775–4510
                                                                     Email: astrasser@robbinsrussell.com
                                                                     *PRO HAC VICE*
                                                                     *ATTORNEY TO BE NOTICED*

                                                                     **Daniel N. Lerman , Esq.**
                                                                     Robbins, Russell, Englert, Orseck,
                                                                     Untereiner &Sauber LLP
                                                                     1801 K Street N.W., Suite 411 L
                                                                     Washington, DC 20006
                                                                     (202) 775–4500
                                                                     Fax: (202) 775–4510
                                                                     Email: dlerman@robbinsrussell.com
                                                                     *PRO HAC VICE*
                                                                     *ATTORNEY TO BE NOTICED*

                                                                     **Jon T. Alexander , Esq.**
                                                                     Office of the Attorney General
                                                                     109 State Street
                                                                     Montpelier, VT 05609–1001
                                                                     (802) 828–1299
                                                                     Email: jon.alexander@state.vt.us
                                                                     *ATTORNEY TO BE NOTICED*

                                                                     **Kate T. Gallagher**
                                                                     Office of the Attorney General
                                                                     109 State Street
                                                                     Montpelier, VT 05609–1001
                                                                     802–828–1300
                                                                     Email: kate.gallagher@state.vt.us
                                                                     *ATTORNEY TO BE NOTICED*

                                                                     **Kyle H. Landis–Marinello , Esq.**
                                                                     Vermont Office of the Attorney General
                                                                     109 State Street
                                                                     Montpelier, VT 05609–1001
                                                                     (808) 828–1361
                                                                     Email: Kyle.landis–marinello@state.vt.us
                                                                     *ATTORNEY TO BE NOTICED*

                                                                     **Lawrence S. Robbins , Esq.**
                                                                     Robbins, Russell, Englert, Orseck,
                                                                     Untereiner &Sauber LLP
                                                                     1801 K Street N.W., Suite 411 L
                                                                     Washington, DC 20006
                                                                     (202) 775–4500
                                                                     Fax: (202) 775–4510

Email: lrobbins@robbinsrussell.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lee Turner Friedman , Esq.**
Robbins, Russell, Englert, Orseck,
Untereiner &Sauber LLP
1801 K Street N.W., Suite 411 L
Washington, DC 20006
(202) 775–4500
Fax: (202) 775–4510
Email: lfriedman@robbinsrussell.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Megan J. Shafritz , Esq.**
Vermont Office of the Attorney General
109 State Street
Montpelier, VT 05609–1001
(802) 828–5527
Fax: (802) 828–1500
Email: megan.shafritz@state.vt.us
*ATTORNEY TO BE NOTICED*

**Naomi Sheffield**
Vermont Office of the Attorney General
109 State Street
Montpelier, VT 05609
(802) 828–6906
Fax: (802) 828–2154
Email: naomi.sheffield@state.vt.us
*ATTORNEY TO BE NOTICED*

**Defendant**

**Peter E. Shumlin**
*in his official capacity as Governor of
Vermont*

represented by **Alan D. Strasser , Esq.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel N. Lerman , Esq.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jon T. Alexander , Esq.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kate T. Gallagher**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kyle H. Landis–Marinello , Esq.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lawrence S. Robbins , Esq.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lee Turner Friedman , Esq.**
(See above for address)
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Megan J. Shafritz , Esq.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Naomi Sheffield**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**James B. Reardon**
*in his official capacity as Commissioner of the Vermont Department of Finance and Management*

represented by **Alan D. Strasser , Esq.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel N. Lerman , Esq.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jon T. Alexander , Esq.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kate T. Gallagher**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kyle H. Landis−Marinello , Esq.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lawrence S. Robbins , Esq.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lee Turner Friedman , Esq.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Megan J. Shafritz , Esq.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Naomi Sheffield**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Tracy Dolan**
*in her official capacity as the Interim Commissioner of the Vermont Department of Health*

represented by **Alan D. Strasser , Esq.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel N. Lerman , Esq.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jon T. Alexander , Esq.**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Kate T. Gallagher**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kyle H. Landis–Marinello , Esq.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lawrence S. Robbins , Esq.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lee Turner Friedman , Esq.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Megan J. Shafritz , Esq.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Naomi Sheffield**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**Center for Food Safety**
*TERMINATED: 10/07/2014*

represented by **Aurora L. Paulsen , Esq.**
Center for Food Safety
917 S W Oak Street, Suite 300
Portland, OR 97205
(971) 271–7372
Fax: (971) 271–7374
Email: apaulsen@centerforfoodsafety.org
*TERMINATED: 10/07/2014*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**George A. Kimbrell , Esq.**
Center for Food Safety
917 S W Oak Street, Suite 300
Portland, OR 97205
(971) 271–7372
Fax: (971) 271–7374
Email: gkimbrell@centerforfoodsafety.org
*TERMINATED: 10/07/2014*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Laura K.B. Murphy , Esq.**
Environmental and Natural Resources Law
Clinic
Vermont Law School
164 Chelsea Street
P.O. Box 96
South Royalton, VT 05068–0096
(802) 831–1123
Fax: (802) 831–1631
Email: lmurphy@vermontlaw.edu
*TERMINATED: 10/07/2014*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/12/2014 | 1 | COMPLAINT against Harry L. Chen, James B. Reardon, Peter E. Shumlin, William H. Sorrell filed by Snack Food Association, National Association of Manufacturers, Grocery Manufacturers Association, International Dairy Foods Association (IDFA). Summonses issued. (Attachments: # 1 Civil Cover Sheet)(law) (Entered: 06/12/2014) |
| 06/12/2014 | 2 | MOTION for Appearance Pro Hac Vice of Catherine E. Stetson, E. Desmond Hogan, and Judith E. Coleman filed by Grocery Manufacturers Association, International Dairy Foods Association (IDFA), National Association of Manufacturers, Snack Food Association. (Attachments: # 1 Affidavit of Catherine E. Stetson, # 2 Certificate of Good Standing, # 3 Affidavit of E. Desmond Hogan, # 4 Certificate of Good Standing, # 5 Affidavit of Judith E. Coleman, # 6 Certificate of Good Standing)(law) (Entered: 06/12/2014) |
| 06/12/2014 | 3 | CORPORATE DISCLOSURE STATEMENT pursuant to Local Rule 7.1(a) by Grocery Manufacturers Association, International Dairy Foods Association (IDFA), National Association of Manufacturers, Snack Food Association. (law) (Entered: 06/12/2014) |
| 06/16/2014 | 4 | ORDER granting 2 Motion for Admission Pro Hac Vice re: Catherine E. Stetson, Esq., E. Desmond Hogan, Esq., and Judith E. Coleman, Esq. Signed by Chief Judge Christina Reiss on 6/16/2014. (This is a text–only Order.) (cle) (Entered: 06/16/2014) |
| 06/23/2014 | 5 | SUMMONS RETURNED Executed. William H. Sorrell served on 6/16/204, answer due 7/7/2014. (Attachments: # 1 Certificate of Service)(Byrne, Matthew) Text corrected on 6/23/2014 (jlh). (Entered: 06/23/2014) |
| 06/23/2014 | 6 | SUMMONS RETURNED Executed. Harry L. Chen, M.D. served on 6/16/204, answer due 7/7/2014. (Attachments: # 1 Certificate of Service)(Byrne, Matthew) Text clarified on 6/23/2014 (jlh). (Entered: 06/23/2014) |
| 06/23/2014 | 7 | SUMMONS RETURNED Executed. James B. Reardon served on 6/16/204, answer due 7/7/2014. (Attachments: # 1 Certificate of Service)(Byrne, Matthew) Text clarified on 6/23/2014 (jlh). (Entered: 06/23/2014) |
| 06/23/2014 | 8 | SUMMONS RETURNED Executed. Peter Shumlin served on 6/16/204, answer due 7/7/2014. (Attachments: # 1 Certificate of Service)(Byrne, Matthew) Text clarified on 6/23/2014 (jlh). (Entered: 06/23/2014) |
| 06/23/2014 | 9 | NOTICE OF DOCKET ENTRY CORRECTION re: 5 , 6 , 7 , and 8 Summonses Returned Executed. Docket text has been clarified to show that the parties were served on 6/16/204, answer due 7/7/2014. (jlh) (Entered: 06/23/2014) |
| 07/07/2014 | 10 | NOTICE OF APPEARANCE by Megan J. Shafritz, Esq on behalf of Harry L. Chen, James B. Reardon, Peter E. Shumlin, William H. Sorrell(Shafritz, Megan) (Entered: 07/07/2014) |
| 07/07/2014 | 11 | STIPULATED MOTION for Extension of Time to File Answer filed by Harry L. Chen, James B. Reardon, Peter E. Shumlin, William H. Sorrell.(Shafritz, Megan) (Entered: 07/07/2014) |
| 07/08/2014 | 12 | ORDER granting 11 Stipulated Motion for Extension of Time to Answer. Signed by Chief Judge Christina Reiss on 7/8/2014. (This is a text–only Order.) (cle) (Entered: 07/08/2014) |
| 07/09/2014 | 13 | NOTICE of Judicial Disclosure. (Attachments: # 1 Attachment A) (pac) (Entered: 07/09/2014) |
| 07/10/2014 | 14 | NOTICE OF APPEARANCE by Jon T. Alexander, Esq on behalf of Harry L. Chen, James B. Reardon, Peter E. Shumlin, William H. Sorrell(Alexander, Jon) (Entered: 07/10/2014) |
| 07/10/2014 | 15 | NOTICE OF APPEARANCE by Kyle H. Landis–Marinello, Esq on behalf of Harry L. Chen, James B. Reardon, Peter E. Shumlin, William H. Sorrell(Landis–Marinello, Kyle) (Entered: 07/10/2014) |

| 07/10/2014 | 16 | NOTICE OF APPEARANCE by Naomi Sheffield on behalf of Harry L. Chen, James B. Reardon, Peter E. Shumlin, William H. Sorrell(Sheffield, Naomi) (Entered: 07/10/2014) |
|---|---|---|
| 07/21/2014 | 17 | NOTICE OF APPEARANCE by Laura K.B. Murphy, Esq. on behalf of Vermont Public Interest Research Group, Center for Food Safety. (pac) (Entered: 07/21/2014) |
| 07/21/2014 | 18 | MOTION to Intervene filed by Center for Food Safety, Vermont Public Interest Research Group. (Attachments: # 1 Memorandum in Support, # 2 Attachment 1, # 3 Attachment 2, # 4 Attachment 3, # 5 Attachment 4, # 6 Attachment 5, # 7 Attachment 6, # 8 Attachment 7, # 9 Attachment 8, # 10 Attachment 9) (pac) (Entered: 07/21/2014) |
| 07/21/2014 | 19 | MOTION for Appearance Pro Hac Vice of Aurora Paulsen filed by Center for Food Safety, Vermont Public Interest Research Group. (Attachments: # 1 Declaration of Aurora L. Paulsen, # 2 Certificate (of Good Standing), # 3 Text of Proposed Order)(law) (Entered: 07/21/2014) |
| 07/21/2014 | 20 | MOTION for Appearance Pro Hac Vice of George A. Kimbrell filed by Center for Food Safety, Vermont Public Interest Research Group. (Attachments: # 1 Declaration of George A. Kimbrell, # 2 Certification of Current Status, # 3 Text of Proposed Order)(law) (Entered: 07/21/2014) |
| 08/07/2014 | 21 | RESPONSE to 18 MOTION to Intervene filed by Harry L. Chen, James B. Reardon, Peter E. Shumlin, William H. Sorrell. (Shafritz, Megan) (Entered: 08/07/2014) |
| 08/07/2014 | 22 | RESPONSE to 18 MOTION to Intervene *by VT Public Interest Research Group and Center for Food Safety* filed by Grocery Manufacturers Association, International Dairy Foods Association (IDFA), National Association of Manufacturers, Snack Food Association. (Byrne, Matthew) (Entered: 08/07/2014) |
| 08/08/2014 | 23 | STIPULATED MOTION for Leave to Exceed Page Limit *for Memorandum and Support of Motion to Dismiss* filed by Harry L. Chen, James B. Reardon, Peter E. Shumlin, William H. Sorrell.(Shafritz, Megan) Text clarified on 8/14/2014 (law). (Entered: 08/08/2014) |
| 08/08/2014 | 24 | MOTION to Dismiss filed by Harry L. Chen, James B. Reardon, Peter E. Shumlin, William H. Sorrell. (Attachments: # 1 Memorandum in Support, # 2 Exhibit A, # 3 Exhibit B)(Shafritz, Megan) Attachment names clarified on 8/12/2014 (jlh). (Entered: 08/08/2014) |
| 08/08/2014 | 25 | STIPULATED MOTION for Appearance Pro Hac Vice of Daniel N. Lerman, Lawrence S. Robbins, and Lee Turner Friedman filed by Harry L. Chen, James B. Reardon, Peter E. Shumlin, William H. Sorrell. (Attachments: # 1 Affidavit of Daniel N. Lerman, # 2 Certificate of Good Standing, # 3 Affidavit of Lawrence S. Robbins (Non original), # 4 Certificate of Good Standing, # 5 Affidavit of Lee Turner Friedman, # 6 Certificate of Good Standing)(jlh) (Entered: 08/08/2014) |
| 08/11/2014 | 26 | ORDER granting 23 MOTION to Exceed Page Limit *for Memorandum and Support of Motion to Dismiss*. Signed by Chief Judge Christina Reiss on 8/11/2014. (This is a text−only Order.) (pjl) (Entered: 08/11/2014) |
| 08/11/2014 | 27 | ORDER granting 25 STIPULATED MOTION for Appearance Pro Hac Vice of Daniel N. Lerman, Lawrence S. Robbins, and Lee Turner Friedman. Signed by Chief Judge Christina Reiss on 8/11/2014. (This is a text−only Order.) (pjl) (Entered: 08/11/2014) |
| 08/21/2014 | 28 | MOTION for Appearance Pro Hac Vice of Alan D. Strasser, Esq. filed by Harry L. Chen, James B. Reardon, Peter E. Shumlin, William H. Sorrell. (Attachments: # 1 Affidavit of Alan D. Strasser, # 2 Certificate of Good Standing)(jlh) (Entered: 08/21/2014) |
| 08/25/2014 | 29 | REPLY to Response to 18 MOTION to Intervene filed by Center for Food Safety, Vermont Public Interest Research Group. (Murphy, Laura) (Entered: 08/25/2014) |

| 08/27/2014 | 30 | ORDER granting 28 Motion for Admission Pro Hac Vice re: Alan D. Strasser, Esq. Signed by Chief Judge Christina Reiss on 8/26/2014. (This is a text–only Order.) (cle) (Entered: 08/27/2014) |
|---|---|---|
| 08/28/2014 | 31 | MOTION for Leave to File *Motion to Join Defendants' Motion to Dismiss* filed by Center for Food Safety, Vermont Public Interest Research Group. (Attachments: # 1 Motion to Join)(Murphy, Laura) (Entered: 08/28/2014) |
| 08/28/2014 | 32 | NOTICE *of Supplemental Authority* by Grocery Manufacturers Association, International Dairy Foods Association (IDFA), National Association of Manufacturers, Snack Food Association re 18 MOTION to Intervene (Stetson, Catherine) Link corrected on 9/30/2014 (jlh). (Entered: 08/28/2014) |
| 09/11/2014 | 33 | MOTION for Preliminary Injunction filed by Grocery Manufacturers Association, International Dairy Foods Association (IDFA), National Association of Manufacturers, Snack Food Association. (Attachments: # 1 Memorandum in Support, # 2 Declaration of Alan McHughen, # 11 Exhibit A, # 12 Exhibit B, # 3 Declaration of Rick Blasgen, # 4 Declaration of Thomas Dempsey, # 5 Declaration of Richard Michaud, # 6 Declaration of Cofi Adams, # 7 Declaration of Alexander Baxter, # 8 Declaration of Jeff Bradley, # 9 Declaration of Steven Hermansky, # 10 Declaration of Michael Morgan)(Stetson, Catherine) (Attachment 2 replaced on 9/23/2014) (jlh). (Entered: 09/11/2014) |
| 09/11/2014 | 34 | STIPULATED MOTION for Leave to Exceed Page Limit re 33 MOTION for Preliminary Injunction filed by Grocery Manufacturers Association, International Dairy Foods Association (IDFA), National Association of Manufacturers, Snack Food Association.(Stetson, Catherine) (Entered: 09/11/2014) |
| 09/11/2014 | 35 | JOINT MOTION for Hearing re: 33 MOTION for Preliminary Injunction *(Status Conference)* filed by Grocery Manufacturers Association, International Dairy Foods Association (IDFA), National Association of Manufacturers, Snack Food Association.(Stetson, Catherine) Event/text clarified on 9/12/2014 (law). (Entered: 09/11/2014) |
| 09/11/2014 | 36 | RESPONSE in Opposition re 24 MOTION to Dismiss filed by Grocery Manufacturers Association, International Dairy Foods Association (IDFA), National Association of Manufacturers, Snack Food Association. (Stetson, Catherine) (Entered: 09/11/2014) |
| 09/11/2014 | 37 | MOTION for Leave to File *Amended Complaint* as to 1 Complaint, filed by Grocery Manufacturers Association, International Dairy Foods Association (IDFA), National Association of Manufacturers, Snack Food Association. (Attachments: # 1 Proposed Amended Complaint, # 2 Proposed Amended Complaint (Redline))(Stetson, Catherine) (Entered: 09/11/2014) |
| 09/12/2014 | 38 | ORDER granting 35 Joint Motion for Status Conference. Signed by Chief Judge Christina Reiss on 9/12/2014. (This is a text–only Order.) (cle) (Entered: 09/12/2014) |
| 09/12/2014 | 39 | ORDER granting 34 Stipulated Motion to Exceed Page Limit. Signed by Chief Judge Christina Reiss on 9/12/2014. (This is a text–only Order.) (cle) (Entered: 09/12/2014) |
| 09/12/2014 | 40 | REQUEST for Judicial Notice of Certain Materials re: 33 MOTION for Preliminary Injunction by Grocery Manufacturers Association, International Dairy Foods Association (IDFA), National Association of Manufacturers, Snack Food Association. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8)(Stetson, Catherine) Event/text clarified on 11/28/2014 (law). (Entered: 09/12/2014) |
| 09/15/2014 | 41 | RESPONSE in Opposition re 31 MOTION for Leave to File *Motion to Join Defendants' Motion to Dismiss* filed by Grocery Manufacturers Association, International Dairy Foods Association (IDFA), National Association of Manufacturers, Snack Food Association. (Stetson, Catherine) (Entered: 09/15/2014) |
| 09/16/2014 | 42 | NOTICE OF APPEARANCE by Kate T. Gallagher on behalf of Tracy Dolan, James B. Reardon, Peter E. Shumlin, William H. Sorrell.(Gallagher, Kate) |

| | | (Entered: 09/16/2014) |
|---|---|---|
| 09/17/2014 | 43 | NOTICE of Hearing: Status Conference set for 9/19/2014 01:00 PM in Burlington Courtroom 440 before Chief Judge Christina Reiss.(law) (Entered: 09/17/2014) |
| 09/17/2014 | 44 | REPLY to Response to 31 MOTION for Leave to File *Motion to Join Defendants' Motion to Dismiss* filed by Center for Food Safety, Vermont Public Interest Research Group. (Murphy, Laura) (Entered: 09/17/2014) |
| 09/19/2014 | 45 | MINUTE ENTRY for proceedings held before Chief Judge Christina Reiss: Status Conference held on 9/19/2014. Present for Plaintiffs were Matthew Byrne, Esq., Catherine Stetson, Esq., and Judith Coleman, Esq. Present for Defendants were Megan Shafritz, Esq., Lawrence Robbins, Esq., Kyle Landis–Marinello, Esq., Naomi Sheffield, Esq., Kathryn Gallagher, Esq., and John Alexander, Esq. Statements by counsel re: 18 MOTION to Intervene, 24 MOTION to Dismiss Complaint, and 33 MOTION for Preliminary Injunction. ORDERED: counsel to file briefing scheduling within 14 days. (Court Reporter: Anne Pierce) (jbr) Text clarified on 9/19/2014 (law). (Entered: 09/19/2014) |
| 09/19/2014 | 46 | TRANSCRIPT REQUEST by Grocery Manufacturers Association, International Dairy Foods Association (IDFA), National Association of Manufacturers, Snack Food Association for proceedings held on 09/19/2014 before Judge Reiss (Byrne, Matthew) (Entered: 09/19/2014) |
| 09/23/2014 | 47 | NOTICE OF DOCKET ENTRY CORRECTION re: 33 MOTION for Preliminary Injunction filed by Grocery Manufacturers Association, National Association of Manufacturers, International Dairy Foods Association (IDFA), Snack Food Association. The Declaration of Dr. Alan McHughen contained that of the exhibits. The document has been broken apart and reattached to the docket. The corrected documents are now attached to 33 as well as this entry. (Attachments: # 1 Exhibit A, # 2 Exhibit B) (jlh) (Entered: 09/23/2014) |
| 09/23/2014 | 48 | TRANSCRIPT REQUEST by Center for Food Safety, Vermont Public Interest Research Group for proceedings held on 9/19/2014 before Judge Reiss (Murphy, Laura) (Entered: 09/23/2014) |
| 09/24/2014 | 49 | TRANSCRIPT of Status Conference hearing held on 9/19/2014, before Chief Judge Christina Reiss. Court Reporter/Transcriber Anne Pierce, telephone number 802–860–2227. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/20/2014. Redacted Transcript Deadline set for 10/30/2014. Release of Transcript Restriction set for 12/26/2014. (jbr) (Entered: 09/24/2014) |
| 10/03/2014 | 50 | STIPULATED JOINT MOTION for Scheduling Order re 37 MOTION for Leave to File *Amended Complaint*, 33 MOTION for Preliminary Injunction, 24 MOTION to Dismiss filed by William H. Sorrell, Peter E. Shumlin, James B. Reardon, Tracy Dolan, Grocery Manufacturers Association, International Dairy Foods Association (IDFA), National Association of Manufacturers, Snack Food Association.(Stetson, Catherine) Filers added 10/6/2014 (jlh) (Entered: 10/03/2014) |
| 10/06/2014 | 51 | ORDER granting 50 Stipulated Joint Motion for Scheduling Order re 37 MOTION for Leave to File Amended Complaint, 33 MOTION for Preliminary Injunction, 24 MOTION to Dismiss. Signed by Chief Judge Christina Reiss on 10/6/2014. (law) (Entered: 10/06/2014) |
| 10/07/2014 | 52 | OPINION AND ORDER denying 18 Vermont Public Interest Research Group's and Center for Food Safety's Motion to Intervene as Defendants. The Organizations, however, may submit memoranda as *amici curiae*. Signed by Chief Judge Christina Reiss on 10/7/2014. (pac) (Entered: 10/08/2014) |
| 10/08/2014 | 53 | ORDER granting 19 Motion for Admission Pro Hac Vice, re: Aurora L. Paulsen, Esq.; granting 20 Motion for Admission Pro Hac Vice, re: George A. Kimbrell on behalf of the Vermont Public Interest Research Group and the Center for Food Safety, so that both Organizations may offer briefing as *amici curiae*. In accordance with the court's Opinion and Order dated October 7, 2014 denying the |

| | | Organizations' motion to intervene (Doc. 18), the Organizations need not seek leave of the court to file briefs as *amici curiae*. The Organizations must comply with the briefing schedule established by the parties and the court. Signed by Chief Judge Christina Reiss on 10/8/2014. (This is a text–only Order.) (cle) (Entered: 10/08/2014) |
|---|---|---|
| 10/08/2014 | 54 | ORDER denying 31 Motion for Leave to File Motion to Join Defendants' Motion to Dismiss filed by the Vermont Public Interest Research Group and the Center for Food Safety, because neither Organization has been granted party status in the pending case. The Organizations may offer *amici curiae* briefs regarding the State Defendants' motion to dismiss in accordance with the briefing schedule established by the parties and the court. Signed by Chief Judge Christina Reiss on 10/8/2014. (This is a text–only Order.) (cle) (Entered: 10/08/2014) |
| 11/07/2014 | 55 | STIPULATED MOTION to Withdraw as Attorney filed by Grocery Manufacturers Association, International Dairy Foods Association (IDFA), National Association of Manufacturers, Snack Food Association.(Coleman, Judith) (Entered: 11/07/2014) |
| 11/13/2014 | 56 | ORDER granting 55 Stipulated Motion to Withdraw as Attorney, re: Judith E. Coleman, Esq. Signed by Chief Judge Christina Reiss on 11/12/2014. (This is a text–only Order.) (cle) (Entered: 11/13/2014) |
| 11/14/2014 | 57 | NOTICE OF APPEARANCE by Anthony Nicholas L. Iarrapino on behalf of Free Speech for People, Inc..(Iarrapino, Anthony Nicholas) (Entered: 11/14/2014) |
| 11/14/2014 | 58 | STIPULATED MOTION for Leave to File *Amicus Memorandum in Opposition* as to 33 MOTION for Preliminary Injunction filed by Free Speech for People, Inc. (Attachments: # 1 Proposed Memorandum of Amicus)(Iarrapino, Anthony Nicholas) Text clarified on 11/17/2014 (jlh). (Entered: 11/14/2014) |
| 11/14/2014 | 59 | MOTION for Leave to File *Amicus Curiae Brief* filed by Vermont Community Law Center. (Attachments: # 1 Proposed Amicus Brief)(Carter, Jared) Modified on 11/17/2014 (jlh). (Entered: 11/14/2014) |
| 11/14/2014 | 60 | STIPULATED MOTION for Leave to Exceed Page Limit filed by Tracy Dolan, James B. Reardon, Peter E. Shumlin, William H. Sorrell.(Shafritz, Megan) (Entered: 11/14/2014) |
| 11/14/2014 | 61 | RESPONSE to 37 MOTION for Leave to File *Amended Complaint* as to 1 Complaint, filed by Tracy Dolan, James B. Reardon, Peter E. Shumlin, William H. Sorrell. (Shafritz, Megan) (Entered: 11/14/2014) |
| 11/14/2014 | 62 | REQUEST for Judicial Notice re: 33 MOTION for Preliminary Injunction and RESPONSE to 40 REQUEST for Judicial Notice of Certain Materials re: 33 MOTION for Preliminary Injunction filed by Tracy Dolan, James B. Reardon, Peter E. Shumlin, William H. Sorrell.(Shafritz, Megan) Text clarified, links added on 11/28/2014 (law). (Entered: 11/14/2014) |
| 11/14/2014 | 63 | REPLY to Response to 24 MOTION to Dismiss and RESPONSE in Opposition to 33 MOTION for Preliminary Injunction filed by Tracy Dolan, James B. Reardon, Peter E. Shumlin, William H. Sorrell. (Attachments: # 1 Exhibit A, # 14 Exhibit B, # 15 Exhibit 1, # 16 Exhibit C, # 17 Exhibit 1, # 18 Exhibit D, # 19 Exhibit 1, # 20 Exhibit E, # 21 Exhibit 1, # 22 Exhibit F, # 23 Exhibit 1, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J–1, # 11 Exhibit J–2, # 12 Exhibit J–3, # 13 Exhibit K)(Shafritz, Megan) Attachment names clarified on 11/17/2014 (jlh) Text clarified on 12/1/2014 (jlh). (Entered: 11/14/2014) |
| 11/14/2014 | 64 | MEMORANDUM in Support re: 33 MOTION for Preliminary Injunction , 24 MOTION to Dismiss filed by Center for Food Safety, Vermont Public Interest Research Group. (Attachments: # 1 Exhibit A, # 2 Exhibit B (1 of 4), # 3 Exhibit B (2 of 4), # 4 Exhibit B (3 of 4), # 5 Exhibit B (4 of 4), # 6 Exhibit C)(Murphy, Laura) Text clarified on 12/1/2014 (jlh). (Entered: 11/14/2014) |
| 11/17/2014 | 65 | NOTICE OF DOCKET ENTRY CORRECTION re: 63 Reply to Response to Motion filed by William H. Sorrell, Peter E. Shumlin, Tracy Dolan, James B. Reardon. Exhibits B–F contained that of an additional exhibit. The documents have been broken apart and reattached to the docket. The corrected documents are now |

| | | |
|---|---|---|
| | | attached to 63 as well as this entry. (Attachments: # 1 Exhibit 1, # 2 Exhibit C, # 3 Exhibit 1, # 4 Exhibit D, # 5 Exhibit 1, # 6 Exhibit E, # 7 Exhibit 1, # 8 Exhibit F, # 9 Exhibit 1) (jlh) (Entered: 11/17/2014) |
| 11/18/2014 | 66 | NOTICE of Scheduling Conflict re: 37 MOTION for Leave to File Amended Complaint, 33 MOTION for Preliminary Injunction, 24 MOTION to Dismiss by Grocery Manufacturers Association, International Dairy Foods Association (IDFA), National Association of Manufacturers, Snack Food Association, William H. Sorrell, Tracy Dolan, James B. Reardon, Peter E. Shumlin, (Stetson, Catherine) Text clarified, filers added on 11/19/2014 (jlh). (Entered: 11/18/2014) |
| 11/19/2014 | 67 | ORDER granting 37 Motion for Leave to File Amended Complaint. Signed by Chief Judge Christina Reiss on 11/19/2014. (This is a text–only Order.) (cle) (Entered: 11/19/2014) |
| 11/19/2014 | 68 | ORDER granting 60 Motion to Exceed Page Limit for Reply Briefs. Signed by Chief Judge Christina Reiss on 11/19/2014. (This is a text–only Order.) (cle) (Entered: 11/19/2014) |
| 11/25/2014 | 69 | MOTION for Appearance Pro Hac Vice of Ronald Fein filed by Free Speech for People, Inc. (Attachments: # 1 Declaration of Ronald Fein, # 2 Certificate of Good Standing)(jlh) (Entered: 11/25/2014) |
| 11/26/2014 | 70 | STIPULATED MOTION for Appearance Pro Hac Vice of Mary H. Wimberly, Esq. filed by Grocery Manufacturers Association, International Dairy Foods Association (IDFA), National Association of Manufacturers, Snack Food Association. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Certificate of Service)(jlh) (Entered: 12/01/2014) |
| 12/03/2014 | 71 | ORDER granting 70 Stipulated Motion for Admission Pro Hac Vice of Mary H. Wimberly, Esq. Signed by Chief Judge Christina Reiss on 12/3/2014. (This is a text–only Order.) (law) (Entered: 12/03/2014) |
| 12/05/2014 | 72 | NOTICE of Hearing re: 24 MOTION to Dismiss , 33 MOTION for Preliminary Injunction , and the REQUESTS for Judicial Notice 40 , 62 set for 1/7/2015 9:30 AM in Burlington Courtroom 542 before Chief Judge Christina Reiss.(jbr) (Entered: 12/05/2014) |
| 12/05/2014 | 73 | ORDER granting 69 Motion for Admission Pro Hac Vice re: Ronald Fein, Esq. Signed by Chief Judge Christina Reiss on 12/5/2014. (This is a text–only Order.) (cle) (Entered: 12/05/2014) |
| 12/05/2014 | 74 | STIPULATED MOTION for Leave to Exceed Page Limit *for Reply Memorandum* re: 33 MOTION for Preliminary Injunction filed by Grocery Manufacturers Association, International Dairy Foods Association (IDFA), National Association of Manufacturers, Snack Food Association.(Stetson, Catherine) Link added on 12/8/2014 (law). (Entered: 12/05/2014) |
| 12/05/2014 | 75 | REPLY to Response to 33 MOTION for Preliminary Injunction filed by Grocery Manufacturers Association, International Dairy Foods Association (IDFA), National Association of Manufacturers, Snack Food Association. (Attachments: # 1 Rebuttal Declaration of Dr. Alan McHughen)(Stetson, Catherine) Attachment name clarified on 12/10/2014 (jlh). (Entered: 12/05/2014) |
| 12/15/2014 | 76 | SURREPLY in Support of 24 MOTION to Dismiss filed by Tracy Dolan, James B. Reardon, Peter E. Shumlin, William H. Sorrell. (Shafritz, Megan) (Entered: 12/15/2014) |
| 12/15/2014 | 77 | SURREPLY in Support of 24 MOTION to Dismiss filed by Center for Food Safety, Vermont Public Interest Research Group. (Murphy, Laura) Text clarified on 12/16/2014 (jlh). (Entered: 12/15/2014) |
| 12/16/2014 | 78 | ORDER granting 74 Stipulated Motion to Exceed Page Limit for Reply in Support of 33 Motion for a Preliminary Injunction. Signed by Chief Judge Christina Reiss on 12/16/2014. (This is a text–only Order.) (cle) (Entered: 12/16/2014) |
| 12/16/2014 | 79 | ORDER granting 58 Stipulated Motion for Leave to File *Amicus* Memorandum. Signed by Chief Judge Christina Reiss on 12/16/2014. (This is a text–only Order.) |

| | | (cle) (Entered: 12/16/2014) |
|---|---|---|
| 12/16/2014 | 80 | ORDER granting 59 Motion for Leave to File *Amicus Curiae Brief*. Signed by Chief Judge Christina Reiss on 12/16/2014. (This is a text–only Order.) (cle) (Entered: 12/16/2014) |
| 12/16/2014 | 81 | RESPONSE in Opposition re 33 MOTION for Preliminary Injunction filed by Free Speech for People, Inc.. (Iarrapino, Anthony Nicholas) (Entered: 12/16/2014) |
| 12/17/2014 | 82 | CERTIFICATE OF SERVICE re: 76 SURREPLY in Support of 24 MOTION to Dismiss by Tracy Dolan, James B. Reardon, Peter E. Shumlin, William H. Sorrell.(Shafritz, Megan) Link added on 12/18/2014 (jlh). (Main Document 82 replaced on 12/18/2014) (jlh). (Entered: 12/17/2014) |
| 12/18/2014 | 83 | NOTICE OF DOCKET ENTRY CORRECTION re: 82 Certificate of Service filed by William H. Sorrell, Peter E. Shumlin, Tracy Dolan, James B. Reardon. The document image has been replaced to correct the service date. The corrected document is now attached to 82 as well as this entry. (jlh) (Entered: 12/18/2014) |
| 12/18/2014 | 84 | MOTION to Strike 77 SURREPLY in Support of 24 MOTION to Dismiss filed by Grocery Manufacturers Association, International Dairy Foods Association (IDFA), National Association of Manufacturers, Snack Food Association.(Stetson, Catherine) Text clarified on 12/19/2014 (jlh). (Entered: 12/18/2014) |
| 12/20/2014 | 85 | RESPONSE in Opposition to 84 MOTION to Strike 77 Sur–Reply to Response to Motion filed by Center for Food Safety, Vermont Public Interest Research Group. (Murphy, Laura) (Entered: 12/20/2014) |
| 01/07/2015 | 86 | MINUTE ENTRY for proceedings held before Chief Judge Christina Reiss: Motion Hearing held on 1/7/2015 re: 24 MOTION to Dismiss, 33 MOTION for Preliminary Injunction, 40 REQUEST for Judicial Notice re: 33 Motion for Preliminary Injunction, 62 REQUEST for Judicial Notice re: 33 Motion for Preliminary Injunction, 84 MOTION to Strike 77 Reply to Response to Motion and for Order Establishing Rules for Amici Participation. Catherine Stetson, Esq., Mary H. Wimberly, Esq. and Matthew Byrne, Esq. present for Plaintiffs. Lawrence Robbins, Esq., Meagan Shafritz, Esq., Alan Strasser, Esq., Daniel Lerman, Esq., Kate Gallagher, Esq., Kyle Landis–Marinello, Esq., Lee Turner Friedman, Esq., and Naomi Sheffield, Esq. present for Defendants. Statements by counsel. ORDERED: Court denies 84 MOTION to Strike 77 Reply to Response to Motion and for Order Establishing Rules for Amici Participation on the record. Motions Taken Under Advisement: 24 MOTION to Dismiss, 33 MOTION for Preliminary Injunction. (Court Reporter: Anne Pierce) (jbr) (Entered: 01/08/2015) |
| 01/07/2015 | | Motions Taken Under Advisement: 33 MOTION for Preliminary Injunction , 24 MOTION to Dismiss (jbr) (Entered: 01/27/2015) |
| 01/23/2015 | 87 | TRANSCRIPT of Hearing on Motions to Dismiss, Preliminary Injunction, and Requests for Judicial Notice held on 01/07/2015, before Judge Christina Reiss. Court Reporter/Transcriber Anne Pierce, telephone number 802–860–2227. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 2/17/2015. Redacted Transcript Deadline set for 2/26/2015. Release of Transcript Restriction set for 4/27/2015. (jbr) (Entered: 01/23/2015) |
| 01/27/2015 | 88 | ORDER granting 40 Plaintiffs' Request for Judicial Notice; and granting 62 Defendants' Request for Judicial Notice. *See Oneida Indian Nation of N.Y. v. State of New York*, 691 F.2d 1070, 1086 (2d Cir. 1982) (holding "judicial notice is limited to law, legislative facts, or factual matters that are incontrovertible" and concluding district court properly took notice of "extrinsic historical evidence" regarding legislative acts); *see also Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) ("[I]t is proper to take judicial notice of the fact that press coverage, prior lawsuits, or regulatory filings contained certain information[.]"); *In re Frito–Lay N. Am., Inc., All Natural Litig.*, 2013 WL 4647512, at *4 (E.D.N.Y. Aug. 29, 2013) (taking notice of "documents for the fact that they contain the statements that they contain," including reports published by industry and consumer organizations, state laws and regulations, the contents of the |

| | | Federal Register, and agency letters, policy and guidance documents, websites, and other agency data made available to the public outside the Federal Register by administrative agencies). Signed by Chief Judge Christina Reiss on 1/27/2015. (This is a text−only Order.) (cle) (Entered: 01/27/2015) |
|---|---|---|
| 03/12/2015 | 89 | MOTION to Withdraw as Attorney *Aurora L. Paulsen as Counsel for Amici* filed by Center for Food Safety, Vermont Public Interest Research Group.(Paulsen, Aurora) (Entered: 03/12/2015) |
| 03/13/2015 | 90 | ORDER granting 89 Motion to Withdraw as Attorney re: Aurora L. Paulsen, Esq. Signed by Chief Judge Christina Reiss on 3/13/2015. (This is a text−only Order.) (cle) (Entered: 03/13/2015) |
| 03/31/2015 | 91 | NOTICE *of Supplemental Authority* re: 33 MOTION for Preliminary Injunction by James B. Reardon, Peter E. Shumlin, William H. Sorrell (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Shafritz, Megan) Attachment descriptions clarified and link added on 3/31/2015 (law). (Entered: 03/31/2015) |
| 04/07/2015 | 92 | RESPONSE re 91 Notice of Supplemental Authority by Grocery Manufacturers Association, International Dairy Foods Association (IDFA), National Association of Manufacturers, Snack Food Association. (Stetson, Catherine) Text clarified on 4/8/2015 (jlh). (Entered: 04/07/2015) |
| 04/17/2015 | 93 | NOTICE *of Supplemental Authority* re: 24 MOTION to Dismiss, 33 MOTION for Preliminary Injunction by Tracy Dolan, James B. Reardon, Peter E. Shumlin, William H. Sorrell (Attachments: # 1 Exhibit A)(Shafritz, Megan) Links added on 4/19/2015 (law). (Entered: 04/17/2015) |
| 04/24/2015 | 94 | RESPONSE re 93 Second Notice Of Supplemental Authority by Grocery Manufacturers Association, International Dairy Foods Association (IDFA), National Association of Manufacturers, Snack Food Association. (Stetson, Catherine) Text clarified on 4/27/2015 (jlh). (Entered: 04/24/2015) |
| 04/27/2015 | 95 | OPINION AND ORDER Granting in Part and Denying in Part 24 Defendants' Motion to Dismiss and Denying 33 Plaintiffs' Motion for a Preliminary Injunction. Signed by Chief Judge Christina Reiss on 4/27/2015. (pac) Text clarified on 4/27/2015 (law). (Entered: 04/27/2015) |
| 05/06/2015 | 96 | NOTICE OF APPEAL as to 95 Order on Motion to Dismiss, Order on Motion for Preliminary Injunction, by Grocery Manufacturers Association, International Dairy Foods Association (IDFA), National Association of Manufacturers, Snack Food Association (Stetson, Catherine) (Additional attachment(s) added on 5/6/2015: # 1 Exhibit A) (jlh). (Entered: 05/06/2015) |
| 05/06/2015 | 97 | Entry has been removed from the docket. (Entered: 05/06/2015) |
| 05/06/2015 | 98 | NOTICE OF DOCKET ENTRY CORRECTION re: 96 Notice of Appeal filed by Grocery Manufacturers Association, National Association of Manufacturers, International Dairy Foods Association (IDFA), Snack Food Association. Document 97 has been removed from the docket as being duplicative of 96 . The exhibit attached to 97 is now attached to 96 as well as this entry. (jlh) (Entered: 05/06/2015) |
| 05/06/2015 | 99 | STIPULATED MOTION for Extension of Time to File Answer to Amended Complaint filed by Tracy Dolan, James B. Reardon, Peter E. Shumlin, William H. Sorrell.(Shafritz, Megan) (Entered: 05/06/2015) |
| 05/07/2015 | | USCA Appeal Fees received $505 receipt number 4682012867 re 96 Notice of Appeal, filed by Grocery Manufacturers Association, National Association of Manufacturers, International Dairy Foods Association (IDFA), Snack Food Association. (gmg) (Entered: 05/07/2015) |
| 05/11/2015 | 100 | TRANSMITTED Index on Appeal Circuit No. 15−1504 re: 96 Notice of Appeal. (gmg) (Entered: 05/11/2015) |
| 05/14/2015 | 101 | ORDER Granting 99 Defendants' Stipulated Motion for Extension of Time to File Answer. Signed by Chief Judge Christina Reiss on 5/14/2015. (This is a text−only Order.) (ejh) (Entered: 05/14/2015) |

# Exhibit C

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2015 APR 27 PM 3: 32

CLERK

BY_____
DEPUTY CLERK

GROCERY MANUFACTURERS          )
ASSOCIATION, SNACK FOOD        )
ASSOCIATION, INTERNATIONAL     )
DAIRY FOODS ASSOCIATION, AND   )
NATIONAL ASSOCIATION OF        )
MANUFACTURERS,                 )
                               )
    Plaintiffs,              )
                               )
    v.                       )          Case No. 5:14-cv-117
                               )
WILLIAM H. SORRELL,            )
PETER E. SHUMLIN,              )
TRACY DOLAN, AND               )
JAMES B. REARDON,              )
                               )
    Defendants.              )

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION TO DISMISS AND DENYING PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION**
(Doc. 24, 33)

    Pending before the court are a motion to dismiss (Doc. 24) filed by Defendants William H. Sorrell, Peter E. Shumlin, Tracy Dolan, and James B. Reardon (collectively, "the State") and a motion for a preliminary injunction (Doc. 33) filed by Plaintiffs Grocery Manufacturers Association ("GMA"), Snack Food Association ("SFA"), International Dairy Foods Association ("IDFA"), and National Association of Manufacturers ("NAM") (collectively, "Plaintiffs").

    The State's motion asks the court to dismiss Plaintiffs' Amended Complaint in its entirety for failure to state a claim for which relief may be granted. Fed. R. Civ. P. 12(b)(6). Plaintiffs' motion asks the court to enjoin the State's enforcement of Act 120 in its entirety pending a resolution of the case at trial. Fed. R. Civ. P. 65(a). The court heard oral argument on January 7, 2015, at which point the court took the pending

motions under advisement. Because the State's motion to dismiss winnows the claims for which Plaintiffs may seek a preliminary injunction, the court addresses that motion first. In the course of analyzing the motion to dismiss, the court considers whether Plaintiffs are likely to prevail on the merits of their claims at trial, which is an essential component of their request for preliminary injunctive relief.

Plaintiffs are represented by Catherine E. Stetson, Esq., E. Desmond Hogan, Esq., Mary H. Wimberly, Esq., and Matthew B. Byrne, Esq. The State is represented by Alan D. Strasser, Esq., Daniel N. Lerman, Esq., Lawrence S. Robbins, Esq., Lee Turner Friedman, Esq., Vermont Assistant Attorney General ("VTAG") Megan J. Shafritz, VTAG Jon T. Alexander, VTAG Kate T. Gallagher, VTAG Kyle H. Landis-Marinello, and VTAG Naomi Sheffield.

The following Amicus Curiae have filed briefs in support of Act 120: the Vermont Public Interest Research Group and the Center for Food Safety, which are represented by Laura B. Murphy, Esq.; The Vermont Community Law Center, which is represented by Jared Kingsbury Carter, Esq. and William B. Peard, Esq.; and the Free Speech For People, Inc., which is represented by Ronald A. Fein, Esq. and Anthony N. L. Iarrapino, Esq.

## I.    Factual and Procedural Background.

### A.    The Amended Complaint.

Plaintiffs' Amended Complaint challenges Act 120's requirement that certain manufacturers and retailers identify whether raw and processed food sold in Vermont was produced in whole or in part through genetic engineering (Act 120's "GE disclosure requirement")[1] and which prohibits manufacturers from labeling or advertising GE foods

---

[1] Plaintiffs contend that Act 120's designation of food as "entirely or partially produced with genetic engineering," 9 V.S.A. § 3043(a)(2), is inaccurate because "[o]ne may genetically engineer a plant but one does not genetically engineer a food into existence." (Doc. 33-1 at 42-43.) Plaintiffs are correct that foods are not actually *produced* with genetic engineering; however, the term "produced with genetic engineering" conveys sufficient information that a reasonable consumer would understand that the product contains a GE ingredient or ingredients. *See* U.S. Food & Drug Admin., Draft Guidance for Industry: Voluntary Labeling Indicating Whether Foods Have or Have Not Been Developed Using Bioengineering, at 6-7 (2001)

as "natural," "naturally made," "naturally grown," "all natural," or "any words of similar import" (Act 120's "'natural' restriction").

Count One of the Amended Complaint alleges Act 120's GE disclosure requirement violates the First Amendment; Count Two claims Act 120's "natural" restriction violates the First Amendment; Count Three asserts Act 120's "natural" restriction is impermissibly vague in violation of the First and Fifth Amendments; Count Four alleges Act 120 violates the Commerce Clause; and Count Five asserts Act 120 is preempted by various federal statutes. With regard to each claim, Plaintiffs allege a violation of the Fourteenth Amendment, as they are suing defendants for their actions under the color of state law. *See* U.S. Const. amend. XIV, § 1.

**B. Act 120.**

Act 120 was signed on May 8, 2014 and will be enforceable effective July 1, 2016 (the "effective date"). It requires that "food [intended for human consumption] offered for sale by a retailer" after the Act's effective date "be labeled as produced entirely or in part from genetic engineering if it is a product: (1) offered for retail sale in Vermont; and (2) entirely or partially produced with genetic engineering." 9 V.S.A. § 3043(a). Genetic engineering ("GE") is defined as "a process by which a food is produced from an organism[2] or organisms in which the genetic material has been changed" through the application of:

---

(authorizing the voluntary use of "informative statements" of "the fact that a food or its ingredients was produced using bioengineering"); *see also* Questions & Answers on Food from Genetically Engineered Plants, U.S. Food & Drug Admin., http://www.fda.gov/Food/FoodScienceResearch/Biotechnology/ucm346030.htm (last visited Apr. 27, 2015) (acknowledging "the strong interest that many consumers have in knowing whether a product was produced using genetic engineering"). For ease of reference, the court will refer to food subject to Act 120 as "GE food" or "GE food products" produced by "GE manufacturers" and offered for sale by "GE retailers."

[2] An organism is defined as "any biological entity capable of replication, reproduction, or transferring of genetic material." 9 V.S.A. § 3042(7).

(A) in vitro nucleic acid techniques,[3] including recombinant
deoxyribonucleic acid (DNA) techniques and the direct injection of nucleic
acid into cells or organelles; or

(B) fusion of cells (including protoplast fusion) or hybridization techniques
that overcome natural physiological, reproductive, or recombination
barriers, where the donor cells or protoplasts do not fall within the same
taxonomic group, in a way that does not occur by natural multiplication or
natural recombination.

9 V.S.A. § 3042(4).

    Act 120 applies to raw agricultural commodities, which are defined as "any food
in its raw or natural state, including any fruit or vegetable that is washed, colored, or
otherwise treated in its unpeeled natural form prior to marketing." 9 V.S.A. § 3042(10).
It also applies to processed foods, which are defined as "any food other than a raw
agricultural commodity and includes any food produced from a raw agricultural
commodity that has been subjected to processing such as canning, smoking, pressing,
cooking, freezing, dehydration, fermentation, or milling." 9 V.S.A. § 3042(8).

    A GE manufacturer is subject to Act 120 if it:

(A) produces a processed food or raw agricultural commodity under its own
brand or label for sale in or into the State;

(B) sells in or into the State under its own brand or label a processed food
or raw agricultural commodity produced by another supplier;

(C) owns a brand that it licenses or licensed to another person for use on a
processed food or raw commodity sold in or into the State;

(D) sells in, sells into, or distributes in the State a processed food or raw
agricultural commodity that it packaged under a brand or label owned by
another person;

---

[3] "In vitro nucleic acid techniques" are defined as "techniques, including recombinant DNA or
ribonucleic acid techniques, that use vector systems and techniques involving the direct
introduction into the organisms of hereditary materials prepared outside the organisms such as
micro-injection, chemoporation, electroporation, micro-encapsulation, and liposome fusion."
9 V.S.A. § 3042(5).

(E) imports into the United States for sale in or into the State a processed food or raw agricultural commodity produced by a person without a presence in the United States; or

(F) produces a processed food or raw agricultural commodity for sale in or into the State without affixing a brand name.

9 V.S.A. § 3042(6).

### 1. Act 120's GE Disclosure Requirement.

Act 120 requires that a "packaged raw agricultural commodity" be labeled by GE manufacturers "with the clear and conspicuous words 'produced with genetic engineering.'" 9 V.S.A. § 3043(b)(1). If the "raw agricultural commodity" is not sold separately packaged, then a GE retailer must "post a label" on the shelf or bin "with the clear and conspicuous words 'produced with genetic engineering.'" 9 V.S.A. § 3043(b)(2). Packaged processed food must be labeled by a GE manufacturer with the words: "'partially produced with genetic engineering,'" or "'may be produced with genetic engineering,'" or "'produced with genetic engineering.'" 9 V.S.A. § 3043(b)(3). Act 120 states it "shall not be construed to require" either "the listing or identification of any ingredient or ingredients that were genetically engineered" or "the placement of the term 'genetically engineered' immediately preceding any common name or primary product descriptor of a food." 9 V.S.A. § 3043(d).

### 2. Act 120's "Natural" Restriction.

Act 120 prohibits GE manufacturers from using labeling, advertising, or signage indicating that a GE food product is "'natural,' 'naturally made,' 'naturally grown,' 'all natural,' or any words of similar import that would have a tendency to mislead a consumer." 9 V.S.A. § 3043(c). Act 120 does not define the term "natural" or the phrase "any words of similar import."

### 3. Act 120's Exemptions and Penalties.

Act 120 exempts certain products from its embrace, including alcoholic beverages subject to Title 7 of Vermont's statutory code and food not packaged for retail sale that is "a processed food prepared and intended for immediate human consumption" or that is

5

"served, sold, or otherwise provided in any restaurant or other food establishment." 9 V.S.A. § 3044(4), (7)(A)-(B). It also exempts "[f]ood consisting entirely of or derived entirely from an animal which has not itself been produced with genetic engineering, regardless of whether the animal has been fed or injected with any food, drug, or other substance produced with genetic engineering." 9 V.S.A. § 3044(1).

A GE manufacturer or retailer may obtain an exemption from Act 120 for any food "grown, raised, or produced without the knowing or intentional use of food or seed produced with genetic engineering" by providing its own "sworn statement," or verification from an independent organization, that the food "has not been knowingly or intentionally produced with genetic engineering and has been segregated from and has not been knowingly or intentionally commingled with food that may have been produced with genetic engineering at any time." 9 V.S.A. §§ 3044(2), (6); 3045(b). Act 120 provides that a "person" is liable for any "false statement" made in the course of obtaining this exemption. 9 V.S.A. § 3047.

Under Act 120, any "person" who violates its requirements is "liable for a civil penalty of not more than $1,000.00 per day, per product," which "shall accrue and be assessed per each uniquely named, designated, or marketed product." 9 V.S.A. § 3048(a).

## C.  Act 120's Legislative Findings.

In conjunction with its enactment of Act 120, the Vermont General Assembly promulgated certain "Findings." One such "Finding" is that federal law does not require the labeling of GE food, as evidenced by the following:

(A) Federal labeling and food and drug laws do not require manufacturers of food produced with genetic engineering to label such food as genetically engineered.

(B) As indicated by the testimony of a U.S. Food and Drug Administration (FDA) Supervisory Consumer Safety Officer, the FDA has statutory authority to require labeling of food products, but does not consider genetically engineered foods to be materially different from their traditional counterparts to require such labeling.

6

(C) No formal FDA policy on the labeling of genetically engineered foods
has been adopted. Currently, the FDA only provides nonbinding guidance
on the labeling of genetically engineered foods, including a 1992 draft
guidance regarding labeling of food produced from genetic engineering and
a 2001 draft guidance for industry regarding voluntary labeling of food
produced from genetic engineering.

2014 Vt. Acts & Resolves No. 120, Sec. 1(1)(A)-(C).

Vermont's General Assembly's "Findings" include a finding that "[g]enetically
engineered foods are increasingly available for human consumption" in light of estimates
"that up to 80 percent of the processed foods sold in the United States" may contain
ingredients produced from GE sources. *Id.* at Sec. 1(3)(A). They also include a
"Finding" that federal law does not presently require independent testing of the safety of
GE food and that:

(A) In its regulation of food, the FDA does not distinguish genetically
engineered foods from foods developed by traditional plant breeding.

(B) Under its regulatory framework, the FDA does not independently test
the safety of genetically engineered foods. Instead, manufacturers submit
safety research and studies, the majority of which the manufacturers finance
or conduct. The FDA reviews the manufacturers' research and reports
through a voluntary safety consultation, and issues a letter to the
manufacturer acknowledging the manufacturer's conclusion regarding the
safety of the genetically engineered food product being tested.

(C) The FDA does not use meta-studies or other forms of statistical analysis
to verify that the studies it reviews are not biased by financial or
professional conflicts of interest.

(D) There is a lack of consensus regarding the validity of the research and
science surrounding the safety of genetically engineered foods, as indicated
by the fact that there are peer-reviewed studies published in international
scientific literature showing negative, neutral, and positive health results.

(E) There have been no long-term or epidemiologic studies in the United
States that examine the safety of human consumption of genetically
engineered foods.

*Id.* at Sec. 1(2)(A)-(E).

7

With regard to GE food safety, the General Assembly declared in its "Findings" that GE foods "potentially pose risks to health, safety, agriculture, and the environment," as evidenced by the following:

>    (A) There are conflicting studies assessing the health consequences of food produced from genetic engineering.
>
>    (B) The genetic engineering of plants and animals may cause unintended consequences.
>
>    (C) The use of genetically engineered crops is increasing in commodity agricultural production practices, which contribute to genetic homogeneity, loss of biodiversity, and increased vulnerability of crops to pests, diseases, and variable climate conditions.
>
>    (D) Cross-pollination of or cross-contamination by genetically engineered crops may contaminate organic crops and, consequently, affect marketability of those crops.
>
>    (E) Cross-pollination from genetically engineered crops may have an adverse effect on native flora and fauna.  The transfer of unnatural deoxyribonucleic acid to wild relatives can lead to displacement of those native plants, and in turn, displacement of the native fauna dependent on those wild varieties.

*Id.* at Sec. 1(4)(A)-(E).

Based upon its "Findings," the General Assembly concluded "that food produced from genetic engineering should be labeled as such," because "[l]abeling gives consumers information they can use to make decisions about what products they would prefer to purchase," because public opinion polls indicate labeling is relevant to consumers,[4] and because "[p]ersons with certain religious beliefs object to producing foods using genetic engineering [and object] to tampering with the genetic makeup of life

---

[4] These polls include a poll conducted by the Center for Rural Studies at the University of Vermont that "indicate[d] that a large majority of Vermonters want foods produced with genetic engineering to be labeled as such" and a poll conducted by the New York Times that "indicated that many consumers are under an incorrect assumption about whether the food they purchase is produced from genetic engineering, and labeling food as produced from genetic engineering will reduce consumer confusion or deception regarding the food they purchase."  2014 Vt. Acts & Resolves No. 120, Sec. 1(5)(A)-(B).

forms and the rapid introduction and proliferation of genetically engineered organisms and, therefore, need food to be labeled as genetically engineered." *Id.* at Sec. 1(5)(A)-(B), (D)-(E).

In support of Act 120's "natural" restriction, the General Assembly found:

> Because genetic engineering, as regulated by this [A]ct, involves the direct injection of genes into cells, the fusion of cells, or the hybridization of genes that does not occur in nature, labeling foods produced with genetic engineering as "natural," "naturally made," "naturally grown," "all natural," or other similar descriptors is inherently misleading, poses a risk of confusing or deceiving consumers, and conflicts with the general perception that "natural" foods are not genetically engineered.

*Id.* at Sec. 1(5)(C).

"For multiple health, personal, religious, and environmental reasons," the General Assembly ultimately found that "the State should require food produced with genetic engineering to be labeled as such in order to serve the interests of the State, notwithstanding limited exceptions, to prevent inadvertent consumer deception, prevent potential risks to human health, protect religious practices, and protect the environment." *Id.* at Sec. 1(5), (6).

### D. Act 120's Legislative Purpose.

Act 120's "Purpose," as declared by the General Assembly, is to:

> (1) Establish a system by which persons may make informed decisions regarding the potential health effects of the food they purchase and consume and by which, if they choose, persons may avoid potential health risks of food produced from genetic engineering;
>
> (2) Inform the purchasing decisions of consumers who are concerned about the potential environmental effects of the production of food from genetic engineering;
>
> (3) Reduce and prevent consumer confusion and deception by prohibiting the labeling of products produced from genetic engineering as "natural" and by promoting the disclosure of factual information on food labels to allow consumers to make informed decisions; and

(4) Provide consumers with data from which they may make informed decisions for religious reasons.

9 V.S.A. § 3041(1)-(4).

E.    **Evidence In Support of the Pending Motions.**

The parties have submitted competing expert witness declarations and reports, examining the science, safety, efficacy, economics, and impacts of GE food production.[5] They nonetheless acknowledge that their submissions cannot be considered in adjudicating the State's motion to dismiss Plaintiffs' Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6).

The parties further acknowledge that because Plaintiffs do not seek either an evidentiary hearing or a consolidation with the merits for their preliminary injunction motion, the court cannot rely on contested evidence to resolve any factual disputes. *See Kern v. Clark*, 331 F.3d 9, 12 (2d Cir. 2003) ("'The existence of factual disputes

---

[5] At the parties' request, the court took judicial notice of the following: Act 120's legislative history and the materials considered by the Vermont General Assembly in arriving at its "Findings"; White House Office of Sci. & Tech. Policy, Coordinated Framework for Regulation of Biotechnology, 51 Fed. Reg. 23,302 (June 26, 1986); U.S. Food & Drug Admin. ("FDA"), Statement of Policy: Foods Derived from New Plant Varieties, 57 Fed. Reg. 22,984 (May 29, 1992); U.S. Food & Drug Admin., Draft Guidance for Industry: Voluntary Labeling Indicating Whether Foods Have or Have Not Been Developed Using Bioengineering (2001); FDA Commissioner's testimony on March 27, 2014 before a House Appropriations Subcommittee; materials from the American Medical Association, Policy H-480.958, Bioengineered (Genetically Engineered) Crops and Foods (June 2012), and the American Association for the Advancement of Science, Statement by the AAAS Board of Directors on Labeling of Genetically Modified Foods (Oct. 20, 2012); certain materials from the Vermont Office of the Attorney General, including materials regarding the Office of the Attorney General's Draft GE Food Labeling Rule (Oct. 15, 2014) (Doc. 63-1); a report from the Vermont Agency of Agriculture, Food, and Markets; and select articles, including an article submitted by the State post-hearing. (Docs. 40, 62 & 91.)  In taking judicial notice of the materials submitted by the parties, the court does not accept or adjudicate the truth of the statements contained therein, but merely takes notice of the fact that the statements contained in the documents were made. *See Oneida Indian Nation of N.Y. v. State of New York*, 691 F.2d 1070, 1086 (2d Cir. 1982) (holding "judicial notice is limited to law, legislative facts, or factual matters that are incontrovertible," including "extrinsic historical evidence" regarding legislative acts); *In re Frito-Lay N. Am., Inc., All Natural Litig.*, 2013 WL 4647512, at *4 (E.D.N.Y. Aug. 29, 2013) (taking judicial notice of similar "documents for the fact that they contain the statements that they contain"); *see also* 21B Fed. Prac. & Proc. Evid. § 5103.2 (2d ed.) (explaining judicial notice of legislative facts, to which Fed. R. Evid. 201 does not apply).

necessitates an evidentiary hearing . . . before a motion for a preliminary injunction may be decided.'") (alteration in original) (quoting *Commodity Futures Trading Comm'n v. Incomco, Inc.*, 649 F.2d 128, 131 (2d Cir. 1981)).

For purposes of adjudicating the pending motions, the court is therefore confined to the factual and procedural background set forth herein and does not determine whether the General Assembly erred in its "Finding" that "[g]enetically engineered foods potentially pose risks to health, safety, agriculture, and the environment." 2014 Vt. Acts & Resolves No. 120, Sec. 1(4).

In support of their motion for a preliminary injunction, Plaintiffs submitted the declarations of the Coca-Cola Company ("Coke"), PepsiCo, Inc. ("Pepsi"), General Mills, ConAgra Foods, Inc. ("ConAgra"), and Kraft Foods Group, Inc. ("Kraft"), as well as declarations from the SFA, Michaud Distributors ("Michaud"), and the Council of Supply Chain Management Professionals ("CSCMP"). The court refers to these entities as "Plaintiffs' GE manufacturers."

The State submitted competing declarations from Ben & Jerry's, Clif Bar and Company ("Clif Bar"), and Beanfields Snacks ("Beanfields"). These entities are referred to as "the State's declarants."

### 1. The Costs of Compliance with Act 120.

Generally, food manufacturers offer items for retail sale by identifying them through a "stock-keeping unit" ("SKU"), which is a unique number for purposes of manufacturing, packaging, storage, sales, and distribution. A single product can have several SKUs that reflect each size of the product offered for sale, such as a six-pack or a twelve-pack, as well as the type of packaging used, such as a cardboard box or plastic. A SKU is typically not state-specific because manufacturers often do not have separate product lines for individual states, but, rather, distribute their products nationwide.

Plaintiffs' GE manufacturers distribute a large number of SKUs, ranging from approximately 1,700 SKUs (Pepsi) to tens of thousands of SKUs (ConAgra). None of Plaintiffs' GE manufacturers currently label their products in accordance with Act 120's GE disclosure requirement. They have considered whether to "reformulate" their

products to be GE-free and have concluded that it is virtually impossible to manufacture many foods with non-GE sources for several reasons, including the prevalence of GE crops nationwide and the unavailability of non-GE ingredients in relation to demand, as well as an inability to change existing planting patterns, crops cycles, and contracts for production before Act 120's effective date.[6]  (*See, e.g.*, Doc. 33-4 at 6-7, ¶¶ 20-23.) Plaintiffs' GE manufacturers therefore represent that if they continue to distribute non-exempt food products in Vermont, they will have to re-label the "vast majority" of their products.  (*See, e.g.*, Doc. 33-8 at 4, ¶ 12; Doc. 33-10 at 5, ¶ 16.)  They contend that re-labeling will require "a costly, time and resource-intensive effort" because they source from hundreds of ingredients that are made from or with GE crops in order to produce and distribute a large number of products.  (Doc. 33-8 at 5, ¶ 15; *see also* Doc. 33-7 at 3-4, ¶¶ 11, 15.)

To comply with Act 120's GE disclosure requirement, Plaintiffs' GE manufacturers represent that they will incur "significant" costs, although the total costs of compliance are "difficult or impossible to quantify."  (Doc. 33-10 at 10, ¶¶ 33-34.)  They explain that compliance will require them to evaluate whether their products contain or likely contain GE ingredients, including an investigation of all "upstream components," (Doc. 33-10 at 5, ¶ 18), which will be followed by an evaluation of "the feasibility of designing, producing[,] and implementing Vermont-specific labels for all affected products."  (Doc. 33-8 at 5, ¶ 17; *see also* Doc. 33-9 at 7, ¶¶ 22-24.)

In addition to the impacts of designing new packages and/or labels for Vermont-bound products, Plaintiffs' GE manufacturers assert they will need to expend resources for dual-inventory, production, and distribution systems for Vermont-bound products, which will require additional plant and storage space for producing and handling separate inventories of Vermont-specific labels and products.  They point out that while larger

---

[6] As an alternative to compliance with Act 120, some of Plaintiffs' GE manufacturers considered whether they could refrain from selling products in Vermont, but concluded that, due to the long shelf lives of many products and current distributor relationships and contracts, they may still have non-compliant products in distribution as of the Act's effective date.  (*See* Doc. 33-7 at 8, ¶ 29; Doc. 33-10 at 13, ¶ 46; *see also* Doc. 33-4 at 9, ¶¶ 29-31.)

manufacturers will have more SKUs to change, smaller manufacturers may not be able to incur the expense of designing, reviewing, and creating new labels for their Vermont-bound products.  They contend that this, in turn, may reduce competition in Vermont to a few multi-category, multinational companies that can afford product segregation.

## 2.    The Timing of Compliance with Act 120.

Plaintiffs' GE manufacturers claim that they may not be able to implement product changes in time to comply with Act 120's effective date because the process of "designing the packaging, conducting a compliance review, and making new plates would take 20 to 26 weeks," without accounting for additional lead times for production of new labels and newly-labeled products, distribution, and to "clear non-compliant products from commerce."  (Doc. 33-4 at 4, 10, ¶¶ 14, 33; *see also* Doc. 33-3 at 12-13, ¶¶ 40-41.)  The lead times required for Plaintiffs' GE manufacturers vary based on the number of GE products that must be re-labeled and on the shelf lives of those products, which range from "months, if not up to two years."  (Doc. 33-8 at 7, ¶ 22; *see also* Doc. 33-6 at 6-7, ¶¶ 20-22.)  Some of Plaintiffs' GE manufacturers estimate they will have to begin distribution by at least July 1, 2015 to comply with Act 120's GE disclosure requirement.  (*See* Doc. 33-10 at 11-12, ¶¶ 40-41.)

The State's declarants challenge Plaintiffs' GE manufacturers' contentions regarding the costs of creating new packaging, as well as the timing and feasibility of compliance with Act 120.[7]  They point out that using stickers, adding labels, or using separate packaging for products requiring a GE disclosure present alternative methods of

---

[7] For example, Ben & Jerry's, which manufacturers products with approximately 70 SKUs, estimates that the "entire process" of changing its packaging would cost $500 per SKU; that "a simple 4 to 6 word change to a label or package," including the design, production, and delivery to its manufacturing facility, would be a "fairly easy" change that would take about six weeks; and that it would take six months from "package redesign to store shelf."  (Doc. 63-7 at 4-5, ¶¶ 8-9, 11.)  Clif Bar states the total cost for each packaging change ranges between $500 and $1,950 and estimates the entire process to redesign and produce its packaging would take approximately four to six months.  (Doc. 63-8 at 5, 7, ¶¶ 11, 15.)  Beanfields identifies a cost of $300 to $400 per package or label change and that it could implement these changes in three to four months, if necessary.  Beanfields, however, will not have to make any changes to its packaging to comply with Act 120 because it produces non-GE food products.  (Doc. 63-9 at 4-5, ¶¶ 6, 10-11.)

compliance that would be less costly and time-consuming than the methods suggested by Plaintiffs' GE manufacturers. Regardless of how a manufacturer chooses to comply, the State's declarants point out that compliance costs could be passed on to consumers or absorbed by the manufacturer, that "[c]hanging labels is simply part of the business," and that it is "common" to change a product's packaging or labeling for a host of reasons, including to further marketing objectives. (Doc. 63-9 at 4, ¶ 7; *see also* Doc. 63-8 at 4, ¶¶ 6-8.) They contend that most food manufacturers manage their inventory "in weeks, not months," (Doc. 63-7 at 4, ¶ 7), and maintain no greater than a 90 day supply of "packaging inventory." (Doc. 63-8 at 6, ¶ 13.) Accordingly, they assert that GE manufacturers will have the ability to use non-compliant packaging before Act 120's effective date and to use any non-compliant inventory thereafter for distribution outside of Vermont. (*See* Doc. 63-8 at 6, ¶ 13.)

      F.    **The Final Rule.**

Act 120 provides that the Attorney General "may adopt by rule requirements for the implementation" of Act 120 that include: (1) "a requirement that the label required for food produced from genetic engineering include a disclaimer that the Food and Drug Administration does not consider foods produced from genetic engineering to be materially different from other foods"; and (2) "a requirement that a label required under [Act 120] identify food produced entirely or in part from genetic engineering in a manner consistent with requirements in other jurisdictions for the labeling of food, including the labeling of food produced with genetic engineering." 2014 Vt. Acts & Resolves No. 120, Sec. 3(1), (2); *see also* 9 V.S.A. § 3048(b) ("The Attorney General shall have the same authority to make rules . . . as provided under subchapter 1 of chapter 63 of this title.").

During the pendency of this case, the Office of the Attorney General filed a Final Rule on April 20, 2015. *See* Consumer Protection Rule 121 [hereinafter Final Rule] (Doc. 93-1). According to the State, the Final Rule is intended "to clarify the reach of the statute," (Doc. 63 at 27), and provides several definitions for terms used in Act 120, including that "[t]he term 'genetic engineering' does not encompass a change of genetic material through the application of traditional breeding techniques, conjugation,

fermentation, traditional hybridization, in vitro fertilization, or tissue culture." Final Rule § 121.01(6). The Final Rule also provides definitions for "Clear and conspicuous," "Know," and "Knowingly." *See* Final Rule § 121.01(1), (9)-(10).

The Final Rule purports to "clarif[y] the scope" of Act 120's "natural" restriction, (Doc. 63 at 28), by stating that the phrase "'[n]atural or any words of similar import' means the words nature, natural, or naturally." Final Rule § 121.01(14). It limits Act 120's "natural" restriction on advertising or signage to a "retail premises" in Vermont:

> The manufacturer of a food that is produced entirely or partially with genetic engineering and offered for retail sale in Vermont shall not make any statement about the food that contains the word natural or any words of similar import: (1) in advertising at or in the retail premises, (2) on signs identifying the product at the point of display in the retail premises, or (3) on the label of the food. This prohibition does not apply to a food's trade, brand, or product name, or any information required by the [FDA], as referenced in 21 C.F.R. § 101.2(b).

Final Rule § 121.02(c)(i); *see also* Final Rule § 121.01(22)-(23) (defining "Retail Premises" to mean "the physical location in Vermont where a retailer offers food for retail sale to consumers" and "Retailer" to mean "a person located in Vermont offering any raw agricultural commodity or processed food for retail sale").

The Final Rule confirms that Act 120 does not prohibit "a person" from disclaiming on a food's "packaging" that the FDA "does not consider food produced with genetic engineering to be materially different from other foods," and it affirmatively provides that "a person may, in connection with offering food produced with genetic engineering for retail sale in Vermont, make other disclosures about the food on its packaging." Final Rule § 121.02(c)(ii).

The Final Rule provides that Act 120 shall not be construed to:

> require the listing or identification of any ingredient or ingredients that were genetically engineered; or require the placement of the term "genetically engineered" or a similar phrase immediately preceding or following any common name or primary product descriptor of a food; or require the placement of any disclosure required under section 121.02 of this rule as "intervening material" under 21 C.F.R. § 101.2(e); or otherwise

require adding to or amending the information required by the [FDA], as
referenced in 21 C.F.R. § 101.2(b).

Final Rule § 121.02(d).

The Final Rule purports to limit when a GE manufacturer may use "partially" and
"may be" produced with genetic engineering in conjunction with a GE food. Under the
Final Rule, "'[p]artially' may be used to modify 'Produced with Genetic Engineering'
only when a processed food contains less than 75% genetically engineered material by
weight," and "'[m]ay be' may be used to modify 'Produced with Genetic Engineering'
only when the food's manufacturer does not know, after reasonable inquiry, whether the
food is, or contains a component that is, produced with genetic engineering." Final Rule
§ 121.02(b).

The Final Rule provides a safe harbor for GE retailers that requires notice and an
opportunity for "corrective action" before an enforcement action takes place. Final Rule
§ 121.04(c)(i). It also sets forth a "presumption of manufacturer compliance," which
provides that:

> Any packaged, processed food subject to the provisions of this rule and
> offered for retail sale in Vermont before January 1, 2017, that does not
> comply with this rule, is presumed to have been packaged and distributed
> prior to July 1, 2016, and the manufacturer shall not be liable for failure to
> comply with this rule unless there is evidence that the food was distributed
> on or after July 1, 2016.

Final Rule § 121.04(d)(i).

Plaintiffs contend that Act 120 cannot lawfully be amended by either a Draft Rule
or a Final Rule and that only the General Assembly may "correct" Act 120's alleged
constitutional deficiencies. The parties have not fully briefed this issue as only a Draft
Rule existed when their motions and related papers were filed. The court thus considers
the Final Rule in conjunction with the pending motions, but will provide the parties with
an opportunity to address its import in supplemental briefing.

## II.   Conclusions of Law and Analysis.

### A.   Motion to Dismiss.

Under Fed. R. Civ. P. 12(b)(6), when deciding a motion to dismiss for failure to state a claim, a court assumes "all well-pleaded, nonconclusory factual allegations in the complaint to be true," *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 124 (2d Cir. 2010), and determines "whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The court also draws "all reasonable inferences in the plaintiff's favor." *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009) (internal quotation marks omitted). The court will not credit "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678.

In its evaluation of a motion to dismiss, "a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). A district court may also consider any "materials" that are "integral to" the complaint, *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 156 (2d Cir. 2006), as well as those matters of which the court took judicial notice. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

To survive a motion to dismiss, a complaint must contain sufficient factual allegations "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (citations and internal quotation marks omitted).

The district court's role "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *DiFolco*, 622 F.3d at 113 (internal quotation marks omitted); *see also Global Network*

*Commc'ns, Inc.*, 458 F.3d at 155 ("The purpose of Rule 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief *without* resolving a contest regarding its substantive merits."). For this reason, the court does not evaluate the credibility of the Amended Complaint's factual allegations. *See Wright v. MetroHealth Med. Ctr.*, 58 F.3d 1130, 1138 (6th Cir. 1995) ("In considering a motion under Fed. R. Civ. P. 12(b)(6), it is not the function of the court to weigh the evidence or evaluate the credibility of witnesses[.]") (citation omitted).

### B.    Count Four: Plaintiffs' Commerce Clause Challenge.

In adjudicating the motion to dismiss, the court turns first to Count Four, the only count of the Amended Complaint with regard to which Plaintiffs do not seek a preliminary injunction. In Count Four, Plaintiffs allege Act 120 violates the dormant Commerce Clause, and on that basis they ask that the Act be declared invalid in its entirety. The Commerce Clause authorizes Congress "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indians Tribes." U.S. Const. art. I, § 8, cl. 3. Although the Commerce Clause does not "expressly restrain the several States in any way, [the Supreme Court has] sensed a negative implication" within the Clause, "called the dormant Commerce Clause." *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337 (2008) (internal quotation marks omitted).

"The limitation imposed by the Commerce Clause on state regulatory power 'is by no means absolute,' and 'the States retain authority under their general police powers to regulate matters of legitimate local concern, even though interstate commerce may be affected.'" *Maine v. Taylor*, 477 U.S. 131, 138 (1986) (quoting *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 36 (1980)). "[B]ecause consumer protection is a field traditionally subject to state regulation," courts are "'particularly hesitant to interfere with the [state's consumer protection] efforts under the guise of the Commerce Clause.'" *SPGGC, LLC v. Blumenthal*, 505 F.3d 183, 194 (2d Cir. 2007) (quoting *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 344 (2007)).

A law may "clearly discriminat[e]" against interstate commerce "in three ways: (1) by discriminating against interstate commerce on its face; (2) by harboring a

18

discriminatory purpose; or (3) by discriminating in its effect." *Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 48 (2d Cir. 2007) (citations omitted).

In seeking dismissal of Count Four, the State argues that Act 120 does not discriminate against interstate commerce because it treats in-state and out-of-state GE manufacturers in the same manner and because the burdens of Act 120 are not excessive in relation to its benefits under *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970) [hereinafter *Pike*]. Plaintiffs respond that they have alleged sufficient facts at the pleading stage to survive a motion to dismiss, and they urge the court to await the development of the record before undertaking the fact-intensive inquiry required by *Pike*. As explained below, because of the manner in which Plaintiffs have framed their Commerce Clause challenges, the court does not reach a *Pike* analysis.

### 1. Whether Plaintiffs Assert a Facial Challenge to Act 120 and Whether They Allege It Reflects a Discriminatory Purpose.

Plaintiffs' allegations all address Act 120's probable *impacts* on GE manufacturers and interstate commerce. They do not identify any distinction found within Act 120, itself, that discriminates between in-state and out-of-state GE manufacturers. Where courts have struck down a statute based on a facial challenge under the Commerce Clause, the law in question has generally distinguished between in-state and out-of-state commerce.[8] Here, no such distinctions within Act 120 exist "on its face." *Town of Southold*, 477 F.3d at 48. Accordingly, the court assumes Plaintiffs are not making a facial challenge.

---

[8] *See, e.g., Granholm v. Heald*, 544 U.S. 460, 466 (2005) (finding state statutes that restrict direct sales to consumers by out-of-state wineries, but permit in-state sales to those same consumers, violate the Commerce Clause); *Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S. 564, 570-71, 575-76 (1997) (striking down Maine statute that "expressly distinguishes between entities that serve a principally interstate clientele and those that primarily serve an intrastate market, singling out camps that serve mostly in-staters for beneficial tax treatment, and penalizing those camps that do a principally interstate business"); *City of Philadelphia v. New Jersey*, 437 U.S. 617, 618, 629 (1978) (striking down state statute prohibiting the importation of most "waste which originated or was collected outside the territorial limits of [New Jersey]") (internal quotation marks omitted).

Plaintiffs also do not appear to claim that Act 120 reflects a discriminatory purpose. In order to advance a discriminatory purpose challenge under the Commerce Clause, Plaintiffs must plausibly allege that the Vermont General Assembly enacted Act 120 in order to favor Vermont products over the same or similar products from other states. *See, e.g.*, *Bacchus Imps., Ltd. v. Dias*, 468 U.S. 263, 265, 273 (1984) (striking down facially-neutral statute exempting certain locally-produced alcoholic beverages from Hawaii's excise tax because legislative history showed it was intended to foster local industry and "favor" local products); *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 335-36, 352-54 (1977) (striking down facially-neutral statute prohibiting any state grading on certain apple boxes and noting evidence that it was intended to discriminate against out-of-state apples carrying state grades, while favoring in-state apples). Plaintiffs do not allege that Act 120 was passed to favor Vermont GE manufacturers over GE manufacturers from other states, nor do they point to anything in the legislative history that would make such a claim plausible.

### 2. Whether Plaintiffs Plausibly Allege a Discriminatory Effects Challenge to Act 120 Under the Commerce Clause.

Plaintiffs' Commerce Clause challenge to Act 120 is thus confined to a claim that the Act discriminates against interstate commerce "in its effect." *Town of Southold*, 477 F.3d at 48. A discriminatory effects challenge does not always lend itself to neat categorization, but instead often reflects a sliding scale of state-imposed burdens on interstate commerce:

> Regulations that clearly discriminate against interstate commerce [are] virtually invalid *per se*, while those that incidentally burden interstate commerce will be struck down only if the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. The Supreme Court has acknowledged, however, that there is no clear line separating the category of state regulation that is virtually *per se* invalid under the Commerce Clause, and the category subject to the *Pike v. Bruce Church* balancing approach. In order to determine whether [a law] should be analyzed under the *Pike* balancing test or as a *per se* violation, [a court must] examine the nature of the burden on interstate commerce. Under

either analysis, the critical consideration is the overall effect of the statute
on both local and interstate activity.

*Am. Booksellers Found. v. Dean*, 342 F.3d 96, 102 (2d Cir. 2003) (citations and internal
quotation marks omitted).

     The State seeks dismissal of Plaintiffs' discriminatory effects claim, arguing that
Act 120's effect on interstate commerce is either non-existent or *de minimus* and is
therefore not excessive in relation to Act 120's benefits.  In opposing dismissal, Plaintiffs
assert, among other things, that they have "stated a claim that the natural ban's regulation
of national media is a *per se* violation of the Commerce Clause."  (Doc. 36 at 23.)
Although the Amended Complaint does not contain this specific claim, Plaintiffs'
allegations are sufficient to be characterized as a *per se* challenge.[9]  In essence, Plaintiffs
allege that Act 120's "natural" restriction reaches national and Internet communications
that cannot lawfully be regulated by a single state.

     Act 120 prohibits GE manufacturers from, among other things, labeling a product
"in *signage*, or in *advertising* as 'natural,' 'naturally made,' 'naturally grown,' 'all
natural,' or any words of similar import that would have a tendency to mislead a
consumer."  9 V.S.A. § 3043(c) (emphasis supplied).  The Act does not define either
"signage" or "advertising," and therefore these restrictions apply to any non-exempt
"[m]anufacturer" who produces, sells, distributes, or licenses GE products that are sold in
or into Vermont.  9 V.S.A. § 3042(6).  There is, however, no corresponding requirement
that the signage and advertising occur in Vermont.  By its terms, Act 120 purports to
restrict a GE manufacturer's use of "natural" terminology in signage and advertising
nationwide and on the Internet.[10]

---

[9] Plaintiffs allege that "manufacturers promote their food through regional and national
advertising" and that "[m]anufacturers therefore cannot achieve compliance with the advertising
restrictions in the Act without changing their nationwide and regional advertising, as well as
their Internet advertising and web sites."  (Doc. 37-1 at 22, ¶ 75.)

[10] The State appears to misunderstand the essence of Plaintiffs' *per se* Commerce Clause claim.
In a footnote, the State characterizes the claim as one related to the *costs* of changing advertising
and signage whereas Plaintiffs' *per se* claim under the Commerce Clause is directed to the

Act 120's "Findings" and "Purpose" contain no mention of any putative benefit that could be tied to Vermont's regulation of GE manufacturers' advertising and signage activities in other states. "A state law may burden interstate commerce when it 'has the practical effect of requiring out-of-state commerce to be conducted at the regulating state's direction.'" *Entergy Nuclear Vt. Yankee, LLC v. Shumlin*, 733 F.3d 393, 429 (2d Cir. 2013) (quoting *Am. Booksellers Found.*, 342 F.3d at 102); *cf. SPGGC, LLC*, 505 F.3d at 194 (holding that a statute prohibiting the in-state sale of certain types of gift cards did not violate the dormant Commerce Clause because it did not, "by its terms or its effects, directly regulate sales of gift cards in other states . . . [or] prevent other states from regulating gift card sales differently within their own territories").

In *American Booksellers Foundation*, the Second Circuit struck down portions of a Vermont statute that prohibited the transfer of sexually explicit material to a minor. The Second Circuit noted that the Vermont statute reached distribution of sexually explicit material via the Internet and explained that, "[b]ecause the [I]nternet does not recognize geographic boundaries, it is difficult, if not impossible, for a state to regulate [I]nternet activities without 'project[ing] its legislation into other States.'" *Am. Booksellers Found.*, 342 F.3d at 103 (quoting *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 334 (1989)). The Vermont statute's regulation of such activities therefore had "'the practical effect of regulating commerce occurring wholly outside that State's borders,'" and, "[a]lthough Vermont aim[ed] to protect only Vermont minors, the rest of the nation [was] forced to comply with its regulation or risk prosecution." *Id.* at 103 (quoting *Healy*, 491 U.S. at 332). Because "Vermont ha[d] projected its legislation into other States, and *directly regulated* commerce therein, in violation of the dormant Commerce Clause," *id.* at 104 (internal quotation marks omitted), the Second Circuit affirmed this court's permanent

---

nationwide *reach* of Act 120's regulation of advertising and signage. (*See* Doc. 24-1 at 42 n.22.) In its briefing, the State suggested that its Final Rule will "clarify" any problem with Act 120's "natural" restriction. (Doc. 63 at 76.) The Final Rule purports to limit Act 120's reach to "advertising *at or in* the retail premises" for food "offered for retail sale *in Vermont*." Final Rule § 121.02(c)(i) (emphasis supplied). However, because the parties have not briefed whether the Final Rule may lawfully narrow the reach of Act 120's "natural" restriction in this manner, the court confines its analysis to the text of Act 120.

injunction prohibiting enforcement of the Vermont statute insofar as it "applied to the [I]nternet speech upon which plaintiffs based their suit." *Id.* at 105.

A similar conclusion is warranted here. Without limitation and for no stated purpose, Act 120 purports to prohibit GE manufacturers' use of "natural" terminology in signage and advertising regardless of where or how those activities take place. These allegations are sufficient to state a plausible *per se* violation of the Commerce Clause based upon its discriminatory effects. The State's motion to dismiss this aspect of Plaintiffs' Commerce Clause claim is therefore DENIED.

The State is more persuasive in arguing that Plaintiffs' remaining discriminatory effects Commerce Clause claims should be dismissed. In their Amended Complaint, Plaintiffs allege that the effects of Act 120 fall disproportionately on out-of-state food manufacturers because "the vast majority" of Plaintiffs' members are located outside Vermont, there are allegedly "no major food manufacturers" based in Vermont, and that, as a result, "the cost of implementing [Act 120] falls largely, if not entirely, on out-of-state companies." (Doc. 37-1 at 21, ¶ 73.)

Plaintiffs further allege that Act 120 forces their members, who sell food in interstate commerce through national and regional distribution chains, to establish Vermont-specific distribution channels which cannot be established in a commercially reasonable manner before Act 120's effective date. They assert that they will effectively be compelled to change their regional or national labeling, regardless of where their products may be sold, as this will be the only cost-efficient means of achieving compliance with Act 120's GE disclosure requirement. In light of GE labeling legislation in other states, Plaintiffs represent that this task will be complicated by the need to comply with conflicting GE regulations which will only further impede the flow of interstate commerce. For purposes of ruling on the motion to dismiss, the court must accept Plaintiffs' factual allegations as true. *See Mastafa v. Chevron Corp.*, 770 F.3d 170, 177 (2d Cir. 2014).[11] However, even after Plaintiffs' allegations are fully credited,

---

[11] The court need not credit Plaintiffs' further allegation that Act 120 is discriminatory in its effects because of its exemptions. "[I]n order to show a discriminatory effect on interstate

dismissal of their remaining Commerce Clause claims is appropriate under *National Electrical Manufacturers Association v. Sorrell*, 272 F.3d 104 (2d Cir. 2001) [hereinafter *NEMA*].

In *NEMA*, the Second Circuit explained that in order to "run afoul" of the Commerce Clause, a statute "must impose a burden on interstate commerce that is qualitatively or quantitatively different from that imposed on intrastate commerce." *NEMA*, 272 F.3d at 109. Provided Act 120 does not "require manufacturers to label all [products] wherever distributed," there is thus no Commerce Clause violation because "[t]he Vermont statute, by its terms, is indifferent to whether [products] sold anywhere else in the United States are labeled or not." *Id.* at 110 (internal quotation marks omitted). "To the extent the statute may be said to 'require' labels on [products] sold outside Vermont, then, it is only because the manufacturers are unwilling to modify their production and distribution systems to differentiate between Vermont-bound and non-Vermont-bound [products]." *Id.*

*NEMA* also dispenses with Plaintiffs' argument that Act 120 violates the Commerce Clause because the costs of compliance fall disproportionately on larger, out-of-state GE manufacturers:

> Although a regulation might violate the Commerce Clause by creating market incentives that encourage out-of-state manufacturers to abandon a state market while encouraging in-state manufacturers to pick up the slack, the instant regulation is evenhanded such that . . . producers both inside and

commerce, the Plaintiffs must demonstrate that [Act 120] confers on their in-state counterparts a competitive advantage." *Brown & Williamson Tobacco Corp. v. Pataki*, 320 F.3d 200, 216 (2d Cir. 2003). Indeed, "[b]oth an in-state interest and an out-of-state competitor are necessary because laws that draw distinctions between entities that are not competitors do not discriminate for purposes of the dormant Commerce Clause." *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 95 (2d Cir. 2009) (internal quotation marks omitted). Plaintiffs therefore gain nothing by pointing to Act 120's exemptions for certain "favored" products because Act 120 offers those same exemptions for products from out-of-state. *See Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 49 (2d Cir. 2007) (concluding a law did not "discriminate on the basis of geography" because it did not "confer a competitive advantage upon local business vis-a-vis out-of-state competitors" and thus was not "discriminatory in its effect"); *see also Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 218 (2d Cir. 2004) (affirming dismissal of dormant Commerce Clause claim because plaintiffs failed to "identify any in-state commercial interest that [was] favored" by the challenged state statute "at the expense of out-of-state competitors").

24

outside Vermont would face the same putative need to develop separate
production and distribution systems to accommodate simultaneously the
Vermont market and other state markets.

*Id.* at 111. The *NEMA* court observed that "the manufacturers remain free to charge
higher prices only to Vermonters without risking violation of the statute" and that, even if
the full costs could not be passed on to the consumer, the possibility that "manufacturers
must bear some of the costs of the Vermont regulation in the form of lower profits does
not cause the statute to violate the Commerce Clause." *Id.* at 110-11.[12]

*NEMA* also forecloses Plaintiffs' claim that there will be a "patchwork of state
labeling requirements" because the few states that have enacted GE labeling requirements
have not done so in a uniform manner. (Doc. 37-1 at 23, ¶ 78.) The Amended Complaint
alleges no *actual* conflict between Act 120 and any mandatory GE labeling law
elsewhere,[13] and a *potential* statutory conflict will not suffice:

> A state regulation might impose a disproportionate burden on interstate
> commerce if the regulation is in substantial conflict with a common
> regulatory scheme in place in other states. It is not enough to point to a risk
> of conflicting regulatory regimes in multiple states; there must be an actual
> conflict between the challenged regulation and those in place in other
> states.

---

[12] *See also Freedom Holdings, Inc. v. Cuomo*, 624 F.3d 38, 66-67 (2d Cir. 2010) (rejecting
Commerce Clause challenge to tax on cigarettes sold only for consumption in New York because
"nothing prevents manufacturers from recouping increased costs imposed by New York law
from New York consumers" and because a "[m]ere upstream pricing impact is not a violation of
the dormant Commerce Clause, even if the impact is felt out-of-state where the stream
originates") (internal quotation marks omitted); *Nat'l Fed'n of the Blind v. Target Corp.*, 452 F.
Supp. 2d 946, 961 (N.D. Cal. 2006) (observing that "[c]ourts have held that when a defendant
chooses to manufacture one product for a nationwide market, rather than target its products to
comply with state laws, defendant's choice does not implicate the commerce clause").

[13] The Amended Complaint alleges there are "pending" ballot measures in Oregon and Colorado,
neither of which passed, (Doc. 37-1 at 23, ¶ 78), and the only two other states to enact GE
labeling legislation have trigger clauses which render the statutes effective only if, *inter alia*,
four additional states adopt similar GE labeling laws. *See* 2014 Me. Laws ch. 436 (HP 490) (LD
718) (Maine); 2013 Conn. Pub. Acts No. 13-183 (to be codified at Conn. Gen. Stat. § 21a-92)
(Connecticut).

*NEMA*, 272 F.3d at 112 (citations omitted). As the Amended Complaint all but concedes, "[n]o such conflict has been shown here" because "no other state [currently] regulates the labeling of [GE products], much less does so in conflict with Vermont's approach." *Id.* Accordingly, "[w]hile the scope of conflict required to state a dormant Commerce Clause claim is somewhat unclear, it is clear that the present case involves no conflict whatsoever." *Id.*

In accordance with *NEMA*'s controlling precedent, the court must dismiss Plaintiffs' remaining claims that Act 120 is discriminatory in its effects. Act 120 does not *require* GE manufacturers to alter their labeling, production, and distribution practices nationwide, and it is indifferent regarding whether and how GE products are labeled in other states. *See Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 208-09 (2d Cir. 2014) (noting dismissal is appropriate when it is "clear" that "plaintiff's claims are barred as a matter of law") (internal quotation marks omitted); *D.P. ex rel. E.P. v. Sch. Bd. of Broward County*, 483 F.3d 725, 728-29 (11th Cir. 2007) (noting dismissal is appropriate "when, on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action") (internal quotation marks omitted).

In the absence of a plausible claim that Act 120 in its effects "clearly discriminates against interstate commerce," *Wyoming v. Oklahoma*, 502 U.S. 437, 454 (1992), the court need not consider whether Act 120 is "'demonstrably justified by a valid factor unrelated to economic protectionism.'" *Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.*, 155 F.3d 59, 74 (2d Cir. 1998) (quoting *Wyoming*, 502 U.S. at 454). This is because Plaintiffs must first allege discriminatory effects before "the burden shifts to the government to show that the local benefits of the law outweigh its discriminatory effects and that the government lacked a nondiscriminatory alternative by which it could protect the local interests." *Town of Southold*, 477 F.3d at 47 (citing *USA Recycling, Inc. v. Town of Babylon*, 66 F.3d 1272, 1281-82 (2d Cir. 1995)). "[I]f no such unequal burden [is] shown, a reviewing court need not proceed further" with *Pike*'s complex factual inquiry. *NEMA*, 272 F.3d at 109.

Because Plaintiffs' remaining Commerce Clause challenges fail to state a plausible claim for relief under the dormant Commerce Clause, they are hereby DISMISSED under Fed. R. Civ. P. 12(b)(6). The State's motion to dismiss Count Four of the Amended Complaint is thus GRANTED IN PART and DENIED IN PART.

### C. Count Five: Plaintiffs' Preemption Claims.

In Count Five of their Amended Complaint, Plaintiffs allege that Act 120 is expressly preempted or conflict preempted, in whole or in part, by various federal laws and thus violates Article VI, Clause 2 of the U.S. Constitution (the "Supremacy Clause"). The Supremacy Clause provides that the laws of the United States are "the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

Under the Supremacy Clause, a state law may be preempted by federal law in three ways: express preemption, field preemption, and conflict preemption. *See Hillsborough County, Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985). In analyzing whether the Amended Complaint states a claim under the Supremacy Clause, the court is "guided by the rule that '[t]he purpose of Congress is the ultimate touchstone in every pre-emption case.'" *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). It must also adhere to the presumption against preemption, which dictates that "[i]n areas of traditional state regulation, [the court] assume[s] that a federal statute has not supplanted state law unless Congress has made such an intention clear and manifest." *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005) (internal quotation marks omitted). For this reason, "where the text of a preemption clause is ambiguous or open to more than one plausible reading, courts 'have a duty to accept the reading that disfavors pre-emption.'" *N.Y. State Rest. Ass'n v. N.Y.C. Bd. of Health*, 556 F.3d 114, 123 (2d Cir. 2009) [hereinafter *NYSRA*] (quoting *Bates*, 544 U.S. at 449).

Plaintiffs allege express preemption and conflict preemption pursuant to four federal statutes regulating the labeling of food and beverages. They do not allege, nor could they reasonably allege, field preemption, which would require the court to find that

Congress has regulated so comprehensively, and the federal interest is so dominant, in the field of food and beverage labeling that Congress "left no room for state regulation of these matters." *United States v. Locke*, 529 U.S. 89, 111 (2000); *see also Holk v. Snapple Beverage Corp.*, 575 F.3d 329, 337 (3d Cir. 2009) ("It does not appear that Congress has regulated so comprehensively in either the food and beverage or juice fields that there is no role for the states."); *Fellner v. Tri-Union Seafoods, L.L.C.*, 539 F.3d 237, 243 & n.3 (3d Cir. 2008) (noting defendants could not assert a field preemption claim in case involving labeling requirements because "[c]ourts rarely find field preemption, especially in areas traditionally regulated by the states, unless the structure of a regulatory program leaves little doubt that Congress intended federal law to be exclusive in a particular field") (citing *Hillsborough County, Fla.*, 471 U.S. at 717).

With regard to Act 120's GE disclosure requirement, Plaintiffs allege both express and conflict preemption claims under the Federal Food, Drug, and Cosmetic Act (the "FDCA"), 21 U.S.C. §§ 301–399f; and the Nutrition Labeling and Education Act (the "NLEA"), 21 U.S.C. §§ 343-1–343-3; and express preemption claims under the Federal Meat Inspection Act (the "FMIA"), 21 U.S.C. §§ 601–695; and the Poultry Products Inspection Act (the "PPIA"), 21 U.S.C. §§ 451–472.[14] With regard to Act 120's "natural" restriction, Plaintiffs assert preemption only under the FMIA and PPIA.[15]

---

[14] The Amended Complaint further alleges that, in addition to the FDCA, NLEA, FMIA, and PPIA, the Plant Protection Act, 7 U.S.C. §§ 7701–7786; the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. §§ 136–136y; and the Organic Foods Production Act, 7 U.S.C. §§ 6501–6523, reflect Congress's occupation of the field and that Act 120's "new, additional layers of regulation" impose "unjustified burdens on innovative technologies" and stand "as an obstacle to the achievement and execution of Congress's objectives in its regulation of new agricultural technologies." (Doc. 37-1 at 24-25, ¶ 85.) The parties, however, give this claim only cursory treatment in their briefing, and therefore the court declines to address it. *See Ibarra v. City of Chicago*, 2011 WL 4583785, at *8 (N.D. Ill. Sept. 28, 2011) ("Given the complexity of the legal issues, the parties' cursory treatment of the issues, and the current stage of the litigation, the Court declines to dismiss Count II at this time."); *see also Jimmo v. Sebelius*, 2011 WL 5104355, at *22 n.13 (D. Vt. Oct. 25, 2011) (declining to address issues and alleged grounds for dismissal that were addressed only in a cursory manner with regard to a motion to dismiss).

[15] Plaintiffs do not contend that federal law preempts Act 120's "natural" restriction under the FDCA and the NLEA, (Doc. 36 at 27 n.7), presumably because the courts have squarely rejected

The State seeks dismissal of Plaintiffs' claims, arguing that preemption is not
mandated by the identified federal statutes, Plaintiffs lack standing to assert a Supremacy
Clause claim to the FMIA and PPIA, and the State's Final Rule rectifies any remaining
conflicts between Act 120 and preemptive federal law.

### 1. The FDCA and NLEA.

The FDCA prohibits the misbranding of food and drink, *see* 21 U.S.C. § 343, and
its "statutory regime is designed primarily to protect the health and safety of the public at
large." *POM Wonderful LLC v. Coca-Cola Co.*, 134 S. Ct. 2228, 2234 (2014). Because
the FDCA does not contain any express preemption language, it does not, itself, provide a
basis for Plaintiffs' express preemption claims. *See Grocery Mfrs. of Am., Inc. v. Gerace*,
755 F.2d 993, 997 (2d Cir.), *aff'd*, 474 U.S. 801 (1985) (mem.).

The NLEA, which amends the FDCA, is intended "'to clarify and to strengthen
the [FDA's] legal authority to require nutrition labeling on foods, and to establish the
circumstances under which claims may be made about nutrients in foods.'" *NYSRA*, 556
F.3d at 118 (quoting H.R. Rep. No. 101-538, at 7 (1990), *reprinted in* 1990 U.S.C.C.A.N.
3336, 3337). The NLEA contains five express preemption clauses that prohibit states
from enacting food labeling requirements that are "not identical" to certain mandatory
food labeling requirements set forth in the FDCA. 21 U.S.C. § 343-1(a)(1)-(5).[16]

---

such claims. *See, e.g.*, *Holk v. Snapple Beverage Corp.*, 575 F.3d 329, 339-42 (3d Cir. 2009)
(concluding that FDA policy regarding the use of the term "natural" on labels did not "have the
force of law required to preempt conflicting state law"); *Randolph v. J.M. Smucker Co.*, 2014
WL 1018007, at *6 (S.D. Fla. Mar. 14, 2014) (observing that the "FDA has done nothing to date
that preempts any of Plaintiff's [state law] claims" that labeling cooking oil made from GE crops
as "All Natural" was misleading); *In re Frito-Lay N. Am., Inc. All Natural Litig.*, 2013 WL
4647512, at *10 (E.D.N.Y. Aug. 29, 2013) (concluding that FDA's non-binding guidance on the
meaning of the term "natural" "contains no actual federal requirements" and thus has no
"preemptive effect") (internal quotation marks omitted); *Lockwood v. Conagra Foods, Inc.*, 597
F. Supp. 2d 1028, 1031 (N.D. Cal. 2009) (rejecting contention that state law claim alleging "all
natural" pasta was misbranded was expressly preempted by 21 U.S.C. §§ 343-1(a)(2)-(3), or
otherwise field or conflict preempted).

[16] The NLEA's express preemption clauses foreclose any claim of implied preemption. *See
Holk*, 575 F.3d at 336 (observing that "courts may not find implied preemption based on any
provision of the NLEA" and that labeling claims are "impliedly preempted" only if "based on

In order to state a claim that Act 120's GE disclosure requirement violates the Supremacy Clause, Plaintiffs' burden is two-fold. They must first plausibly allege that Act 120's GE disclosure requirement is "not identical" to a mandatory requirement of the FDCA. And second, they must plausibly allege that under the NLEA the identified mandatory FDCA requirement is clearly entitled to preemptive effect. *See* 21 U.S.C. § 343-1(a)(1)-(5); *see also NYSRA*, 556 F.3d at 123 (holding "the NLEA is clear on preemption, stating that it 'shall not be construed to preempt any provision of State law, unless such provision is *expressly preempted*' under [21 U.S.C. § 343-1(a)]'") (alterations in original) (quoting Pub. L. No. 101-535, § 6(c)(1), 104 Stat. 2353, 2364, 21 U.S.C. § 343-1 note).

Plaintiffs acknowledge that the FDA has promulgated no formal standards for GE labeling. They thus point to no federal statute or regulation that prohibits Act 120's GE disclosure requirement. Plaintiffs further concede that the FDA provides guidance for the voluntary disclosure of GE ingredients. This clearly implies that, at least from the FDA's perspective, GE ingredient information may be provided without violating federal law or misbranding a food product. *See* U.S. Food & Drug Admin., Draft Guidance for Industry: Voluntary Labeling Indicating Whether Foods Have or Have Not Been Developed Using Bioengineering, at 6-7 (2001) [hereinafter FDA Draft Guidance] (noting that manufacturers may label their food and beverage products as "genetically engineered" or containing ingredients that were "produced using biotechnology"). Plaintiffs also recognize that pending federal legislation, if enacted, is intended to expressly preempt state law GE disclosure requirements. This, of course, begs the question of why such legislative measures would be necessary if Act 120's GE disclosure requirement was already preempted. *See* Safe and Accurate Food Labeling Act of 2014, H.R. 4432, 113th Cong. (2014) (proposing an amendment to the FDCA that would include express preemption of state mandatory labeling requirements for food and

---

provisions of federal law other than NLEA"); *see also Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 869 (2000) (explaining that an express preemption provision forecloses implied preemption claims).

beverages produced with bioengineered organisms). It is in the midst of this unpromising environment that Plaintiffs claim they can overcome the presumption against preemption with regard to Act 120's GE disclosure requirement.

### a. Whether Act 120's GE Disclosure Requirement Is Expressly Preempted by the FDCA and NLEA.

Plaintiffs cite Act 120's "ingredient labeling" and "product labeling" requirements as the focus of their Supremacy Clause challenge under the FDCA and the NLEA. They assert that Act 120's GE disclosure requirement forces them to modify the "standard of identity"[17] for some products, "the common or usual name"[18] for other products, and the "list of ingredients"[19] for all products. The State counters that Act 120 does not reach that far and must "be interpreted to avoid constitutional difficulties," *Frisby v. Schultz*, 487 U.S. 474, 483 (1988), as "courts 'have a duty to accept the reading that disfavors pre-emption.'" *NYSRA*, 556 F.3d at 123 (quoting *Bates*, 544 U.S. at 449).

---

[17] *See* 21 U.S.C. § 343(g) (deeming food with a standard of identity to be mislabeled "[i]f it purports to be or is represented as a food for which a definition and standard of identity has been prescribed by [the FDA], unless (1) it conforms to such definition and standard, and (2) its label bears the name of the food specified in the definition and standard, and, insofar as may be required by such regulations, the common names of optional ingredients (other than spices, flavoring, and coloring) present in such food"); *see also* 21 U.S.C. § 341 (authorizing FDA to "promulgate regulations fixing and establishing for any food, under its common or usual name so far as practicable, a reasonable definition and standard of identity").

[18] *See* 21 U.S.C. § 343(i)(1) (deeming food without a standard of identity to be mislabeled "[u]nless its label bears . . . the common or usual name of the food, if any there be"); *see also* 21 C.F.R. § 102.5(a) (providing that the "common or usual name" of a food or beverage must identify "in as simple and direct terms as possible, the basic nature of the food or its characterizing properties or ingredients" and must "be uniform among all identical or similar products").

[19] *See* 21 C.F.R. § 101.2(e) (listing requirements for the "information panel" on "packaged food," including a requirement "that the ingredient list for a food or beverage appear in one location on the product label without other intervening material"); 21 C.F.R. § 101.4(a)(1) ("Ingredients required to be declared on the label or labeling of a food . . . shall be listed by common or usual name in descending order of predominance by weight on either the principal display panel or the information panel in accordance with the provisions of [21 C.F.R.] § 101.2[.]"); *see also* 21 U.S.C. § 343(i)(2) (deeming food without a standard of identity that is "fabricated from two or more ingredients" to be mislabeled "[u]nless its label bears . . . the common or usual name of each such ingredient").

31

In order for Act 120's GE disclosure requirement to be found "not identical" to the FDCA's mandatory labeling requirements, Plaintiffs argue that the court need only find that Act 120 requires disclosure of additional or different labeling information from the FDCA. Plaintiffs rely heavily on a federal regulation that appears to interpret "not identical" in this manner. *See* 21 C.F.R. § 100.1(c)(4) (defining "not identical" as "directly or indirectly imposes obligations or contains provisions concerning the . . . labeling of food" that are "not imposed by" or that "[d]iffer from those specifically imposed by" federal law). Courts, however, have rejected the proposition that a federal regulation may extend preemption beyond NLEA's express preemption provisions. *See Reid v. Johnson & Johnson*, 780 F.3d 952, 959 (9th Cir. 2015) (observing that the NLEA "does not preempt any state law unless the law is expressly preempted," notwithstanding 21 C.F.R. § 100.1(c)(4)) (internal quotation marks omitted); *In re Farm Raised Salmon Cases*, 175 P.3d 1170, 1179 (Cal. 2008) (holding that "Congress made clear that the preemptive scope of section 343-1 was to sweep no further than the plain language of the statute itself"); *see also NYSRA*, 556 F.3d at 126 (noting the court would "owe deference to the FDA's reading" of a statute embodied in its regulations if that reading "has some support in the statute," but declining to follow an FDA amicus brief due to "concerns" with the FDA's interpretation).

Accordingly, *not all* state labeling requirements that provide more or different information from the FDCA are preempted.[20] Instead, in order for preemption to apply, the FDCA must require the labeling information at issue; the NLEA must indicate that the mandatory federal labeling requirement is entitled to preemptive effect; and Act 120's GE disclosure requirement must govern this same information.

---

[20] *See POM Wonderful LLC v. Coca-Cola Co.*, 134 S. Ct. 2228, 2237 (2014) ("'Congress did not intend FDA oversight to be the exclusive means' of ensuring proper food and beverage labeling.") (quoting *Wyeth v. Levine*, 555 U.S. 555, 575 (2009)); *id.* at 2238 (observing that "the complex pre-emption provision [of the NLEA] distinguishes among different FDCA requirements" and that "[i]t forbids state-law requirements that are of the type but not identical to only certain FDCA provisions with respect to food and beverage labeling"); *see also NYSRA*, 556 F.3d at 120 (observing that "states are not preempted from adopting nutrition information labeling laws as defined by Section 343(q), but are preempted from adopting nutrient claim laws as defined by Section 343(r)").

Plaintiffs first challenge the alleged conflict between Act 120's GE disclosure requirement and product labeling required pursuant to 21 U.S.C. § 343(g), (i). Section 343(g) of the FDCA provides that where the FDA has established a "standard of identity" for a food, the food product's label "must bear[] the name of the food specified in the definition and standard, and, insofar as may be required by other such regulations, the common names of optional ingredients." 21 U.S.C. § 343(g). Where no "standard of identity" exists, the FDCA requires that a label must "bear[ ] (1) the common or usual name of the food, if any there be, and (2) in case it is fabricated from two or more ingredients, the common or usual name of each such ingredient." 21 U.S.C. § 343(i).

Because the FDA has promulgated standards of identity for only some foods and beverages, the absence of a federal standard of identity obviates any claim that a state requirement is "not identical" to it.[21] In this case, Plaintiffs point to no federal standard of identity that governs GE ingredients. They nonetheless claim that Act 120's GE disclosure requirement must accompany every federal standard of identity, thereby impermissibly modifying its contents.[22] For a food without a standard of identity,

---

[21] *Compare Vt. Pure Holdings, Ltd. v. Nestle Waters N. Am., Inc.*, 2006 WL 839486, at *9 (D. Mass. Mar. 28, 2006) (holding that where "[n]o federal standards of identity for bottled water purity exist" a state law claim challenging bottled water labeled as "pure" was not preempted and noting the FDA's observation that if "there is no Federal requirement to be given preemptive effect, preemption does not occur") (internal quotation marks omitted), *with In re PepsiCo, Inc., Bottled Water Mktg. & Sales Practices Litig.*, 588 F. Supp. 2d 527, 537-38 (S.D.N.Y. 2008) (finding preemption where the plaintiffs' "state law claims alleging that Defendants' misrepresented the source of *Aquafina* water impose requirements that are not identical to the applicable standard of identity" the FDA has set for "purified water" that "explicitly regulate[d] purity requirements" and did not "require the disclosure of source information").

[22] For example, Plaintiffs assert that, under Act 120, enriched corn meal, a product for which the FDA has established a standard of identity, must be labeled "'enriched corn meal made from genetically engineered corn,'" which Plaintiffs argue is a "designation" that is "not identical" to "the product's mandated standard of identity." (Doc. 33-1 at 64.)

Plaintiffs assert that each time "the common or usual name" of a product appears on a label, Act 120's GE disclosure requirement must accompany it.[23]

      The plain language of Act 120 renders Plaintiffs' interpretation implausible. *See Bates*, 544 U.S. at 448-49 (rejecting implausible interpretation and noting that even with a plausible interpretation the court must "accept the reading that disfavors pre-emption"). Act 120 provides that its GE disclosure requirement "shall not be construed to require . . . the placement of the term 'genetically engineered' immediately preceding any common name or primary product descriptor of a food." 9 V.S.A. § 3043(d)(2). The Final Rule reiterates this provision. *See* Final Rule § 121.02(d). There is thus no basis for interpreting Act 120's GE disclosure requirement as mandating modifications of any existing federal standard of identity or the "common or usual name" of any GE food product.

      Plaintiffs' argument regarding the impact of Act 120's GE disclosure requirement on a product's "list of ingredients" is equally untenable. In effect, Plaintiffs ask the court to find that every listed ingredient must be accompanied by a separate GE disclosure if that ingredient is sourced from a GE crop. Nothing in Act 120 supports this interpretation, and Act 120 specifically states that its "requirements . . . shall not be construed to require," *inter alia*, "the listing or identification of any ingredient or ingredients that were genetically engineered." 9 V.S.A. § 3043(d)(1). This is consistent with the FDA's Draft Guidance, which states that "the optional terms that describe an ingredient of a multi-ingredient food as [genetically engineered] should not be used in the ingredient list of the multi-ingredient food." FDA Draft Guidance, at 10. The Final Rule confirms this interpretation and clarifies that the GE disclosure is also not required to be placed in a product's "principal display panel" or "information panel" pursuant to 21

---

[23] Plaintiffs contend that "a carbonated soft drink," which is the product's "common or usual name," must be labeled "a carbonated soft drink partially produced with genetic engineering" under Act 120. (Doc. 33-1 at 63.)

C.F.R. § 101.2.[24]  *See* Final Rule § 121.02(d).  Plaintiffs have therefore failed to establish that Act 120's GE disclosure requirement is "not identical" to any mandatory labeling requirement of the FDCA.

**b.      Whether Act 120's GE Disclosure Requirement Is Conflict Preempted by the FDCA and NLEA.**

Plaintiffs gain no stronger footing with their argument that Act 120 is "conflict preempted" because it requires GE manufacturers to label their products in a false and misleading manner by "convey[ing] an overall impression" that GE ingredients are materially different from non-GE ingredients and "not as safe as other foods" when the FDA, itself, has refused to endorse this labeling message.  (Doc. 33-1 at 67.)  Conflict preemption exists (1) where it is "impossible for a private party to comply with both state and federal requirements," or (2) where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995) (citations omitted).

The "impossibility prong" requires "no inquiry into congressional design" but turns solely on whether "compliance with both federal and state regulations is a physical impossibility."  *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963).  The Supreme Court has recognized that "[i]mpossibility pre-emption is a demanding defense."  *Wyeth*, 555 U.S. at 572.

Plaintiffs' Amended Complaint does not assert that it is physically impossible for a GE food product to be labeled with a "clear and conspicuous" statement that it is "produced with genetic engineering," 9 V.S.A. § 3043(a)(2), (b)(1)-(2), and also comply with the FDCA's mandatory labeling requirements.  Not only does the FDA allow for voluntary GE disclosures, but, for illustrative purposes, the State has proffered a product label that demonstrates how dual compliance may be achieved.  (*See* Doc. 63 at 60)

---

[24] *See* 21 C.F.R. §§ 101.2(b), (e) (directing that "[a]ll information required to appear on the label of any package of food under [federal regulations] shall appear either on the principal display panel or on the information panel, unless otherwise specified by regulations in this chapter," and that "[a]ll information appearing on the information panel pursuant to this section shall appear in one place without other intervening material").

(depicting a cereal label that complies with federal labeling requirements and includes a GE disclosure statement). Plaintiffs have therefore failed to plausibly allege the "physical impossibility" of "dual compliance." *Paul*, 373 U.S. at 143.

The "obstacle prong" of conflict preemption, which requires an analysis of whether a state requirement thwarts the purposes and objectives of Congress, is "informed by examining the federal statute as a whole and identifying its purpose and intended effects." *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 101 (2d Cir. 2013) (internal quotation marks omitted), *cert. denied sub nom. Exxon Mobil Corp. v. City of New York*, 134 S. Ct. 1877 (2014). The court must consider whether "the purpose of the act cannot otherwise be accomplished—if its operation within its chosen field . . . must be frustrated and its provisions be refused their natural effect." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (internal quotation marks omitted). Where an obstacle of this magnitude is found, "the state law must yield to the regulation of Congress within the sphere of its delegated power." *Id.* (internal quotation marks omitted).

Plaintiffs contend that Act 120 is conflict preempted because the FDCA prohibits "false or misleading" labeling, 21 U.S.C. § 343, and the GE disclosure requirement allegedly conveys a false and misleading opinion regarding the safety of GE food products based on a definition of GE that "far exceeds the meaning of that term in federal law." (Doc. 33-1 at 66-67.) Act 120's GE disclosure requirement, however, makes no statement regarding food safety, and thus any "overall impression" that GE ingredients are "unsafe" owes nothing to the purely factual information provided by it. Act 120's GE disclosure requirement also conveys no information regarding nutrition and makes no claim about the nutritional value of GE ingredients. As the term "genetically engineered" is not federally regulated or defined for purposes of food and beverage labeling, it can hardly be said that a state definition that differs from definitions used in federal policy and guidance statements is "false and misleading," or "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 132 S. Ct. 2492, 2501 (2012) (internal quotation marks omitted).

Plaintiffs fare no better with their claim that Act 120 "stands in the way of the ability of federal agencies . . . to administer the health and safety statutes they are charged with implementing." (Doc. 75 at 31.)  Plaintiffs' reliance on a 1986 policy statement by the Office of Science and Technology Policy entitled "Coordinated Framework for Regulation of Biotechnology," 51 Fed. Reg. 23,302 (June 26, 1986) [hereinafter Coordinated Framework], is misplaced because the Coordinated Framework has no preemptive effect. *See Holk*, 575 F.3d at 341 (observing that the "FDA's policy statement" is "not entitled to preemptive effect").  There is also no basis for finding the Coordinated Framework reflects *Congress's* objectives with regard to the labeling of GE foods.

Plaintiffs' strongest conflict preemption argument is that the FDCA, as amended by the NLEA, is intended to promote "national uniformity in certain aspects of food labeling, so that the food industry can market its products efficiently in all 50 States in a cost-effective manner."  State Petitions Requesting Exemption from Federal Preemption, 58 Fed. Reg. 2462, 2462 (Jan. 6, 1993) (codified at 21 C.F.R. pt. 100).  As the Seventh Circuit recently observed, albeit in *dicta*: "It is easy to see why Congress would not want to allow states to impose disclosure requirements of their own on packaged food products, most of which are sold nationwide.  Manufacturers might have to print 50 different labels, driving consumers who buy food products in more than one state crazy." *Turek v. Gen. Mills, Inc.*, 662 F.3d 423, 426 (7th Cir. 2011).

While Plaintiffs' plea for GE labeling uniformity reflects economic sense, and perhaps common sense as well, it runs afoul of the presumption against preemption which "'is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there [is] between them.'" *Wyeth*, 555 U.S. at 575 (alteration in original) (quoting *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 166-67 (1989)).  Regulation of food and beverages is an area in which

37

Congress has long expressed its awareness of state legislation and has consistently tolerated the states' competing interests and regulatory control.[25]

Because the "purpose of Congress is the ultimate touchstone in every pre-emption case," *Lohr*, 518 U.S. at 485 (internal quotation marks omitted), "[i]n areas of traditional state regulation, [the court] assume[s] that a federal statute has not supplanted state law unless Congress has made such an intention clear and manifest." *Bates*, 544 U.S. at 449 (internal quotation marks omitted). Plaintiffs therefore fall short of plausibly alleging that Act 120's GE disclosure requirement "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Myrick*, 514 U.S. at 287 (internal quotation marks omitted). This court must therefore presume that Act 120's GE disclosure requirement can "'coexist with federal regulations,'" *NYSRA*, 556 F.3d at 123 (quoting *Hillsborough County, Fla.*, 471 U.S. at 718), and must dismiss Plaintiffs' conflict preemption claims.

For the reasons stated above, the State's motion to dismiss that portion of Count Five alleging express and conflict preemption claims under the FDCA and NLEA is hereby GRANTED. For these same reasons, the court finds that Plaintiffs have failed to establish that they are likely to succeed on the merits of these claims at trial.

### 2. The FMIA and PPIA.

Plaintiffs allege that the FMIA and PPIA "expressly preempt all state regulation of labeling of meat and poultry products, including products Act 120 does not exempt." (Doc. 37-1 at 24, ¶ 84.) Plaintiffs further allege that the United States Department of Agriculture ("USDA"), "which administers these statutes, does not require special

---

[25] *See Plumley v. Massachusetts*, 155 U.S. 461, 472 (1894) ("If there be any subject over which it would seem the states ought to have plenary control . . . it is the protection of the people against fraud and deception in the sale of food products."); *Holk*, 575 F.3d at 334 ("Health and safety issues have traditionally fallen within the province of state regulation. This is true of the regulation of food and beverage labeling and branding."); *see also Entergy Nuclear Vt. Yankee, LLC v. Shumlin*, 733 F.3d 393, 426 (2d Cir. 2013) (recognizing the "presumption against preemption with respect to areas where states have historically exercised their police powers") (internal quotation marks omitted).

labeling for products containing GE ingredients, and it does not prohibit the use of the term 'natural' on those products [produced with GE ingredients]." *Id.*

In opposing dismissal and seeking preliminary injunctive relief, Plaintiffs narrow their FMIA and PPIA preemption claims to argue that some GE food products that contain meat, poultry, and eggs which do not fall within Act 120's exemption for products "consisting entirely of or derived entirely from an animal," 9 V.S.A. § 3044(1), are regulated for labeling purposes by the FMIA or the PPIA. They identify canned meat and poultry products and pre-made frozen meals containing meat or poultry as examples of products that fall within both statutory frameworks. In their Amended Complaint and declarations, however, Plaintiffs fail to identify even one of their members who produces a non-exempt GE food product that is covered by the FMIA or PPIA.

> **a. Whether Plaintiffs Have Standing to Bring Supremacy Clause Claims Under the FMIA and PPIA.**

Asserting that Plaintiffs lack standing, the State seeks dismissal of Plaintiffs' Supremacy Clause claims under the FMIA and PPIA because Plaintiffs fail to allege that their members actually produce GE food products that are both non-exempt under Act 120 and governed by the FMIA and PPIA. If dismissal is not granted for lack of standing, the State effectively concedes that the FMIA and PPIA are entitled to preemptive effect, but argues that the State's Draft Rule, which is now its Final Rule, renders Plaintiffs' preemption claims moot.

Under Article III of the Constitution, federal courts have jurisdiction only over "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. Standing "is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) [hereinafter *Lujan*]. If Plaintiffs lack standing, then the court has no jurisdiction to hear their claims. *See Carver v. City of New York*, 621 F.3d 221, 225 (2d Cir. 2010) ("[P]laintiff[s] must demonstrate standing for each claim and form of relief sought.") (internal quotation marks omitted).

The "irreducible constitutional minimum of standing" requires that: (1) the plaintiff must have suffered injury in fact, which is an actual or imminent invasion of a

legally protected, concrete, and particularized interest; (2) there must be a causal connection between the alleged injury and the defendant's conduct at issue; and (3) it must be "likely," not "speculative," that the court can redress the alleged injury. *Lujan*, 504 U.S. at 560-61 (internal quotation marks omitted). "When an association asserts standing solely as the representative of its members, it must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." *Disability Advocates, Inc. v. N.Y. Coal. for Quality Assisted Living, Inc.*, 675 F.3d 149, 156-57 (2d Cir. 2012) (internal quotation marks omitted); *see also Hunt*, 432 U.S. at 343 ("[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; [or] (b) the interests it seeks to protect are germane to the organization's purpose[.]").

A plaintiff's burden to establish the elements of standing "increases over the course of litigation." *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011). At the pleading stage, a plaintiff need only allege facts that establish a plausible claim to standing. *See Bldg. & Constr. Trades Council of Buffalo, N.Y. & Vicinity v. Downtown Dev., Inc.*, 448 F.3d 138, 145 (2d Cir. 2006) ("[E]ach element of standing 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation.'") (quoting *Lujan*, 504 U.S. at 561).

In their Amended Complaint, Plaintiffs do not specifically allege that their members manufacture GE products that are non-exempt under Act 120 and subject to the FMIA and PPIA. However, in alleging that members of the NAM include "small and large manufacturers in all 50 states and in every industrial sector, including the food and beverage industry," and further asserting that NAM "members in the food manufacturing industry sell foods containing ingredients derived from genetically engineered plants and will be directly, immediately, and substantially affected by the Act," (Doc. 37-1 at 6, ¶ 12), Plaintiffs have alleged sufficient facts to withstand a standing challenge at the pleading stage. *See Carver*, 621 F.3d at 225 ("Because standing is challenged on the

basis of the pleadings, [the court must] accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.") (internal quotation marks omitted); *see also Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 149 (2d Cir. 2011) (directing that, while a plaintiff bears the burden of demonstrating standing, the court "should take care to give the plaintiff ample opportunity to secure and present evidence relevant to the existence of jurisdiction") (internal quotation marks omitted). At this juncture, the court will therefore not dismiss Plaintiffs' FMIA and PPIA Supremacy Clause claims for lack of standing. *See Baur v. Veneman*, 352 F.3d 625, 642 (2d Cir. 2003) (noting the "standing inquiry" is distinct from the merits of the case and explaining defendants could "test" the "factual underpinnings" of plaintiff's standing as the litigation proceeded but to do so at the pleading stage was "premature" because an "allegation of a credible risk may be sufficient at the pleading stage [to establish standing] without further factual confirmation or quantification") (internal quotation marks omitted).

> **b.    Whether Act 120 Is Preempted by the FMIA and PPIA.**

"The labeling of meat and poultry products shipped in interstate commerce is specifically controlled by the [FMIA] and the [PPIA] and their respective regulations." *Gerace*, 755 F.2d at 997 (citations omitted). Both acts are administered by the USDA, and both acts "contain substantially identical preemption language which permits some concurrent state enforcement but prohibits state '[m]arking, labeling, packaging, or ingredient requirements in addition to, or different than, those' mandated by federal law." *Id.* (alteration in original) (citing 21 U.S.C. § 678 (FMIA); 21 U.S.C. § 467e (PPIA)).

Specifically, the FMIA requires certain mandatory marking and labeling for "meat food products" and provides: "Marking, labeling, packaging, or ingredient requirements in addition to, or different than, those made under this chapter may not be imposed by any State or Territory or the District of Columbia with respect to articles prepared at any establishment under inspection in accordance with the requirements" of the FMIA. 21 U.S.C. § 678. Under the FMIA, "meat food product" means "any product capable of use as human food which is made wholly or in part from any meat or other portion of the

carcass of any cattle, sheep, swine, or goats, excepting [certain] products." 21 U.S.C.
§ 601(j). Labels are defined as "a display of written, printed, or graphic matter upon the
immediate container (not including package liners) of any article," 21 U.S.C. § 601(o),
and labeling is defined as "all labels and other written, printed, or graphic matter (1) upon
any article or any of its containers or wrappers, or (2) accompanying such article." 21
U.S.C. § 601(p).

The PPIA contains a similar express preemption clause for the "[m]arking,
labeling, packaging, or ingredient requirements" of poultry products that are "in addition
to, or different than," those mandated by the PPIA. 21 U.S.C. § 467e. Poultry means
"any domesticated bird, whether live or dead," 21 U.S.C. § 453(e), and "poultry product"
means "any poultry carcass, or part thereof; or any product which is made wholly or in
part from any poultry carcass or part thereof, excepting [certain] products." 21 U.S.C.
§ 453(f).

Act 120 mandates a GE disclosure that is clearly in addition to and different than
the marking, labeling, and packaging requirements imposed under the FMIA and PPIA.
Act 120's GE disclosure requirement is therefore expressly preempted for products
subject to those federal laws. *See Nat'l Meat Ass'n v. Harris*, 132 S. Ct. 965, 970 (2012)
(addressing the preemptive effect of the FMIA and noting that it "sweeps widely" and
"prevents a State from imposing any additional or different—even if non-conflicting—
requirements that fall within the scope of the Act").

Act 120's "natural" restriction is also in addition to and different than the labeling
requirements of the FMIA and the PPIA, which do not prohibit or regulate "natural"
terminology. In light of the expansive reach of the express preemption provisions of the
FMIA and the PPIA, Act 120's "natural" restriction is likewise preempted. *See Gerace*,
755 F.2d at 1002-03 (concluding New York state law that mandated "the precise size of
the letters in and relative location of the word 'imitation' on package labels" were
"requirements [that did] not comport exactly with the federal specifications" under the
FMIA and PPIA and was preempted) (citing *Jones v. Rath Packing Co.*, 430 U.S. 519,

42

530-32 (1977) (holding state standard regulating the accuracy of net weight labeling on meat and poultry products that differed from the federal standard was preempted)).

However, in the absence of more concrete evidence that Plaintiffs' members actually manufacture GE food products that are non-exempt under Act 120 and subject to the FMIA or PPIA, the court cannot find a likelihood that Plaintiffs will succeed on the merits of their FMIA and PPIA preemption claims at trial. *See Prayze FM v. F.C.C.*, 214 F.3d 245, 252 (2d Cir. 2000) (directing that "to say that [the plaintiff] has standing . . . is not to say that the [plaintiff's] challenge is meritorious" and that the party seeking a preliminary injunction must still "demonstrate[] a likelihood of prevailing on the merits" of that challenge). This conclusion is underscored by the State's Final Rule, which purports to exempt FMIA and PPIA products from Act 120's embrace, and thus renders an enforcement action unlikely. *See* Final Rule 121.03(a)(ii) (providing that Act 120's GE disclosure requirement and "natural" restriction do not apply to "[p]ackaged, processed food containing meat or poultry, the label of which requires approval by the [USDA]" under the FMIA and PPIA); *see also Harrison & Burrowes Bridge Constructors, Inc. v. Cuomo*, 981 F.2d 50, 60 (2d Cir. 1992) (noting that a court reviewing a statute's constitutionality can consider "interpretative limitations" within "implementing regulations" where such regulations have actually been promulgated).

For the foregoing reasons, the State's motion to dismiss Plaintiffs' Supremacy Clause claims in Count Five of the Amended Complaint is GRANTED IN PART and DENIED IN PART. Plaintiffs' Supremacy Clause claims alleging express and conflict preemption under the FDCA and NLEA are DISMISSED, as well as their claim of conflict preemption pursuant to the Coordinated Framework. The State's motion to dismiss Plaintiffs' Supremacy Clause claims under the FMIA and PPIA is DENIED WITHOUT PREJUDICE.

### D. Counts One Through Three: Plaintiffs' First Amendment Challenges.

The First Amendment to the United States Constitution prohibits laws and regulations that "abridg[e] the freedom of speech." U.S. Const. amend. I. It protects "both the right to speak freely and the right to refrain from speaking at all." *Wooley v.*

*Maynard*, 430 U.S. 705, 714 (1977); *accord Amidon v. Student Ass'n of State Univ. of N.Y. at Albany*, 508 F.3d 94, 98-99 (2d Cir. 2007).

In Counts One through Three of the Amended Complaint, Plaintiffs assert claims under the First Amendment, challenging both Act 120's GE disclosure requirement and its "natural" restriction. The Supreme Court has recognized that there are "material differences between disclosure requirements and outright prohibitions on speech." *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 650 (1985). Act 120 contains both.

### E. Count One: Plaintiffs' First Amendment Challenge to the GE Disclosure Requirement.

In Count One of their Amended Complaint, Plaintiffs challenge Act 120's GE disclosure requirement, alleging that:

> Act 120 compels manufacturers to use labels that do not accurately describe their products, that could confuse consumers rather than inform them, and that could frighten consumers from purchasing safe, nutritious, affordable foods that are no different from counterpart organic, "Non-GMO" certified, or otherwise exempted foods. At bottom, Act 120 requires manufacturers to use their labels to convey an opinion with which they disagree, and that the State does not purport to endorse: namely, that consumers should assign significance to the fact that a product contains an ingredient derived from a genetically engineered plant.

(Doc. 37-1 at 14, ¶ 43.)

In seeking dismissal of Count One, the State argues that Plaintiffs have failed to state a plausible claim for relief under the First Amendment because Act 120's GE disclosure requirement compels disclosure of purely factual, non-controversial, commercial information that furthers the legitimate and substantial governmental interests set forth in Act 120's "Findings" and "Purpose."

The only point on which the parties are in apparent agreement is that Act 120's GE disclosure requirement *compels* rather than *restricts* speech. The court's "lodestars in deciding what level of scrutiny to apply to a compelled statement must be the nature of the speech taken as a whole and the effect of the compelled statement thereon." *Riley v.*

*Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988); *accord Conn. Bar Ass'n v. United States*, 620 F.3d 81, 94 (2d Cir. 2010).

### 1.    Whether Strict Scrutiny Applies.

Plaintiffs make two arguments in favor of the use of strict scrutiny to evaluate Act 120's GE disclosure requirement. First, they contend Act 120 compels political speech. Second, they assert that Act 120 compels speech on the basis of viewpoint discrimination. If strict scrutiny applies, Act 120 must be "justified by a compelling government interest" and must be "narrowly drawn to serve that interest." *Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2738 (2011). The State would therefore be required to "specifically identify an actual problem in need of solving, and the curtailment of free speech must be actually necessary to the solution." *Id.* (citations and internal quotation marks omitted).

### a.    Political Speech.

Plaintiffs assert that Act 120's GE disclosure requirement compels political speech because it is "a politically motivated speech regulation" that emerged from an allegedly GE-hostile and politically-charged legislative environment. (Doc. 33-1 at 31-37.) This argument is readily disposed of because speech does not become "political" on this basis.

A manufacturer who is required to disclose whether its products contain certain ingredients is not compelled to make a political statement even if such a statement "links a product to a current public debate" because "many, if not most, products may be tied to public concerns with the environment, energy, economic policy, or individual health and safety." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 562-63 n.5 (1980). Nor is this a case in which the line between political speech and commercial speech is blurred because "the nature of the speech taken as a whole," *Riley*, 487 U.S. at 796, remains a food labeling requirement. *See Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 474-75 (1989) (concluding that presentations to sell housewares that also included "home economics elements no more converted [the company's] presentations into educational speech, than opening sales presentations with

45

a prayer or a Pledge of Allegiance would convert them into religious or political speech").

Moreover, objection and opposition, no matter however vehement, do not, without more, convert a disclosure requirement about a food product into a political statement. Indeed, the only occasion on which courts have applied strict scrutiny to a disclosure requirement is when that speech is "inextricably intertwined" with "fully protected speech." *Riley*, 487 U.S. at 796.[26] Plaintiffs identify no "fully protected speech" with which Act 120 interferes. They thus allege neither a factual nor a legal basis for concluding that Act 120's GE disclosure requirement mandates "political" speech.

### b. Viewpoint Discrimination.

Plaintiffs' argument that Act 120's GE disclosure requirement reflects impermissible viewpoint discrimination is more nuanced, but nonetheless contravenes controlling precedent.[27] Act 120's GE disclosure requirement does not become

---

[26] *See, e.g.*, *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988) (applying strict scrutiny because "fully protected" charitable speech was intertwined with disclosure requirement that professional fundraisers advise donors of the percentage of donations dedicated to charitable purposes and noting speech does not "retain[] its commercial character when it is inextricably intertwined with otherwise fully protected speech"); *Consol. Edison Co. of N.Y. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 530, 532, 540 (1980) (holding that when a private company "utilize[s] its own billing envelopes to promulgate its views on controversial issues of public policy," such as nuclear energy, the state's complete ban of bill inserts that discussed "political matters" could not withstand strict scrutiny) (internal quotation marks omitted); *Evergreen Ass'n, Inc. v. City of New York*, 740 F.3d 233, 249-50 (2d Cir. 2014) (holding regulation requiring pregnancy services centers to "address abortion, emergency contraception, or prenatal care at the beginning of their contact with potential clients alters the centers' political speech by mandating the manner in which the discussion of these issues begins" and "will change the way in which a pregnancy services center, if it so chooses, discusses the issues of prenatal care, emergency contraception, and abortion," thereby "mandat[ing] discussion of controversial political topics").

[27] Plaintiffs erroneously assert that "[a] law may not stand under any circumstance" if it is viewpoint discriminatory. (Doc. 33-1 at 31.) Notwithstanding viewpoint discrimination's status as "an egregious form of content discrimination" and the Supreme Court's observation that "[d]iscrimination against speech because of its message is presumed to be unconstitutional," *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828-29 (1995), "heightened judicial scrutiny" applies to "actual viewpoint discrimination" rather than striking down the statute as *per se* unconstitutional. *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2663-64 (2011) (internal quotation marks omitted). This is because "[e]ven protected speech is not equally

viewpoint discrimination merely because it fails to require the disclosure of the *absence* of GE ingredients,[28] or because its *mens rea* requirement renders it applicable to only certain GE manufacturers and retailers.[29]  Plaintiffs' viewpoint discrimination claim is therefore limited to a contention that Act 120's GE disclosure requirement "singles out Plaintiffs' members for special burdens in order to tilt public debate in a preferred direction" that GE foods are unsafe and requires Plaintiffs' members to "accommodate" that view and convey it to their customers.  (Doc. 33-1 at 32-33) (internal quotation marks omitted).  In this respect, Plaintiffs argue the State has used Act 120's GE disclosure requirement to "'require[] the utterance of a particular message favored by the Government.'"  (Doc. 75 at 13) (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994)).

Although the Supreme Court has recognized that "[m]andating speech that a speaker would not otherwise make necessarily alters the content of the speech," *Riley*, 487 U.S. at 795, it has also recognized "a more general exception for content

---

permissible in all places and at all times."  *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799 (1985).

[28] Taken to its logical conclusion, Plaintiffs in effect argue that a law requiring disclosure of the presence of an ingredient in a particular food product must also require manufacturers to disclose the absence of that ingredient in order to be "even-handed."  Plaintiffs cite no authority for this approach.  *See Burson v. Freeman*, 504 U.S. 191, 207 (1992) ("States adopt laws to address the problems that confront them.  The First Amendment does not require States to regulate for problems that do not exist."); *see also McCullen v. Coakley*, 134 S. Ct. 2518, 2532 (2014) (explaining that a state could "enact a limited solution" in light of "the limited nature of the problem[s]" at issue because a state should adopt a law to address the problems that confront it even if broader solutions are available).

[29] Plaintiffs argue that Act 120's *mens rea* requirement, which exempts food produced "without the knowing or intentional use of" GE ingredients, means that only *some* GE manufacturers will be subject to Act 120's GE disclosure requirement.  *See* 9 V.S.A. §§ 3044(2), (6); 3045(b) (allowing retailers and manufacturers to certify, or to provide the certification from an independent organization, that the food was not "knowingly or intentionally" produced from or commingled with food produced from GE seeds or ingredients).  As the State points out, the legislative history of Act 120 reveals that this exemption was an attempt "to avoid penalizing traditional farmers (and the manufacturers they supply) whose crops were, unbeknownst to them, contaminated by gene flow from GE-crops."  (Doc. 63 at 44 & n.34.)  Plaintiffs cite no authority for the proposition that a *mens rea* requirement constitutes viewpoint discrimination.

47

discrimination that does not threaten censorship of ideas." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 393 (1992). As a result, "[a]lthough the Court has, on occasion, declared that content-based regulations of speech are never permitted, such claims are overstated." *Id.* at 420 (Stevens, J., concurring) (citations and internal quotation marks omitted). The Supreme Court's "decisions demonstrate that content-based distinctions, far from being presumptively invalid, are an inevitable and indispensable aspect of a coherent understanding of the First Amendment." *Id.*; *see also Turner Broad. Sys., Inc.*, 512 U.S. at 658 (rejecting argument "that all speaker-partial laws are presumed invalid").

"The principal inquiry in determining content neutrality, in speech cases generally . . . , is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). "[L]aws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based," whereas "laws that confer benefits or impose burdens on speech without reference to the ideas or views expressed are in most instances content neutral." *Turner Broad. Sys., Inc.*, 512 U.S. at 643.

In this case, it is beyond dispute that Act 120's GE disclosure requirement forces Plaintiffs' members to speak against their will, regulates the content of that speech, and identifies the class of speakers who must make it. However, virtually all mandatory disclosure requirements regulate content and speakers in this manner; that does not necessarily render them impermissible viewpoint discrimination. *See NEMA*, 272 F.3d at 116 (observing that "[i]nnumerable federal and state regulatory programs require the disclosure of product and other commercial information" and that subjecting each to "searching scrutiny" is "neither wise nor constitutionally required"); *see also Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 316 (1st Cir. 2005) (noting that "[t]he idea that . . . thousands of routine [disclosure] regulations require an extensive First Amendment analysis is mistaken").

To constitute impermissible viewpoint discrimination, the "speech in question [must be] defined by its content." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S.

803, 811 (2000). In other words, freedom of expression must depend upon the message expressed such that the identity of who can and cannot speak is "based on hostility—or favoritism—towards the underlying message expressed," *R.A.V.*, 505 U.S. at 386, and "the opinion or perspective," or "the specific motivating ideology," of the speaker. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).[30]

Examining the essence of the speech at issue, it is clear that Act 120's GE disclosure requirement mandates disclosure of a fact: the presence or potential presence of GE ingredients. It does not require GE manufacturers and retailers to convey a "preferred message" about that fact, and it applies regardless of a manufacturer's or retailer's own view of GE and GE foods. *See Hill v. Colorado*, 530 U.S. 703, 719-25 (2000) (upholding a criminal statute prohibiting any person from knowingly approaching within eight feet of another person near a health care facility without that person's consent because it is a content and viewpoint "neutral" restriction that applies regardless of the content or viewpoint of the proposed speech and the motivation or identity of the speaker). Act 120's GE disclosure requirement does not become viewpoint discrimination merely because it emerged from a contested legislative debate about the safety of GE foods or because it reflects the State's preference for a legislative outcome. *See id.* at 724 (observing that "the contention that a statute is viewpoint based simply because its enactment was motivated by the conduct of the partisans on one side of a debate is without support") (internal quotation marks omitted); *see also Frisby*, 487 U.S.

---

[30] *See, e.g.*, *Sorrell v. IMS Health, Inc.*, 131 S. Ct. 2653, 2659, 2663-64, 2667 (2011) (concluding that a Vermont statute restricting "[s]peech in aid of pharmaceutical marketing" was "content-based and, in practice, viewpoint-discriminatory" because the statute prohibited drug manufacturers and marketers from using "prescriber-identifying information" for marketing, but allowed the same information to be used for other purposes, such as research, thus reflecting Vermont's value judgment that the permitted users would use the information for a beneficial purpose, whereas drug manufacturers and marketers would use it only for their own economic interests); *see also Reno v. ACLU*, 521 U.S. 844, 868 (1997) (concluding that statutory provisions enacted to protect minors from "indecent" and "patently offensive" Internet communications constituted "a content-based blanket restriction on speech") (internal quotation marks omitted); *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 94-95 (1972) (invalidating an ordinance that "describes permissible picketing in terms of its subject matter" because "[p]eaceful picketing on the subject of a school's labor-management dispute is permitted, but all other peaceful picketing is prohibited").

at 481-82 (affirming lower court's conclusion that anti-picketing ordinance enacted in response to anti-abortion protesters who wanted to protest at a particular doctor's home was viewpoint and content neutral, notwithstanding the political debate that engendered its enactment).

If a GE manufacturer or retailer believes Act 120's GE disclosure requirement gives rise to a negative connotation regarding the safety of GE foods, Act 120 does not prohibit "correction" of this allegedly erroneous impression.[31]  Courts have recognized that the ability to convey additional information reflecting the speaker's own perspective and opinions renders it unlikely that a statute reflects impermissible viewpoint discrimination.[32]

Consistent with controlling precedent, the State has therefore sustained its burden to establish that Act 120's GE disclosure requirement does not "require[]" GE manufacturers and retailers "to take the government's side" on the issue of GE food safety.  *Alliance for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 651 F.3d 218, 235 (2d Cir. 2011), *aff'd*, 133 S. Ct. 2321 (2013).  In turn, because Act 120's GE

---

[31] The Final Rule confirms this interpretation of Act 120, providing that "a person may, in connection with offering food produced with genetic engineering for retail sale in Vermont, make other disclosures about the food on its packaging, including that the [FDA] does not consider food produced with genetic engineering to be materially different from other foods." Final Rule § 121.02(c)(ii).

[32] *See, e.g.*, *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 250 (2010) (rejecting First Amendment challenge to mandatory "disclosures [that] entail only an accurate statement identifying the advertiser's legal status and the character of the assistance provided," and noting that the disclosure requirements "do not prevent debt relief agencies . . . from conveying any additional information"); *Conn. Bar Ass'n v. United States*, 620 F.3d 81, 87, 98 (2d Cir. 2010) (holding that the mandated disclosures of certain "language to be included in debt relief agency advertisements" did not compel "inaccurate or misleading disclosures" because nothing "preclude[d] an attorney from providing . . . *more* information than is contained in the mandated disclosures to ensure accurately informed choice") (footnote omitted); *Envtl. Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 848-50 (9th Cir. 2003) (holding that the compelled disclosure of educational materials about the hazards of stormwater discharges and the proper disposal of waste "involve[d] no compelled recitation of a message and no affirmation of belief" because "[i]nforming the public about safe toxin disposal is non-ideological," and nothing prohibited a regulated entity "from stating its own views about the proper means of managing toxic materials") (citations and internal quotation marks omitted).

disclosure requirement neither compels political speech, nor constitutes impermissible viewpoint discrimination, strict scrutiny does not apply.

To the extent Count One of the Amended Complaint asserts claims that Act 120's GE disclosure requirement must be invalidated on the basis of strict scrutiny, those claims are not plausible and are hereby DISMISSED. *See Neitzke v. Williams*, 490 U.S. 319, 326-27 (1989) (explaining that Rule 12(b)(6) allows a court "to dismiss a claim on the basis of a dispositive issue of law" if the claim is without legal merit and the factual allegations taken as true nonetheless would not support that claim).

For purposes of Plaintiffs' request for a preliminary injunction, the court further finds that Plaintiffs have failed to establish that they are likely to prevail at trial on a claim that strict scrutiny applies to Act 120's GE disclosure requirement. The court therefore will not grant preliminary injunctive relief on this basis. *See* Fed. R. Civ. P. 65(a); *see also Munaf v. Geren*, 553 U.S. 674, 690 (2008) ("[A] party seeking a preliminary injunction must demonstrate, among other things, a likelihood of success on the merits.") (internal quotation marks omitted).

## 2. Whether Intermediate Scrutiny or a Reasonable Relationship Test Applies.

Having determined that strict scrutiny does not apply to Act 120's GE disclosure requirement, the court turns to the parties' competing requests for a lesser form of judicial scrutiny. Plaintiffs argue that intermediate scrutiny as set forth in *Central Hudson* applies because Act 120's GE disclosure requirement compels speech that requires Plaintiffs' members to convey controversial information for the sole purpose of appeasing consumer curiosity. The State counters that *Zauderer*'s less exacting scrutiny applies because Act 120's GE disclosure requirement compels only factual, non-controversial commercial information and furthers governmental purposes beyond merely satisfying a consumer's right to know whether food products contain GE ingredients.

Intermediate scrutiny requires that a statute restricting speech be no "more extensive than is necessary," and must "directly advance[]," a "substantial" governmental interest. *Cent. Hudson Gas & Elec. Corp.*, 447 U.S. at 566. In contrast, under

*Zauderer*'s reasonable relationship test, "disclosure requirements [must be] reasonably related to the State's interest in preventing deception of consumers," *Zauderer*, 471 U.S. at 651, or "promote informed consumer decision-making" in order to address a potential cause of harm. *NYSRA*, 556 F.3d at 134. The appropriate test turns on three factors: whether the compelled speech is "commercial" in nature, whether it is purely factual and not "controversial," and whether Act 120's GE disclosure requirement is supported by a State interest beyond merely satisfying consumer curiosity. The court answers each of these questions in the affirmative.

a.  **Whether Act 120's GE Disclosure Requirement Compels "Commercial" Speech.**

"It is undisputed that commercial speech is entitled to the protection of the First Amendment." *Id.* at 131. The Supreme Court, however, has "always been careful to distinguish commercial speech from speech at the First Amendment's core." *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 623 (1995). Consequently, "the degree of protection afforded by the First Amendment depends on whether the activity sought to be regulated constitutes commercial or non-commercial speech." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 65 (1983).

In affording only "a limited measure of protection" to commercial speech, *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978), the Supreme Court has explained that "'[t]wo features of commercial speech permit regulation of its content'":

> First, commercial speakers have extensive knowledge of both the market and their products. Thus, they are well situated to evaluate the accuracy of their messages and the lawfulness of the underlying activity. In addition, commercial speech, the offspring of economic self-interest, is a hardy breed of expression that is not particularly susceptible to being crushed by overbroad regulation.

*Conn. Bar Ass'n*, 620 F.3d at 93 (alteration in original) (quoting *Cent. Hudson Gas & Elec. Corp.*, 447 U.S. at 564 n.6).

Plaintiffs argue that Act 120's GE disclosure requirement does not mandate commercial speech because it does not propose a commercial transaction. To the

contrary, they claim a GE disclosure conveys a message to consumers that they *should not buy* the product because of unfounded concerns about the safety of GE food.  The problem with this argument is twofold: it not only defines commercial speech too narrowly, but it ascribes negative connotations to Act 120's GE disclosure that do not otherwise exist.

"While the 'core' notion of commercial speech is 'speech which does no more than propose a commercial transaction,'" *Conn. Bar Ass'n*, 620 F.3d at 93 (quoting *Bolger*, 463 U.S. at 66), "the Supreme Court has also defined commercial speech as 'expression related solely to the economic interests of the speaker and its audience.'" *Id.* at 94 (quoting *Cent. Hudson Gas & Elec. Corp.*, 447 U.S. at 561).  Product labeling requirements are traditionally regarded as commercial speech even if they effectively discourage the product's consumption.  *See, e.g.*, *NYSRA*, 556 F.3d at 131, 133 (holding required "disclosure of calorie information in connection with a proposed commercial transaction—the sale of a restaurant meal"—is "clearly commercial speech" notwithstanding state restaurant association's claim that the disclosure required restaurants "to cram calorie information down the throats of their customers") (internal quotation marks omitted).

Plaintiffs' contention that Act 120's GE disclosure requirement is not commercial because it emerged from a debate about the safety of GE foods is similarly unavailing. The Supreme Court has "held that speech does not cease to be commercial merely because it alludes to a matter of public debate." *Conn. Bar Ass'n*, 620 F.3d at 94. Indeed, in *Central Hudson*, the Supreme Court declined to "grant broad constitutional protection to any advertising that links a product to a current public debate" because "many, if not most, products may be tied to public concerns with the environment, energy, economic policy, or individual health and safety." *Cent. Hudson Gas & Elec. Corp.*, 447 U.S. at 562-63 n.5.  For this reason, "informational pamphlets are properly characterized as commercial speech . . . notwithstanding the fact that they contain[ed] discussions of important public issues" because "advertising which links a product to a current public debate is not thereby entitled to the constitutional protection afforded

noncommercial speech." *Bolger*, 463 U.S. at 67-68 (footnotes and internal quotation marks omitted); *see also Fox*, 492 U.S. at 471, 474-75 (concluding prohibition of certain "private commercial enterprises" on college campus regulated commercial speech despite company's argument that its Tupperware parties "touch[ed] on other subjects," including "how to be financially responsible and how to run an efficient home") (internal quotation marks omitted).

Application of these standards to Act 120's GE disclosure requirement reveals that, despite the partisan debate which gave rise to its enactment, the "nature of the speech taken as a whole" remains a factual disclosure regarding a food product's ingredients made in conjunction with the purchase and sale of food. *Riley*, 487 U.S. at 796. Act 120's GE disclosure requirement thus compels "clearly commercial speech." *NYSRA*, 556 F.3d at 131.

### b. Whether Act 120's GE Disclosure Requirement Compels "Controversial" Speech.

Plaintiffs assert that, even if Act 120's GE disclosure requirement is characterized as commercial speech, it compels Plaintiffs' members to engage in "controversial" speech[33] and therefore must be subjected to at least intermediate scrutiny. Plaintiffs submit that "[i]t would be difficult to point to a current consumer issue *more* controversial than genetic engineering." (Doc. 33-1 at 46.)

At first blush, Plaintiffs' characterization of the GE disclosure requirement as mandating a "controversial" disclosure appears unassailable. Act 120's GE disclosure requirement was enacted in the midst of public and political controversy regarding the safety and benefits of GE and GE food. Courts, however, have not affixed the

---

[33] Plaintiffs further contend Act 120 mandates "misleading" speech because Act 120's definition of GE is erroneous, conflicts with other GE definitions used by the State, and conflicts with the FDA's definition of GE. Plaintiffs point to no authority for the proposition that speech is misleading when it fails to reflect a party's preferred definition of a statutorily-defined term. *See supra* n.1.

"controversial" label lightly, and the fact that Plaintiffs would prefer not to make the required disclosure is insufficient to render it "controversial."[34]

Instead, before compelled commercial information is deemed "controversial," the compelled information must, itself, be "controversial." The Second Circuit's decision in *Evergreen Association* makes this point clear. *See Evergreen Ass'n, Inc. v. City of New York*, 740 F.3d 233 (2d Cir. 2014). In that case, the Second Circuit separated the disclosures required by a city ordinance into three categories: the Services Disclosure which mandated that pregnancy services centers disclose whether they provide, or provide referrals for, abortion and emergency contraception; the Status Disclosure which mandated that centers disclose whether they had a licensed medical provider on staff; and the Government Message which mandated that centers disclose that the city encourages pregnant women to consult with a licensed provider.

With regard to the Services Disclosure and the Government Message, the Second Circuit observed, "[a]ssuming *arguendo* that [the city ordinance] required disclosures regulate commercial speech, we do not believe that the law regulates purely factual and uncontroversial information" because the "Government Message requires pregnancy services centers to state the City's preferred message, while the Services Disclosure requires centers to mention controversial services that some pregnancy services centers, such as Plaintiffs in this case, oppose." *Id.* at 245 n.6; *see id.* at 249 (concluding Services Disclosure "alters the centers' political speech"). However, the Status Disclosure, requiring pregnancy services centers to disclose whether they had a licensed medical

---

[34] *See NEMA*, 272 F.3d at 113, 114 (rejecting district court's conclusion that a disclosure requirement impinges on First Amendment rights because it "indisputably requires [certain manufacturers] to speak when they would rather not" and noting that "[t]o the extent commercial speakers have a legally cognizable interest in withholding accurate, factual information, that interest is typically accommodated by the common law of property and its constitutional guarantors") (internal quotation marks omitted); *see also United States v. Philip Morris USA, Inc.*, 907 F. Supp. 2d 1, 17-18 (D.D.C. 2012) (explaining that "controversy must mean more than the fact that some people may be highly agitated and be willing to go to court over the matter" and that "it must also mean more than that [the regulated entities] simply disagree with a particular proposition that has been decided against them") (citation and internal quotation marks omitted).

provider on staff, was a "neutral message" and a "brief, bland, and non-perjorative disclosure." *Id.* at 249, 250 (internal quotation marks omitted). It was therefore constitutionally permissible even though it was part of an otherwise unconstitutional ordinance that regulated speech regarding "controversial political topics." *Id.* at 250. *Evergreen Association* thus instructs that it is the nature of the regulation of compelled speech that controls, not the nature of the legislative debate that gave rise to its enactment.

Other courts have concluded that compelled commercial information must also be "opinion-based" before it can be said to convey a "controversial" governmental message. *See, e.g.*, *Entm't Software Ass'n v. Blagojevich*, 469 F.3d 641, 652 (7th Cir. 2006) (invalidating "a subjective and highly controversial" disclosure requirement mandating "18" sticker to indicate "adults only" on video games that met the statute's definition of "sexually explicit" because the "State's definition of [sexually explicit] is far more opinion-based than the question of whether a particular chemical is within any given product"); *CTIA-Wireless Ass'n v. City & County of San Francisco*, 494 F. App'x 752, 753 (9th Cir. 2012) (striking down ordinance which required disclosure of "more than just facts" and required cell phone sellers to convey information regarding cell phone radiation to consumers, including "San Francisco's recommendations as to what consumers should do if they want to reduce exposure to radiofrequency energy emissions," and thus suggesting "San Francisco's opinion that using cell phones is dangerous"). A factual disclosure does not reflect an opinion merely because it compels a speaker to convey information contrary to its interests.[35] *See Disc. Tobacco City &*

---

[35] *See, e.g.*, *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 650 (1985) (holding that by requiring attorneys "to state that the client may have to bear certain expenses even if he [or she] loses, [the state] has not attempted to prevent attorneys from conveying information to the public; it has only required them to provide somewhat more information than they might otherwise be inclined to present"); *NYSRA*, 556 F.3d at 134 (concluding calorie disclosure law compelled "factual and uncontroversial information by commercial entities," although certain restaurants did "not want to communicate to their customers that calorie amounts should be prioritized among other nutrient amounts") (internal quotation marks omitted); *NEMA*, 272 F.3d at 107, 113 (concluding disclosure requirement mandating that certain products be labeled to advise consumers "that the products contain

*Lottery, Inc. v. United States*, 674 F.3d 509, 569 (6th Cir. 2012) ("Facts can disconcert, displease, provoke an emotional response, spark controversy, and even overwhelm reason, but that does not magically turn such facts into opinions.").

If GE manufacturers and retailers believe a GE disclosure conveys a negative message about their products, Act 120 does not prevent them from "correcting" that message with their own disclosures, which may include a statement that the FDA does not consider GE food to be materially different from non-GE food. The Final Rule confirms that such "corrective" messages are permissible. *See* Final Rule § 121.02(c)(ii).

Because Act 120's GE disclosure requirement mandates the disclosure of only factual information—whether a food product contains GE ingredients—in conjunction with a purely commercial transaction, it does not require the disclosure of "controversial" information. *See NEMA*, 272 F.3d at 114 (noting that "[r]equired disclosure of accurate, factual commercial information presents little risk that the state is forcing speakers to adopt disagreeable state-sanctioned positions, suppressing dissent, confounding the speaker's attempts to participate in self-governance, or interfering with an individual's right to define and express his or her own personality"). The only remaining question is whether the Second Circuit's decision in *International Dairy Foods Association v. Amestoy*, 92 F.3d 67 (2d Cir. 1996) [hereinafter *IDFA*], applies.

        **c.**     **Whether Act 120's GE Disclosure Requirement Is Supported By More Than Appeasement of Consumer Curiosity.**

Plaintiffs argue that Act 120's GE disclosure requirement is supported by no other interest beyond the gratification of consumer curiosity. Under *IDFA*, a state interest of this nature fails to withstand First Amendment scrutiny. *See IDFA*, 92 F.3d at 74

---

mercury and, on disposal, should be recycled or disposed of as hazardous waste" required constitutionally permissible "factual and uncontroversial" speech, although manufacturers' trade association challenged the disclosure as requiring them to speak against their will and although the disclosure arguably highlighted an undesirable product component) (footnote and internal quotation marks omitted); *see also Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 27 (D.C. Cir. 2014) ("We . . . do not understand country-of-origin labeling to be controversial in the sense that it communicates a message that is controversial for some reason other than dispute about simple factual accuracy.").

(holding "that consumer curiosity alone is not a strong enough state interest to sustain the compulsion of even an accurate, factual statement, in a commercial context") (citations omitted). The State, however, asserts that in drafting Act 120, it was mindful of *IDFA*'s teaching and took pains to ensure that Act 120's GE disclosure requirement was readily distinguishable and supported by governmental interests beyond the public's right to know.

In *IDFA*, the Second Circuit ruled in favor of dairy manufacturers' First Amendment challenge to a Vermont statute that required disclosure of whether a synthetic hormone called recombinant Bovine Somatotropin ("rBST") or recombinant Bovine Growth Hormone ("rBGH") was used in the production of a milk product for retail sale in Vermont. The FDA had approved the use of these hormones and had declined to impose a mandatory rBST or rBGH labeling requirement, finding that dairy products derived from herds treated with these hormones were indistinguishable from dairy products from untreated herds.

The Second Circuit noted that "the already extensive record" in *IDFA* "contain[ed] no scientific evidence from which an objective observer could conclude that rBST has any impact at all on dairy products." *Id.* at 73. It also pointed out that the State had conceded that its only purpose in enacting the disclosure requirement was to satisfy consumer curiosity. Accordingly, even if the disclosure requirement was deemed "purely commercial speech," it could not be sustained under the First Amendment because "Vermont [did] not claim that health or safety concerns prompted the passage of the Vermont Labeling Law, but instead defend[ed] the statute on the basis of strong consumer interest and the public's right to know." *Id.* at 72, 73 (internal quotation marks omitted).

Since *IDFA*, the Second Circuit has repeatedly held that the application of *Central Hudson*'s intermediate scrutiny in that case was solely attributable to the State's concessions. *IDFA* has thus been confined to its facts. As the Second Circuit has observed:

> Although we applied the *Central Hudson* test in *IDFA*—which addressed a
> Vermont regulation requiring dairy producers to label dairy products
> derived from cows treated with recombinant Bovine Somatotropin
> (rBST)—our decision was expressly limited to cases in which a state
> disclosure requirement is supported by no interest other than the
> gratification of "consumer curiosity." *IDFA*, 92 F.3d at 74. The disclosure
> statute at issue here, however, is based on Vermont's substantial interest in
> protecting human health and the environment from mercury poisoning.

*NEMA*, 272 F.3d at 115 n.6; *accord NYSRA*, 556 F.3d at 134 (explaining that *IDFA*'s

application of intermediate scrutiny is "expressly limited to cases in which a state

disclosure requirement is supported by no interest other than the gratification of

'consumer curiosity'") (quoting *IDFA*, 92 F.3d at 74).

Act 120's "Findings" and "Purpose" extend beyond the mere appeasement of

consumer curiosity, and the State emphasizes that it is *not making* the concessions it

made in *IDFA*. It cites to what it characterizes as an ample legislative record

documenting the scientific debate about the safety of GE ingredients and the studies that

have produced positive, negative, and neutral results. This record includes studies about

the safety of consuming GE plant-based foods, as well as studies about the environmental

impacts of GE and GE crops. The State also points to its interest in accommodating

religious beliefs about GE, as well as its interest in providing factual information for

purposes of informed consumer decision-making.

Although some of the State's interests arguably border on the appeasement of

consumer curiosity, the Second Circuit has recently observed that commercial disclosure

requirements that enhance consumer decision-making *further* First Amendment interests:

> Commercial disclosure requirements are treated differently from
> restrictions on commercial speech because mandated disclosure of accurate,
> factual, commercial information does not offend the core First Amendment
> values of promoting efficient exchange of information or protecting
> individual liberty interests. Such disclosure furthers, rather than hinders,
> the First Amendment goal of the discovery of truth and contributes to the
> efficiency of the marketplace of ideas. Protection of the robust and free
> flow of accurate information is the principal First Amendment justification
> for protecting commercial speech, and requiring disclosure of truthful

information promotes that goal.

*NEMA*, 272 F.3d at 113-14 (footnote and internal quotation marks omitted); *accord Safelite Grp., Inc. v. Jepsen*, 764 F.3d 258, 263 (2d Cir. 2014).

In light of Act 120's "Findings" and "Purpose," and their grounding in an extensive legislative record, the court cannot conclude that Act 120's GE disclosure requirement is supported only by a desire to gratify consumer curiosity. Under Second Circuit precedent, *Zauderer* therefore dictates the appropriate level of First Amendment scrutiny to be applied to Act 120's GE disclosure requirement. *See Conn. Bar Ass'n*, 620 F.3d at 93 (noting that when "regulations compel disclosure without suppressing speech, *Zauderer*, not *Central Hudson*, provides the standard of review").

Because whether intermediate scrutiny applies to Act 120's GE disclosure requirement presents a question of law, not a question of plausibility, and because that question of law is subject to reasonable debate, the court does not dismiss Plaintiffs' First Amendment challenges to Act 120's GE disclosure requirement based upon intermediate scrutiny at this time. The State's motion to dismiss Plaintiffs' intermediate scrutiny challenge to Act 120's GE disclosure requirement is therefore DENIED WITHOUT PREJUDICE.

However, having determined that intermediate scrutiny is not warranted, the court further finds that Plaintiffs have failed to establish a likelihood of prevailing at trial on their claim that intermediate scrutiny requires the invalidation of Act 120's GE disclosure requirement. Preliminary injunctive relief is thus not available on that basis. *See N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (noting that proof of likelihood of success on the merits is a "dominant" factor when a party seeks a preliminary injunction "in the First Amendment context"); *see also Mastrovincenzo v. City of New York*, 435 F.3d 78, 90-91 (2d Cir. 2006) (addressing motion for a preliminary injunction by analyzing whether plaintiffs "would likely prevail on the merits of their claim that [a city ordinance] violates their First Amendment rights to free speech" as determined by the appropriate level of scrutiny).

60

### 3. Whether Act 120's GE Disclosure Requirement Satisfies the Reasonable Relationship Test.

In *Zauderer*, the Supreme Court held that "an advertiser's [First Amendment] rights are adequately protected as long as disclosure requirements are reasonably related to the State's interest in preventing deception of consumers." *Zauderer*, 471 U.S. at 651. The Court has described *Zauderer* as "less exacting scrutiny" and has noted that the "First Amendment protection for commercial speech is justified in large part by the information's value to consumers" and because the "constitutionally protected interest in *not* providing the required factual information is 'minimal.'" *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 249-50 (2010) (quoting *Zauderer*, 471 U.S. at 651). Stated differently, "[w]hen a State . . . requires the disclosure of beneficial consumer information, the purpose of its regulation is consistent with the reasons for according constitutional protection to commercial speech and therefore justifies less than strict review." *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 501 (1996) (plurality opinion).

The Second Circuit has applied *Zauderer* not only to compelled disclosures "intended to prevent consumer confusion or deception," but also to disclosures intended "to better inform consumers about the products they purchase." *NEMA*, 272 F.3d at 115 (citation and internal quotation marks omitted). Plaintiffs challenge Act 120's GE disclosure requirement under *Zauderer* on three grounds. First, they contend the Second Circuit has grafted on to *Zauderer* a requirement that the State's interest underpinning a commercial disclosure requirement be "substantial," a test they assert the State cannot satisfy. (Doc. 33-1 at 48-50) (internal quotation marks omitted). Second, even if the State could identify a substantial interest, according to Plaintiffs, any interest it identifies is not "real," "governmental," or "legitimate." *Id.* at 38, 50-51 (internal quotation marks omitted). And third, Plaintiffs claim there is no reasonable relationship between the State's interests and Act 120's GE disclosure requirement.

As a threshold issue, it is not clear whether *Zauderer* requires a state to identify a "substantial" governmental interest before it may require a factual, non-controversial

commercial disclosure. *Zauderer*, itself, does not impose this requirement.[36]  To the contrary, while it required a "substantial interest" to support Ohio's prohibitions on certain attorney advertising, its commercial disclosure analysis was bereft of this requirement—a fact that Justice Brennan's concurring opinion appears to recognize.  *See Zauderer*, 471 U.S. at 657-58 (Brennan, J., concurring in part and dissenting in part) ("I agree with the Court's somewhat amorphous reasonable relationship inquiry only on the understanding that it comports with the standards more precisely set forth in our previous commercial-speech cases [requiring, among other things,] that a State can demonstrate a legitimate and substantial interest to be achieved by the regulation.") (footnote and internal quotation marks omitted).

Although Plaintiffs are correct that the Second Circuit's recent commercial disclosure cases have identified a "substantial" governmental interest, the Second Circuit has not affirmatively stated that *Zauderer* requires this type of interest.  The D.C. Circuit recently grappled with this same issue, concluding that "*Zauderer* gives little indication of what type of interest might suffice" and that "the Supreme Court has not made clear whether *Zauderer* would permit government reliance on interests that do not qualify as substantial under *Central Hudson*'s standard, a standard that itself seems elusive."  *Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 23 (D.C. Cir. 2014).  The D.C. Circuit observed that the requirement of a "substantial" governmental interest, to the extent it exists, has been made less daunting by the Supreme Court because "'the pedestrian nature of those interests affirmed as substantial calls into question whether *any* governmental interest—except those already found trivial by the Court—could fail to be substantial.'"  *Id.* (quoting *Kansas v. United States*, 16 F.3d 436, 443 (D.C. Cir. 1994) (collecting cases)).

---

[36] The *Zauderer* Court rejected an argument that Ohio had to demonstrate its "disclosure requirement serves some substantial governmental interest" because this argument "overlooks material differences between disclosure requirements and outright prohibitions on speech" in that the disclosure requirement of factual commercial information did not "prescribe what shall be orthodox" or "other matters of opinion," nor did it "prevent attorneys from conveying information to the public."  *Zauderer*, 471 U.S. at 650-51 (internal quotation marks omitted).

Assuming *arguendo* that a "substantial" governmental interest is required under the Second Circuit's interpretation of *Zauderer*, the State asserts that Act 120's "Findings" and "Purpose" reflect a substantial interest in the need to disclose information relevant to potential health consequences from human consumption of GE food; to accommodate religious beliefs and practices regarding GE and GE food; to promote informed consumer decision-making; and to address the potential "unintended" consequences from GE food production to non-GE crops and the environment. *See* 2014 Vt. Acts & Resolves No. 120, Sec. 1(4), (5). At this stage in the proceedings, the court is required to view these legislative findings with deference. *See Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 330 n.12 (1985) (observing that legislative "findings on essentially factual issues . . . are of course entitled to a great deal of deference, inasmuch as [a legislature] is an institution better equipped to amass and evaluate the vast amounts of data bearing on such an issue"). Under *Zauderer* and its progeny, the court has little difficulty in characterizing these interests as "substantial."

Plaintiffs nonetheless maintain that even if the identified interests are deemed "substantial," "the harms recited in Act 120 are not real" because they "consist of speculation and conjecture about speculation and conjecture" based only on "risks," or "mere potentiality." (Doc. 33-1 at 37-38) (characterizing the "problems" identified in Act 120 as "fictional potentials") (internal quotation marks omitted). It is, however, undisputed that there are studies supporting both "sides" of the GE debate, including studies regarding the negative impacts of GE food production and consumption. Therefore, even though Plaintiffs characterize the studies on which the State relies as "outdated, retracted, or debunked," (Doc. 75 at 15), they have not and cannot plausibly allege that the State's evidence is not "real"—only that it is not persuasive.

Plaintiffs lose both traction and credibility in their further contention that any State interest in "catering to personal, political, and religious views that reject science is neither legitimate nor governmental" and that, because the State allegedly "has no monetary skin in the game, there is not even a *financial* interest in the enforcement of [Act 120]." (Doc. 33-1 at 50-51.) The safety of food products, the protection of the environment, and the

accommodation of religious beliefs and practices are all quintessential governmental interests, as is the State's desire "to promote informed consumer decision-making." *NYSRA*, 556 F.3d at 134; *accord NEMA*, 272 F.3d at 115.

Plaintiffs' argument that any governmental interest is "not legitimate because it is politically motivated," (Doc. 33-1 at 50-51), is equally unpersuasive. Most legislation is, to some extent, "politically motivated," but Act 120 is nonetheless readily distinguishable from the purposeful discrimination at issue in *United States Department of Agriculture v. Moreno*, 413 U.S. 528 (1973), upon which Plaintiffs rely.[37]

Plaintiffs' final challenge under *Zauderer* is that Act 120's GE disclosure requirement fails for lack of a requisite "fit" because a disclosure that a product *may* contain GE ingredients does nothing to further Act 120's "Findings" and "Purpose." The State counters that *Zauderer* requires only a reasonable relationship and persuasively argues that Act 120's GE disclosure requirement satisfies this standard.

The Second Circuit has held that a state's interest in "encouraging . . . changes in consumer behavior" through compelled disclosure is "rationally related" to a disclosure requirement even if the disclosure is not the *best means* of furthering that goal. *See NEMA*, 272 F.3d at 115 (concluding Vermont's statute was rationally related to the State's goals because "prescribed labeling would likely contribute directly to the reduction of mercury pollution, whether or not it makes the greatest possible contribution," and "notwithstanding that the statute may ultimately fail to eliminate all or even most mercury pollution in the state"); *see also NYSRA*, 556 F.3d at 136 (noting that

---

[37] Plaintiffs' reliance on *United States Department of Agriculture v. Moreno*, 413 U.S. 528 (1973), is wholly misplaced. In *Moreno*, the Supreme Court considered the legislative history to an amendment to the Food Stamp Act which excluded participation by households that contained an individual who was unrelated to any member of the household. The Court noted that the amendment "was intended to prevent so[-]called hippies and hippie communes from participating in the food stamp program." *Id.* at 534 (internal quotation marks omitted). Analyzing the issue as one of equal protection, not freedom of expression, the Court held that, "if the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *Id. Moreno* is inapplicable to this case as Plaintiffs are not a politically unpopular group that has been subjected to purposeful and unconstitutional discrimination in violation of the Equal Protection Clause.

the restaurant association's expert had not asserted that "information about the calorie content of food at the point of purchase in restaurants will not be beneficial in reducing obesity levels" but only "that it might not").

Under *Zauderer*, there is also no requirement that a disclosure law "get at all facets of the problem it is designed to ameliorate." *Zauderer*, 471 U.S. at 651 n.14; *accord NEMA*, 272 F.3d at 116; *see also NYSRA*, 556 F.3d at 133-34 & n.22 (rejecting contention that targeting only calories and a low percentage of restaurants within New York City for the disclosure requirement is irrational because "the First Amendment does not bar the City from compelling such 'under-inclusive' factual disclosures" when the government's decision to focus its attention on one potential cause of the harm is "rational") (quoting *Zauderer*, 471 U.S. at 651 n.14). Act 120's exemptions to the GE disclosure requirement therefore do not defeat its constitutionality under the First Amendment because "a statute is not invalid under the Constitution [when] it might have gone farther than it did"; the Vermont General Assembly was therefore entitled to "take one step at a time." *Jana-Rock Constr., Inc. v. N.Y. State Dep't of Econ. Dev.*, 438 F.3d 195, 211 (2d Cir. 2006) (citations and internal quotation marks omitted); *see also McCullen v. Coakley*, 134 S. Ct. 2518, 2532 (2014) (noting in a free speech case that states are allowed to address problems with "a limited solution"); *NEMA*, 272 F.3d at 116 (directing that "States are not bound to follow any particular hierarchy in addressing problems within their borders" and that a State "may choose to tackle a subsidiary cause of a problem rather than its primary cause").

Because the State has established that Act 120's GE disclosure requirement is reasonably related to the State's substantial interests, under *Zauderer*, Act 120's GE disclosure requirement is constitutional. Nonetheless, because the appropriate level of scrutiny is a contested question of law and because the factual record is undeveloped, the court does not dismiss Plaintiffs' First Amendment challenge to Act 120's GE disclosure requirement under *Zauderer* at this time. The State's motion to dismiss the remainder of Count One is thus DENIED WITHOUT PREJUDICE.

However, in light of the court's conclusion that Act 120's GE disclosure requirement is constitutional under *Zauderer*, there is no aspect of Count One that would entitle Plaintiffs to preliminary injunctive relief. *See Doninger v. Niehoff*, 527 F.3d 41, 53 (2d Cir. 2008) (affirming denial of preliminary injunction when, "based on the existing record," plaintiff failed to make a "sufficient" showing she would succeed as a matter of law on her First Amendment and Equal Protection claims); *see also Beal v. Stern*, 184 F.3d 117, 127, 129-30 (2d Cir. 1999) (affirming denial of preliminary injunction when plaintiffs had not "shown a clear likelihood of success on the merits" of their First Amendment claims because the record was "unclear" and lacking "evidence" and commenting that "the merits of th[e] dispute would best be resolved by a proceeding in which a complete record is made").

F.    **Count Two: Plaintiffs' First Amendment Challenge to the "Natural" Restriction.**

In Count Two of the Amended Complaint, Plaintiffs assert a First Amendment challenge to Act 120's "natural" restriction, which prohibits GE manufacturers from using labeling, advertising, or signage indicating that a GE food product is "'natural,' 'naturally made,' 'naturally grown,' 'all natural,' or any words of similar import that would have a tendency to mislead a consumer." 9 V.S.A. § 3043(c). They allege that the State cannot establish that the restricted terms are inherently misleading, actually misleading, or potentially misleading when applied to GE foods and that, even if the State could make this showing, the restriction does not materially advance the State's asserted interests and is more extensive than necessary. The State seeks dismissal of Count Two, arguing that Plaintiffs fail to state a claim for which relief may be granted because GE manufacturers' use of "natural" terminology is entitled to no protection under the First Amendment.

1.    **Whether Plaintiffs Have Standing.**

In seeking dismissal of Count Two, the State initially argued that Plaintiffs lacked standing to challenge Act 120's "natural" restriction because Plaintiffs failed to allege that their members used "natural" terminology in marketing and labeling their GE food

products. In the Amended Complaint, Plaintiffs cure this defect by alleging that "Plaintiffs' members include companies that have used, currently use, and intend to continue to use the 'natural' terms specifically identified in Act 120 with respect to products that contain ingredients derived from GE crops" and that because of their members' "diverse range of marketing activities across all forms of media," members will be subject to enforcement actions under Act 120 if they use words of "similar import" that may have a tendency to mislead "some consumer somewhere." (Doc. 37-1 at 18-19, ¶ 59.) The State concedes that its standing challenge is moot in light of the Amended Complaint.[38]

### 2. Whether the "Natural" Terminology Is Inherently, Actually, or Potentially Misleading Speech.

The State argues that it may freely regulate and even ban the use of "natural" and similar words to describe GE food products as such usage is inherently or actually misleading. To the extent Act 120's restriction on the use of "natural" terminology and "any words of similar import" is ambiguous, the State asserts that it can rely on the Final Rule to avoid and correct any ambiguity. Plaintiffs counter the State is wrong on both points. The court agrees.[39]

"The States and the Federal Government are free to prevent the dissemination of commercial speech that is false, deceptive, or misleading, or that proposes an illegal transaction." *Zauderer*, 471 U.S. at 638 (citations omitted). "A State may not, however,

---

[38] The State nonetheless points out that "notably, and not surprisingly, in the numerous declarations submitted by Plaintiffs, none of their members is willing to identify any specific products that contain GE ingredients but are which nevertheless []labeled as 'natural.'" (Doc. 63 at 45 n.35.) Although this absence of proof does not defeat standing for purposes of the motion to dismiss, it is relevant to whether Plaintiffs are able to establish irreparable harm. *See Moore v. Consol. Edison Co. of N.Y.*, 409 F.3d 506, 510-11 (2d Cir. 2005) (affirming the district court's "holding that the alleged harm to third parties did not provide plaintiff a basis for a preliminary injunction").

[39] In its briefing, the State relied on a yet-to-be-finalized, yet-to-be-promulgated Draft Rule and conceded that it was "still fine tuning Act 120" through rulemaking. (Doc. 63 at 48.) As the Final Rule provides no definition of the "natural" terminology and defines "any words of similar import" by reference to "natural" terms, any ambiguity inherent in Act 120 remains.

completely ban statements that are not actually or inherently misleading[.]" *Peel v. Attorney Registration & Disciplinary Comm'n of Ill.*, 496 U.S. 91, 110 (1990). As the party "'seeking to uphold a restriction on commercial speech,'" the State "'carries the burden of justifying it.'" *Alexander v. Cahill*, 598 F.3d 79, 90 (2d Cir. 2010) (quoting *Edenfield v. Fane*, 507 U.S. 761, 770 (1993)).

Act 120 does not define "natural," "naturally made," "naturally grown," and "all natural." The Final Rule also does not define these terms. The State thus faces an uphill battle in arguing that a GE manufacturer's use of "natural" terminology is actually or inherently misleading because the alleged deception cannot be measured against a statutory, or even a regulatory, definition of the restricted terms.[40]

The State asserts that regardless of how "natural" is defined, it cannot apply to GE foods because GE "techniques are, by definition, not 'brought about by' or 'existing in' nature, but instead are 'manmade' and brought about by 'purposeful interference' and 'artificial means.'" (Doc. 24-1 at 31-32.) It cites the Vermont General Assembly's "Finding" that labeling GE foods as "natural" or with "similar descriptors" is "inherently misleading." 2014 Vt. Acts & Resolves No. 120, Sec. 1(5)(C).[41] It also points out that

---

[40] The State also has not and cannot establish that there is a single, accepted definition of the term "natural." It has only demonstrated that the various definitions of that word share commonalities. *See, e.g., Natural*, The American Heritage College Dictionary 908 (3d ed. 1993) ("1. Present in or produced by nature. 2. Of, relating to, or concerning nature. 3. Conforming to the usual or ordinary course of nature."); *Natural*, Black's Law Dictionary 1188 (10th ed. 2014) (defining "natural" as "[i]n accord with the regular course of things in the universe and without accidental or purposeful interference"; as "[b]rought about by nature as opposed to artificial means"; and as "[u]ntouched by civilization"); *Natural*, Merriam-Webster Online Dictionary, www.merriam-webster.com/dictionary/natural (last visited Apr. 27, 2015) (defining "natural" as "existing in nature and not made or caused by people"; "coming from nature"; and "not containing anything artificial").

[41] This finding is somewhat at odds with the General Assembly's further "Finding" that a GE manufacturer's use of any of the "natural" terms "poses a risk of confusing or deceiving consumers." 2014 Vt. Acts & Resolves No. 120, Sec. 1(5)(C). Speech that is inherently misleading poses more than a risk of confusion or deception, and it is for this reason it receives no First Amendment protection. Moreover, as Plaintiffs observe, the numerous exemptions in Act 120 undermine the State's position that it is inherently misleading to label GE products as "natural." (Doc. 33-1 at 52, 54) ("There is no reason why 'inherently' deceptive speech would

both the World Health Organization and one of the members of Plaintiff GMA, the Monsanto Company, "define genetically modified organisms as those that have been *altered* from their 'natural' state." (Doc. 24-1 at 32.) However, green houses, fertilizers, pesticides, and even the watering, weeding, and pruning of plants are "manmade," "purposeful interference" in plant production, not "existing in nature," and thus can readily and reasonably be deemed an "artificial means" of food production. More particularly, altering seeds and plants from their "natural" state has occurred for centuries through techniques such as selective breeding, hybridization, cross pollination, and grafting. Act 120's "natural" restriction thus subjects GE manufacturers to a standardless restriction that virtually no food manufacturer could satisfy.

      Even if the use of "natural" in advertising, labeling, and signage for GE foods is not inherently misleading, the State maintains that it is actually misleading. It cites the General Assembly's consideration of a 2010 survey conducted by The Hartman Group, Inc., (the "Hartman Report") that purportedly shows that 61% of consumers "believed" that "natural" suggests or implies "the absence of genetically engineered food." (Doc. 63-12 at 212; Ex. J at 805) (Doc. 63-20 at 6, ¶ 9; Ex. E at 6, ¶ 9) (*see also* Doc. 63-20 at 13, ¶ 26; Ex. E at 13, ¶ 26) (noting that "recent results from the 2013 Vermonter Poll . . . confirm that 'natural' labels on genetically engineered foods would be misleading to Vermont citizens in particular"). The General Assembly also considered the Hartman Report's conclusion that the word "natural" on food products has become increasingly "meaningful" to consumers because they desire "fresh, real foods" that are "less processed" with "clean ingredient lists," and that "natural" means "simple, real foods." (Doc. 63-12 at 222, 232; Ex. J at 815, 825) (noting further that a majority of consumers believed that "natural foods contain nothing artificial"). This conclusion arguably

---

lose that 'inherent' characteristic in certain circumstances or on certain foods, and the Act does not offer one. . . . The exemptions doom the natural ban [because the] State cannot say that 'natural' terms present an unacceptable risk of deception when the State is perfectly willing to tolerate them for exempted foods.").

conflicts with the Hartman Report's further finding that "natural as a marketing term remains vague and unappealing to consumers." (Doc. 63-12 at 222; Ex. J at 815.)[42]

A survey asking whether certain consumers think GE is a "fundamentally unnatural" process, (Doc. 63-20 at 12, ¶ 21; Ex. E at 12, ¶ 21), is not the equivalent of actual and unsolicited citizen problems or complaints regarding GE manufacturers' use of "natural" terminology. *Cf. Alexander*, 598 F.3d at 92 (evaluating wholesale prohibitions on certain attorney advertisements and noting that the regulators had "not submitted any statistical or anecdotal evidence of consumer problems with or complaints of the sort they seek to prohibit" and had not "specifically identified any studies from other jurisdictions on which the state relied in implementing the [prohibitions]"). At best, the State has mustered *some* evidence that *some* consumers may find the use of "natural" terminology in conjunction with GE food misleading depending on how "natural" is defined. This evidence does not rise to the level of "evidence of deception" sufficient to support an outright ban on commercial speech. *See Peel*, 496 U.S. at 106 (plurality opinion) (rejecting contention that statement at issue was "actually misleading" due to "the complete absence of any evidence of deception"); *see id.* at 112 (Marshall, J., concurring) (noting there was "no evidence" that any person was "actually" misled by the statement, nor was it "inherently misleading," either of which would justify an outright ban); *Joe Conte Toyota, Inc. v. La. Motor Vehicle Comm'n*, 24 F.3d 754, 756 (5th Cir. 1994) (ruling that "commercial speech is actually misleading when there is evidence of deception") (internal quotation marks omitted). The State has thus failed to establish that Act 120's restriction of GE manufacturers' use of "natural" terminology restrains only inherently or actually misleading speech.

---

[42] Plaintiffs identify an array of problems with the Hartman Report and with the other studies, surveys, and reports relied upon by the State because, *inter alia*, "the surveys on which [the State relies] asked overtly leading questions" and "typically sought customers' opinions about what they believed 'natural' meant . . . not specific to the commercial context—or, critically, advertising"; in addition, "key definitions were left out," including "how the terms 'genetically modified organisms' or 'genetically engineered' were explained to survey participants." (Doc. 75 at 25-26.)

Speech that is shown to be only *potentially* misleading is protected by the First Amendment. *See Alexander*, 598 F.3d at 89-90 (noting that the Supreme Court has "emphasized that 'States may not place an absolute prohibition on certain types of potentially misleading information . . . if the information also may be presented in a way that is not deceptive'" and that it is the State's burden to demonstrate that non-deceptive uses do not exist) (alterations in original) (quoting *In re R. M. J.*, 455 U.S. 191, 203 (1982)). Before the State may ban potentially misleading commercial speech, it must proffer evidence in support of that ban that survives *Central Hudson*'s intermediate scrutiny.

### 3. Whether Act 120's "Natural" Restriction Withstands Intermediate Scrutiny.

The Second Circuit's "previous cases have drawn a distinction between standards of review [to be applied] to laws mandating commercial speech disclosures and laws restricting commercial speech." *Safelite Grp., Inc.*, 764 F.3d at 263 (alteration in original) (internal quotation marks omitted). This reflects the well-established principle that laws that restrict commercial speech impose greater burdens on freedom of expression than do commercial disclosure requirements. *See NEMA*, 272 F.3d at 113-14. The Second Circuit has therefore repeatedly held that intermediate scrutiny as set forth in the "*Central Hudson* test should be applied to statutes that *restrict* commercial speech." *NEMA*, 272 F.3d at 115. Under the *Central Hudson* test, the court "must examine whether: (i) the regulated expression is false or misleading; (ii) the government interest is substantial; (iii) [Act 120's "natural" restriction] directly and materially advances the governmental interest asserted; and (iv) [Act 120's "natural" restriction] is no more extensive than necessary to serve that interest." *Safelite Grp., Inc.*, 764 F.3d at 264 (citing *Cent. Hudson Gas & Elec. Corp.*, 447 U.S. at 566).

Whether Act 120 restricts false and misleading speech in anything other than a random and arbitrary manner turns on how "natural" is defined. If "natural" means occurring or existing "in nature," as the State contends, then virtually no food products should be described as "natural," and GE manufacturers are not the only commercial

71

speakers who should be restricted from its use. *See Clear Channel Outdoor, Inc. v. City of New York*, 594 F.3d 94, 106 (2d Cir. 2010) (observing that one "form of impermissible underinclusivity is presented by a regulation that draws arbitrary distinctions"). If "natural" means "nothing artificial" or "less processed," as the Hartman Report suggests, then many products should not bear this moniker if, for example, they contain preservatives, stabilizers, artificial colorings, or flavorings or are consumed in other than their natural forms. In either case, the State is hard pressed to identify a substantial state interest that is served by restricting the use of undefined terms by some, but not all, similarly-situated commercial speakers.

Even if the State could establish that any use of "natural" terminology in conjunction with GE foods is potentially misleading, it does not thereby establish a substantial state interest. Although "there is no question that [the State's] interest in ensuring the accuracy of commercial information in the marketplace is substantial," *Edenfield*, 507 U.S. at 769, the Second Circuit has questioned whether there can ever be a substantial state interest in banning "potentially misleading" commercial speech:

> It is not clear, however, that a state has a substantial interest in prohibiting *potentially* misleading advertising, as opposed to inherently or actually misleading advertising. If the protections afforded commercial speech are to retain their force, we cannot allow rote invocation of the words potentially misleading to supplant the State's burden. Moreover, it is unclear what harm *potentially* misleading advertising creates, and the state bears the burden of proving that the harms it recites are real and that its restrictions will in fact alleviate them to a material degree.

*Alexander*, 598 F.3d at 91 n.8 (internal quotation marks omitted) (citing *Ibanez v. Fla. Dep't of Bus. & Prof'l Regulation, Bd. of Accountancy*, 512 U.S. 136, 146 (1994)); *accord Hayes v. N.Y. Attorney Grievance Comm. of the Eighth Judicial Dist.*, 672 F.3d 158, 166 (2d Cir. 2012).

Assuming *arguendo* the State could articulate a substantial state interest in banning the use of "natural" terminology in advertising, labeling, and signage for GE foods because it is "potentially misleading," the State has not further established that Act 120's "natural" restriction "directly and materially advances" that state interest and "is no

more extensive than necessary to serve that interest." *Safelite Grp., Inc.*, 764 F.3d at 264; *see also Alexander*, 598 F.3d at 90 (holding "'[c]ommercial speech that is not false or deceptive and does not concern unlawful activities may be restricted only in the service of a substantial governmental interest, and only through means that directly advance that interest'") (alteration in original) (quoting *Shapero v. Ky. Bar Ass'n*, 486 U.S. 466, 472 (1988)). Because Act 120's "natural" restriction is bereft of definitional content, it will either sweep too widely or too narrowly in penalizing commercial activities that employ an advertising term that is "susceptible to more than one interpretation." *Alexander*, 598 F.3d 90. The lack of "fit" between Act 120's "natural" restriction and any state interest is further evidenced by Act 120's regulation of "any words of similar import," which essentially leaves GE manufacturers guessing regarding which advertising terms are prohibited.

Moreover, because Act 120 does not restrict food product manufacturers' use of "natural" terminology generally, this raises the question of what governmental interest could be directly advanced when only certain commercial speakers are prohibited from using a potentially misleading term. *See Bad Frog Brewery, Inc. v. New York State Liquor Auth.*, 134 F.3d 87, 100 (2d Cir. 1998) ("We do not mean that a state must attack a problem with a total effort or fail the third criterion of [*Central Hudson*]. Our point is that a state must demonstrate that its commercial speech limitation is part of a substantial effort to advance a valid state interest, not merely the removal of a few grains of offensive sand from a beach[.]") (citation omitted). As Plaintiffs note, Act 120's many exemptions reveal the State is willing to tolerate the continued use of "natural" terminology for certain GE foods and beverages unsupported by any "Findings" as to why such continued use should be tolerated or why it, too, is not potentially misleading. *See Clear Channel Outdoor, Inc.*, 594 F.3d at 106 (noting a commercial speech regulation may be "constitutionally problematic if it contains exceptions that 'undermine and counteract' the government's asserted interest") (quoting *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 489 (1995)).

Finally, the State makes no argument that its consumer protection statutes are inadequate to address GE manufacturers' potentially misleading use of "natural" terminology. *See* 9 V.S.A. §§ 2451–2466a. It similarly fails to explain why Act 120's GE disclosure requirement is insufficient to provide consumers with adequate information to make up their own minds regarding whether a GE food product fits their definition of "natural." Courts have recognized that restrictions on commercial speech to prevent consumer deception should be limited to those instances when actual deception is likely, or when a reasonable consumer would be deceived.[43]

"The penultimate prong of the *Central Hudson* test requires that a regulation impinging upon commercial expression . . . 'may not be sustained if it provides only ineffective or remote support for the government's purpose.'" *Edenfield*, 507 U.S. at 770 (quoting *Cent. Hudson Gas & Elec. Corp.*, 447 U.S. at 564). The State's burden with respect to this prong "'is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree.'" *Fla. Bar*, 515 U.S. at 626 (quoting *Rubin*, 514 U.S. at 487).

Here, the potential benefits of prohibiting the use of undefined terms by only some food manufacturers and the likelihood those benefits will be achieved remains remote,

---

[43] *See, e.g.*, *Hairston v. S. Beach Beverage Co.*, 2012 WL 1893818, at *4-5 (C.D. Cal. May 18, 2012) (rejecting argument that, because product contained ingredients that are "synthetic or created via chemical processing," the "all natural" label is "potentially deceptive" because Plaintiff's challenge to the label is "based on a single out-of-context phrase found in one component of [the] label" but "all natural" was not used in a "vacuum" and should be considered with other information provided on the label) (internal quotation marks omitted); *Rooney v. Cumberland Packing Corp.*, 2012 WL 1512106, at *4-5 (S.D. Cal. Apr. 16, 2012) (rejecting claim that "Sugar in the Raw" label for sugar that was refined and processed was deceptive because "a reasonable consumer could not be led to believe that [the product] contains unprocessed and unrefined sugar" and thus "would not be deceived"); *Werbel v. Pepsico, Inc.*, 2010 WL 2673860, at *3-5 (N.D. Cal. July 2, 2010) (dismissing claim and concluding that, as a matter of law, no "reasonable consumer" examining the entire packaging would believe that "Cap'n Crunch's Crunch Berries" cereal "derives any nutritional value from berries"); *Videtto v. Kellogg USA*, 2009 WL 1439086, at *1, *3 (E.D. Cal. May 21, 2009) (dismissing without leave to amend claims that consumers reasonably believed that "Froot Loops" cereal contained "real, nutritious fruit" because the cereal's packaging could not "reasonably be interpreted to imply that [Froot Loops] contains or is made from actual fruit").

contingent, and speculative, turning almost entirely on how "natural" terminology is defined and which commercial speakers are banned from using it. The State thus fails to establish that Act 120's "natural" restriction directly advances a substantial state interest and is no greater than necessary to serve that interest. Under *Central Hudson*, the State's complete ban on the use of "natural" terminology in the advertising, labeling, and signage for GE food products therefore violates the First Amendment.

Plaintiffs have stated a plausible claim that Act 120's "natural" restriction is invalid under the First Amendment. They have further established that they are likely to succeed on the merits of this claim at trial. The State's motion to dismiss Count Two of the Amended Complaint is therefore DENIED.

### G. Count Three: Plaintiffs' Vagueness Challenge to Act 120's "Natural" Restriction of "Any Words of Similar Import."

In Count Three, Plaintiffs contend that Act 120's restriction on "any words of similar import," 9 V.S.A. § 3043(c), is void-for-vagueness under the First Amendment and the Due Process Clause because it fails to provide reasonable notice of the scope of conduct that gives rise to civil penalties and authorizes arbitrary enforcement actions. As Act 120's "natural" restriction extends beyond food product labeling and covers advertising and signage activities as well, Plaintiffs ask that Act 120 be declared void in its entirety.

The State seeks dismissal of Plaintiffs' void-for-vagueness challenge, arguing that Plaintiffs have not plausibly alleged an as-applied challenge to Act 120 and that their facial challenge must fail because Act 120's restriction on the use of "any words of similar import" is not impermissibly vague in all of its applications. In the alternative, the State argues that any vagueness in Act 120's use of the phrase "any words of similar import" has been cured by its Final Rule, which defines "any words of similar import" to mean "the words nature, natural, or naturally." Final Rule § 121.01(14).

The "'void-for-vagueness doctrine requires that laws be crafted with sufficient clarity to give the person of ordinary intelligence a reasonable opportunity to know what is prohibited and to provide explicit standards for those who apply them.'" *VIP of Berlin,*

*LLC v. Town of Berlin*, 593 F.3d 179, 186 (2d Cir. 2010) (quoting *Thibodeau v. Portuondo*, 486 F.3d 61, 65 (2d Cir. 2007)). The Supreme Court has stated that "[a] statute can be impermissibly vague for either of two independent reasons." *Hill*, 530 U.S. at 732. "First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." *Id.* "Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Id.* The void-for-vagueness standard is "applied more stringently where the rights of free speech or free association are implicated." *Vt. Right to Life Comm., Inc. v. Sorrell*, 758 F.3d 118, 128 (2d Cir. 2014) (citing *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18-19 (2010)), *cert. denied*, 135 S. Ct. 949 (2015).

Vague restrictions on speech force potential speakers "to 'steer far wider of the unlawful zone' than if the boundaries of the forbidden areas were clearly marked." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964) (quoting *Speiser v. Randall*, 357 U.S. 513, 526 (1958)). Although "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity," *Rock Against Racism*, 491 U.S. at 794, governmental restrictions on protected speech require "narrow specificity." *NAACP v. Button*, 371 U.S. 415, 433 (1963).

Plaintiffs' Amended Complaint presents their void-for-vagueness challenge as both an as-applied challenge and a facial challenge. They have, however, "done little, if anything, to present [an] as-applied vagueness challenge" because they offer "'minimal explanation of how the law is unconstitutional as it pertains to the specific communications [Plaintiffs' members] either ha[ve] made or hope[] to publish.'" *Vt. Right to Life Comm., Inc.*, 758 F.3d at 127 (quoting *Vt. Right to Life Comm., Inc. v. Sorrell*, 875 F. Supp. 2d 376, 387 (D. Vt. 2012)). To support the unspecific allegations in their Amended Complaint, Plaintiffs proffer no evidence of their members' actual use of the "natural" terminology or "any words of similar import." Consequently, although the Amended Complaint may be sufficient for pleading an as-applied void-for-vagueness claim, it provides no support for Plaintiffs' further argument that they are likely to

76

succeed on the merits of this claim at trial. The court will therefore confine its analysis to whether Plaintiffs make a plausible facial challenge to Act 120.[44]

A facial challenge to Act 120 can only succeed if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (internal quotation marks omitted).[45] The Second Circuit has imposed a more demanding standard, holding that "[a] facial vagueness challenge will succeed only when the challenged law can never be validly applied." *Vt. Right to Life Comm., Inc.*, 758 F.3d at 128 (citing *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982)). Under either standard, Plaintiffs state a plausible facial challenge to Act 120's restriction of the use of "any words of similar import" because there are no apparent circumstances in which this complete ban on speech can be validly applied.

Not only does Act 120 fail to define "any words of similar import," but it refers to its undefined "natural" terminology for guidance. The Final Rule adopts this same approach. *See* Final Rule § 121.01(14). Pursuant to the State's interpretation, Act 120's restriction on "any words of similar import" therefore becomes surplusage in

---

[44] *See Vt. Right to Life Comm., Inc. v. Sorrell*, 758 F.3d 118, 127 (2d Cir. 2014) (analyzing claim as a facial challenge because plaintiffs had "not presented any legal arguments or facts specific to an as-applied vagueness challenge" and noting that other circuit courts have proceeded to a facial challenge, despite the preference for as-applied challenges, when "plaintiffs asserting both facial and as-applied challenges have failed to '[lay] the foundation for an as-applied challenge'") (alteration in original) (quoting *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 475 (7th Cir. 2012)); *accord Human Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 1021-22 (9th Cir. 2010); *see also John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010) (explaining that because plaintiffs' "claim and the relief that would follow . . . reach beyond the particular circumstances of these plaintiffs," they "must therefore satisfy [the] standards for a facial challenge to the extent of that reach").

[45] While the *Stevens* Court noted that to "succeed in a typical facial attack," a plaintiff must "establish 'that no set of circumstances exists under which [the statute] would be valid,'" *United States v. Stevens*, 559 U.S. 460, 472 (2010) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)), the Court clarified that in "the First Amendment context," it "recognizes 'a second type of facial challenge,' whereby a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Id.* at 473 (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008)).

contravention to well-established canons of statutory construction. *See State v. Breed*, 2015 VT 43, ¶ 66 (observing that "one way to determine legislative intent is by considering whether a statutory interpretation renders a portion of the statute mere surplusage, as well as if the interpretation produces absurd or irrational results") (citations omitted); *Brennan v. Town of Colchester*, 730 A.2d 601, 604 (Vt. 1999) (declining to adopt a statutory "interpretation" that would "render the phrase 'at any time' surplusage") (citing *State v. Stevens*, 408 A.2d 622, 627 (Vt. 1979) (directing that "[i]n construing a statute, every part of the statute must be considered, and every word, clause, and sentence given effect if possible," rather than treated as surplusage)). Vermont law therefore does not support the Final Rule's interpretation of the phrase "any words of similar import" to mean "nature, natural, or naturally." Final Rule § 121.01(14).

Because Act 120 requires that "any words of similar import" have "a tendency to mislead a consumer," 9 V.S.A. § 3043(c), the State argues that this limitation cures any vagueness. There is, however, no requirement that a reasonable consumer be misled, or that a consumer be reasonably misled, or that the advertising message as a whole be misleading.[46] Vermont law generally limits liability for consumer deception to instances in which an objectively reasonable consumer has been deceived. *See, e.g., Gregory v. Poulin Auto Sales, Inc.*, 2012 VT 28, ¶¶ 12, 16, 191 Vt. 611, 613-14, 44 A.3d 788, 791-92 (directing that the "misleading effects" regarding a consumer transaction must be "material," which is "generally measured by an objective standard, with the baseline

---

[46] The State's assertion that civil liability under Act 120 does not depend on a "*particular* consumer's reaction to an advertisement," (Doc. 63 at 49 n.39), is belied by the express language of Act 120, which applies to "any words of similar import that would have a tendency to mislead *a consumer*." 9 V.S.A. § 3043(c) (emphasis supplied). The civil cases on which the State relies to support the "tendency to mislead" standard are distinguishable as they require proof of "extrinsic evidence [of consumer deception or confusion] to support a finding of an implicitly false message." *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 112-13 (2d Cir. 2010) (alteration in original) (analyzing a false advertising claim under the Lanham Act, the Second Circuit explained that "[t]o succeed in a likelihood-of-confusion case where the statement at issue is not literally false, . . . a plaintiff must demonstrate, by extrinsic evidence, that the challenged commercials tend to mislead or confuse consumers, and must demonstrate that a statistically significant part of the commercial audience holds the false belief allegedly communicated by the challenged advertisement") (internal quotation marks omitted).

being what a reasonable person would regard as important in making a decision," and that "the consumer must be interpreting the message reasonably under the circumstances") (internal quotation marks omitted); *Inkel v. Pride Chevrolet-Pontiac, Inc.*, 2008 VT 6, ¶ 10, 183 Vt. 144, 150-51, 945 A.2d 855, 859 (noting that the elements of a consumer fraud or deceptive act claim "are viewed under an objective standard," including "to measure the materiality of the [consumer's] decision" of "what a reasonable person would regard as important in making [that] decision").

For the foregoing reasons, Act 120's restriction of "any words of similar import" fails to provide "fair notice of what is prohibited." *United States v. Williams*, 553 U.S. 285, 304 (2008). It will therefore permit arbitrary and irrational enforcement as it provides no meaningful standard for determining which words will trigger liability. *See Humanitarian Law Project*, 561 U.S. at 18 (explaining that a law violates due process if it is "so standardless that it authorizes or encourages seriously discriminatory enforcement") (internal quotation marks omitted); *Cunney v. Bd. of Trs. of Grand View, N.Y.*, 660 F.3d 612, 622, 625 (2d Cir. 2011) (striking down zoning ordinance that "provides no standard that can be objectively applied" and thus provides "unfettered latitude in making compliance determinations"); *Advance Pharm., Inc. v. United States*, 391 F.3d 377, 396 (2d Cir. 2004) (holding that an economic regulation may be deemed unconstitutionally vague "if it commands compliance in terms so vague and indefinite as really to be no rule or standard at all") (internal quotation marks omitted). It will also permit those tasked with enforcement to decide which "public and commercial activities may bring [civil] prosecution." *Miller v. California*, 413 U.S. 15, 27 (1973).

Although Plaintiffs have established that their void-for-vagueness claim should not be dismissed at this time, they fail to plausibly allege that Act 120 must be struck down in its entirety on either First Amendment or Due Process grounds. "Generally speaking, when confronting a constitutional flaw in a statute, [a court should] try to limit the solution to the problem, severing any problematic portions while leaving the remainder intact." *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 508 (2010) (internal quotation marks omitted); *Ayotte v. Planned Parenthood of N.*

*New England*, 546 U.S. 320, 329 (2006) (directing courts to "try not to nullify more of a legislature's work than is necessary" because "the normal rule is that partial, rather than facial, invalidation is the required course") (internal quotation marks omitted). Act 120 contains a severability clause, presumably for this very purpose.[47] Plaintiffs' facial challenge must therefore be limited to Act 120's restriction of "any words of similar import" as that is the sole aspect of Act 120 which is impermissibly vague.

The State's motion to dismiss Count Three for failure to state a claim under Fed. R. Civ. P. 12(b)(6) is DENIED. The court further finds that Plaintiffs are likely to succeed on the merits of their facial void-for-vagueness challenge to Act 120's prohibition on the use of "any words of similar import" at trial.

### H.   Whether Plaintiffs Are Entitled to a Preliminary Injunction.

Plaintiffs seek a preliminary injunction, enjoining enforcement of Act 120 in its entirety based upon their First Amendment, Due Process, and Supremacy Clause challenges, portions of which the court has dismissed. A party "seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "A preliminary injunction is an extraordinary remedy never awarded as of right." *Id.* at 24.

The court has found that Plaintiffs are likely to prevail on the merits of their First Amendment challenge to Act 120's "natural" restriction; their First Amendment and Due Process facial challenge to its restriction of "any words of similar import"; and their claim that the FMIA and PPIA preempt Act 120's GE disclosure requirement and "natural" restriction as they apply to food products within their embrace. It is thus only with regard to these claims that Plaintiffs' request for preliminary injunctive relief will be

---

[47] *See* 9 V.S.A. § 3046 ("If any provision of this chapter or its application to any person or circumstance is held invalid or in violation of the Constitution or laws of the United States or in violation of the Constitution or laws of Vermont, the invalidity or the violation shall not affect other provisions of this section which can be given effect without the invalid provision or application, and to this end, the provisions of this chapter are severable.").

analyzed. *See N.Y.C. Envtl. Justice Alliance v. Giuliani*, 214 F.3d 65, 68, 73 (2d Cir. 1999) (affirming denial of motion for preliminary injunction because plaintiffs failed to meet their "burden of demonstrating a likelihood of success on the merits of each of their claims").

In order to obtain a preliminary injunction with regard to any of these claims, Plaintiffs must proffer persuasive evidence that their members will suffer irreparable harm "if [they] lose[] on the preliminary injunction but ultimately prevail[] on the merits, [with] particular attention to whether the 'remedies available at law, such as monetary damages, are inadequate to compensate for that injury.'" *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). The Second Circuit does not "presume[] irreparable harm in cases involving allegations of the abridgement of First Amendment rights," unless "the challenged government action directly limited speech." *Bronx Household of Faith v. Bd. of Educ. of N.Y.C.*, 331 F.3d 342, 349-50 (2d Cir. 2003). "[I]n instances where a plaintiff alleges injury from a rule or regulation that may only *potentially* affect speech, the plaintiff must establish a causal link between the injunction sought and the alleged injury," or, in other words, "the plaintiff must demonstrate that the injunction will prevent the feared deprivation of free speech rights." *Id.* at 350 (emphasis supplied).

Plaintiffs' arguments that their members will suffer irreparable harm if enforcement of Act 120 is not preliminarily enjoined are primarily directed to their challenge to Act 120's GE disclosure requirement and the expense, time, and resources they will expend to achieve compliance with it by Act 120's effective date. They identify few hardships their members will suffer in order to comply with Act 120's "natural" restriction and its prohibition on "any words of similar import." Indeed, other than unspecific allegations in their Amended Complaint, Plaintiffs provide no evidence of any member's *actual* use of the "natural" terminology or "any words of similar import" in conjunction with a GE product. Plaintiffs therefore fail to demonstrate that their members will be irreparably harmed if enforcement of Act 120's "natural" restriction and its prohibition on the use of "any words of similar import" are not enjoined prior to trial.

*See 1-800-411-Pain Referral Serv., LLC v. Otto*, 744 F.3d 1045, 1063 (8th Cir. 2014) (noting that, to obtain a preliminary injunction, "the record must contain more than allegations; it must contain facts demonstrating the undue burden such [statutory] requirements have on the company's ability to advertise"); *see also Moore v. Consol. Edison Co. of N.Y.*, 409 F.3d 506, 511 (2d Cir. 2005) (concluding that, in order to obtain preliminary injunctive relief, it is not enough to establish that third parties may suffer irreparable harm).

There is also no evidence that Plaintiffs' members' use of the "natural" terminology and "any words of similar import" will be chilled prior to trial, nor any suggestion that Plaintiffs' members must make material changes in the way they conduct business in order to prepare for compliance with these restrictions. *See Bennett v. Lucier*, 239 F. App'x 639, 640 (2d Cir. 2007) (noting that a plaintiff "must show some evidence of actual chill that would be cured by the requested injunction") (citing *Moore*, 409 F.3d at 512) (affirming district court's finding there was "no risk" of irreparable harm without "any evidence" of intimidation or retaliation based on exercising right of free expression)); *Latino Officers Ass'n v. Safir*, 170 F.3d 167, 171 (2d Cir. 1999) (concluding plaintiff organization failed to demonstrate that its police officer members would suffer "real and imminent irreparable harm" from the "conjectural chill" of the officers' First Amendment speech rights). Correspondingly, Plaintiffs do not claim their members are facing or have been threatened with an enforcement action as a result of Act 120's "natural" restriction and its prohibition on "any words of similar import" and that on this basis irreparable harm is "actual and imminent." *Dexter 345 Inc. v. Cuomo*, 663 F.3d 59, 63 (2d Cir. 2011) (internal quotation marks omitted).[48]

---

[48] *Compare Elrod v. Burns*, 427 U.S. 347, 373 (1976) (holding preliminary injunction may be proper where it is "clear" that "First Amendment interests were either threatened or in fact being impaired at the time relief was sought" because the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"), *with Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv.*, 766 F.2d 715, 722 (2d Cir. 1985) (denying injunctive relief and distinguishing *Elrod* where plaintiffs "failed to allege a clearcut infringement of [F]irst [A]mendment rights which, absent preliminary injunctive relief, either

Similarly, Plaintiffs do not identify any of their members who currently produce non-exempt GE products that are governed by either the FMIA or the PPIA. The court thus cannot evaluate the magnitude of any harm these members may suffer in order to comply with Act 120's GE disclosure requirement and "natural" restriction. In light of the Final Rule's exemption from Act 120 for any "[p]ackaged, processed food containing meat or poultry" subject to the FMIA and PPIA, Final Rule § 121.03(a)(ii), an enforcement action against these GE manufacturers appears unlikely.

Irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." *Bell & Howell: Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42, 45 (2d Cir. 1983) (internal quotation marks omitted); *see also Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 37 n.6 (2d Cir. 2010) (noting that "*Winter* reiterates the majority position of the circuits, including [the Second Circuit], that a showing of irreparable harm is fundamental to any grant of injunctive relief"). Plaintiffs have only identified the "possibility" of harm, and "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22 (internal quotation marks omitted).

Accordingly, in the absence of a "clear showing" of irreparable harm, the court proceeds no further with analyzing whether Plaintiffs have satisfied the remaining requirements for preliminary injunctive relief. Plaintiffs' claims that have not been dismissed must therefore await a trial on the merits. *See Entergy Nuclear Vt. Yankee, LLC v. Shumlin*, 2011 WL 2811317, at *2-3 (D. Vt. July 18, 2011) (noting a court may "decline[] to order short-term drastic and extraordinary injunctive relief" that would "have no operative effect on state actions before trial" and observing that a court is "in a better position to tailor injunctive relief, if it is warranted, as part of a final determination of the merits").

---

has occurred or will occur in the future" and further failed to establish "how a chilling of the right to speak . . . could logically be thawed by the entry of an interim injunction").

## CONCLUSION

For reasons stated above, the court GRANTS IN PART and DENIES IN PART the State's motion to dismiss. (Doc. 24.) It DISMISSES Count One with respect to Plaintiffs' claim that strict scrutiny applies to Act 120's GE disclosure requirement; it DISMISSES Count Four with respect to Plaintiffs' claims that Act 120 violates the Commerce Clause, with the exception of Plaintiffs' *per se* challenge to the application of Act 120's "natural" restriction to GE manufacturers' nationwide and Internet signage and advertising activities; and it DISMISSES Count Five with respect to Plaintiffs' preemption claims, except their express preemption claims under the FMIA and the PPIA. The court DENIES all remaining aspects of the State's motion to dismiss.

With regard to Plaintiffs' claims that have not been dismissed, the court DENIES Plaintiffs' motion for a preliminary injunction. (Doc. 33.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this $\underline{27^{\text{th}}}$ day of April, 2015.

Christina Reiss, Chief Judge
United States District Court